1      **IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
           **COUNTY DEPARTMENT, CHANCERY DIVISION**

2

3
    CHRISTOPHER D. SHURLAND,    )    *ORIGINAL*

4    individually and as the   )
    representative of a class of )

5    similarly-situated persons,  )
                        )

6          Plaintiffs,       )
                        )

7     vs.               ) No. 08 CH 10786
                        )

8    BACCI CAFE` & PIZZERIA ON  )
    OGDEN, INC., and DOES 1-10,  )

9                        )
         Defendants.      )

10

11

12       The Discovery Deposition of **JAMES J.**

13  **TRACY**, called by the Plaintiffs for

14  examination, taken pursuant to notice, taken

15  before MICHELE J. LOSURDO, CSR, a Notary Public

16  within and for the County of DuPage, State of

17  Illinois, and a Certified Shorthand Reporter of

18  said state, taken at 233 South Wacker Drive,

19  Suite 7800, Chicago, Illinois, at the hour of

20  1:00 p.m., on the 10th of December, A.D., 2008.

21

22

23

24

**APPEARANCES:**

    ANDERSON + WANCA
    BY: MR. GERALD E. NORA
    3701 Algonquin Road
    Suite 760
    Rolling Meadows, Illinois  60008
    (847) 368-1500

        Appeared on behalf of the Plaintiffs;

    SMITHAMUNDSEN
    BY: MR. ERIC L. SAMORE
    150 North Michigan Avenue
    Suite 3300
    Chicago, Illinois  60601
    (312) 894-3251

        Appeared on behalf of the Defendants;

    SONNENSCHEIN, NATH & ROSENTHAL, LLP
    BY: MR. THOMAS A. ANDREOLI
    8000 Sears Tower
    233 South Wacker Drive
    Chicago, Illinois  60606
    (312) 876-7474

        Appeared on behalf of Translink.

# I N D E X

**THE WITNESS:** JAMES J. TRACY                    <u>PAGE</u>

Examination
by Mr. Nora........................... 4

Examination
by Mr. Samore......................... 70

Further Examination
by Mr. Nora........................... 89

Further Examination
by Mr. Samore......................... 94

Examination
by Mr. Andreoli....................... 96

Further Examination
by Mr. Nora........................... 97

# E X H I B I T S

<u>MARKED FOR IDENTIFICATION</u>

Translink Exhibit Number 1............. 22
Translink Exhibit Number 2............. 43
Translink Exhibit Number 3............. 46
Translink Exhibit Number 4............. 63

1    **JAMES J. TRACY,**

2    having been first duly sworn, was examined and

3    testified as follows:

4                    **EXAMINATION**

5                    by Mr. Nora

6        Q.   Mr. Tracy, would you please state your

7    name and spell it for the court reporter?

8        A.   James J. Tracy, T-r-a-c-y.

9        Q.   Mr. Tracy, have you been deposed

10   before?

11       A.   No.

12       Q.   You've been -- you're here with your

13   attorney -- your company's attorney and you

14   talked to him about the procedure we're doing

15   here today?

16       A.   Yes.

17       Q.   And you understand that if something I

18   say does not make sense or if you want a

19   question repeated you have to ask me to stop,

20   rephrase or repeat as the case may be; is that

21   correct?

22       A.   Yes.

23       Q.   You'll let me know if I don't make

24   sense?

1     A.   Yes.

2     Q.   And if at any time during this

3  deposition if you want to talk to your

4  attorney, want to take a break or do anything

5  else, let us know and we'll respond

6  accordingly, okay?

7     A.   Yes.  Thank you.

8     Q.   Now, in this deposition, we're

9  concerned primarily with service your company

10  performed for Bacci Pizzeria at 6920 West

11  Ogden.  If I mention the restaurant or the

12  store, will you understand that I'm speaking

13  about those premises?

14     A.   Yes.

15     Q.   Sir, what is your position?

16     A.   Executive vice president.

17     Q.   And for what company, sir?

18     A.   National Translink Corporation.

19     Q.   How long have you been with National

20  Translink?

21     A.   Sixteen years.

22     Q.   And were you with any other company

23  before that?

24     A.   Yes.

1        Q.    And what was that?

2        A.    Cherry Payment Systems.

3        Q.    What kind of company was that, sir?

4        A.    A credit card sales organization.

5        Q.    How long were you there?

6        A.    One-and-a-half years.

7        Q.    Were you in school before that or

8  working --

9        A.    Worked.

10       Q.    -- or both?  Okay.  Where was that?

11       A.    CPS, Chemical Personnel Search.

12       Q.    And what type of work is that?

13       A.    I was a recruiter.

14       Q.    How long were you with that company?

15       A.    Three years.

16       Q.    And briefly what kind of work history

17  did you have before CPS?

18       A.    School.

19       Q.    Where was that?

20       A.    Loyola University of Chicago.

21       Q.    Mr. Tracy, what is National Translink?

22       A.    It is an independent sales organization

23  that sells credit card processing services and

24  terminals to small business owners.

1      Q.    What are your duties there now?

2      A.    I oversee all sales and operations of

3  the organization.

4      Q.    What type of services does your company

5  provide to small businesses?

6      A.    We have a sales staff that provides the

7  credit card machines and sells on behalf of a

8  bank the services that go in the credit card

9  machines to the small business owners.

10      Q.    Do you sell those as a package or

11  separately or both?

12      A.    I don't --

13      Q.    Let me rephrase it.  If I'm a small

14  business person and you want to sell something

15  to me, you sell me the machines if I want the

16  machines, correct?

17      A.    Correct.

18      Q.    And you mentioned bank services.  Would

19  you please describe to me as though I were just

20  setting up my first credit card system what

21  kind of services I need and after that, I want

22  to know which of those services you'll provide,

23  so first what services will I need to run

24  credit cards through my business?

1     A.   A processor will have to program that

2    machine so that it will work so that when a

3    credit card gets run through the machine, it

4    can contact a processing center to know if that

5    card is approved or not, so we act as a

6    go-between between the small business owner and

7    the processing centers and the banks which

8    settle the funds every day.  So in ordinary

9    terms when the credit card goes through the

10    machine, it contacts a processing center, that

11    processing center approves the transaction and

12    if that transaction is approved, a bank needs

13    to settle those funds.

14    Q.   When you say the bank settles those

15    funds, money goes from where to where, if you

16    could tell me?

17    A.   From the bank to the small business

18    owner's checking account.

19    Q.   So, for instance, if I'm setting this

20    system up, the processing center will read

21    whether the card is a MasterCard or a Visa and

22    determine whether or not it's an authorized

23    transaction; is that correct?

24    A.   Yes.

1    Q.    Or some other type of card?

2    A.    Correct.

3    Q.    If it's authorized, then the processing

4    center will contact the appropriate bank for

5    the card issuer and obtain -- let me change

6    that.  After obtaining the authorization, which

7    bank is also contacted?

8    A.    There are multiple banks that are

9    contacted and Visa and MasterCard are

10   contacted.  There is an issuer that issued the

11   credit card to the cardholder and there is an

12   acquirer -- acquiring bank.  That's the bank

13   that we are the sales organization for that

14   settles the transactions, so the bank that we

15   work for gives the small business owner their

16   money.  They contact Visa and MasterCard.  Visa

17   and MasterCard goes to the issuer who gave that

18   guy the card and the issuing bank gives the

19   money to the acquiring bank.

20   Q.    So the bank you're working with then

21   essentially is advancing the money that

22   ultimately comes from the issuing card's bank

23   to the --

24        MR. ANDREOLI:  I'll object to the form.

1     BY MR. NORA:

2        Q.   Your bank, the acquiring bank

3     immediately pays money into the small business

4     person's bank?

5        A.   Within 48 hours.

6        Q.   Within 48 hours?

7        A.   Yes.

8        Q.   Is there one acquiring bank that your

9     company works for?

10       A.   Yes.

11       Q.   What is the name of that bank?

12       A.   Merrick Bank, M-e-r-r-i-c-k, Bank.

13     They're a division of a company called

14     CardWorks.

15       Q.   What is their main address, sir?

16       A.   I do not know.  It is in New York.

17       Q.   Do you know the corporate name for that

18     bank?

19       A.   I believe CardWorks is their publicly

20     traded name.  I don't know what to call that

21     but their public name.

22       Q.   Who is the primary contact at Merrick

23     Bank for Translink?

24       A.   We have many contacts.  I don't know

1    who -- we have many contacts.

2        Q.    Can you give me the highest ranking

3    contacts you have there?

4        A.    Yes, if you give me a moment.

5        Q.    Take your time.

6        A.    Can we come back to that question?

7        Q.    Surely.

8        A.    For some reason, his name -- my contact

9    who is the senior vice president there is

10   drawing a blank at a moment but I'll come up

11   with it.

12       Q.    Has that acquiring bank been the same

13   one during your entire tenure at Translink?

14       A.    No.

15       Q.    How long has that bank been the

16   acquiring bank?

17       A.    Approximately seven-and-a-half years.

18       Q.    And have they been the only acquiring

19   bank for the last seven-and-a-half years?

20       A.    Yes.

21       Q.    Now, if you're making the sales call to

22   me, if I already have a machine, do you still

23   sell me the services?

24       A.    We don't sell them the services.   We

1    provide access to the services.

2              MR. ANDREOLI:  I'm going to -- I'll

3    object to the form to the extent it was

4    ambiguous.  If you understand the question,

5    answer it.  If you need clarification,

6    please feel free to ask counsel.

7              THE WITNESS:  I'm sorry.

8    BY MR. NORA:

9        Q.    Treat me as a small business owner who

10   likes to sound like he knows what he's talking

11   about.  Straighten me out.  When you come to my

12   company to see if I want these services, are

13   you providing the service to me for a fee or

14   are you working for someone else who will then

15   charge?

16       A.    We work for somebody else who will

17   charge you.  That is the acquiring bank.

18       Q.    And when you come to me, will one of

19   your salespeople approach me or will I have

20   already been contacted by the bank's

21   salespeople?

22       A.    No.  It would be our salespeople that

23   would contact you, yes.

24       Q.    And would your salespeople take care of

1    making the contract out for the services that

2    you're providing?

3         A.   Yes.

4         Q.   Now, you provide machines and bank

5    services.  When you provide machines, is that

6    sale, lease or both?

7         A.   Both.

8         Q.   And if I'm purchasing the machines, who

9    would I be purchasing the machines from?

10        A.   My company.

11        Q.   If I'm leasing the machines, who would

12   I be leasing the machines from?

13        A.   We've used a large number of different

14   leasing companies throughout the last 15 years.

15        Q.   So you would -- and if I'm using the

16   wrong word tell me, but you would broker a

17   lease between another company and my company?

18        A.   Correct.

19        Q.   Now, when you provide this service, if

20   I already have machines, will you sell me the

21   banking services alone or will you always

22   provide the machines with the banking services?

23        A.   No.  We will provide those other

24   services without the machine, but it's not

1    actually us providing the service.

2        Q.   Tell me exactly what you do to set this

3    up for me and what, if anything, you have to do

4    with it afterwards.

5        MR. SAMORE:  Object to the compound

6        nature.

7        MR. ANDREOLI:  It also calls for a

8        narrative.

9    BY MR. NORA:

10       Q.   I want to do business with you.  Tell

11   me what you will do for me to get me started

12   with the credit card transactions in my

13   business.

14       A.   If I was a salesman?

15       Q.   Yes.  What will Translink do for me?

16       A.   If you were a business owner and you

17   already had a credit card machine and you

18   wanted the services, we would come in with a

19   bank application or we could mail it or fax it

20   to you.  You would fill out a bank application.

21   We will assist you with it if necessary.  We

22   will submit that bank application to the bank

23   after reviewing it ourselves, get an approval

24   on it and if it's approved, contact a

1    processing company to program your machine so

2    that it can contact the processing company and

3    get the credit card approvals.

4         Q.    Who handles actually setting the

5    machine up for contacting the processing

6    center, does your company do that or do you

7    have someone else do that?

8         A.    I don't understand the question.

9         Q.    Maybe I was writing and not paying

10   enough attention to the last part of your

11   answer.  You're going to contact another

12   company about setting me up with the processing

13   center?

14        A.    Correct.

15        Q.    Do you use one company or multiple

16   companies?

17        A.    Multiple companies.

18        Q.    What type of companies are those?

19        A.    We use two as far as I know currently.

20   One is called Vital I believe.

21        Q.    How do you spell that, sir?

22        A.    V-i-t-a-l.

23        Q.    And the other one?

24        A.    Is called currently CardWorks.  It's

```
1      part of Merrick Bank.  They recently purchased

2      the processing center in Arizona formerly known

3      as Pay By Touch Processing.

4           Q.   How long have you been using only those

5      two companies, CardWorks and Vital?

6           A.   Are you asking -- because CardWorks has

7      changed hands like four or five times over the

8      last seven years.

9           Q.   If you can, in 2004 and 2005 which

10     companies were you using at that time?

11          A.   We were using CardWorks and Vital.

12          Q.   Now, after you contact one of those

13     companies to set up my processing, what will

14     they do?

15          A.   They will send a -- what is called a

16     download.  That is a computer program to your

17     machine that can actually dial into the

18     machine.  Depending on the machine, they may

19     have to call you first and have you hit

20     something on the machine or they may be able to

21     dial directly into the machine and send a

22     program into that machine, a computer program

23     to be more specific.

24          Q.   Tell me, is that something that
```

```
 1          typically is done as a matter of routine?

 2          A.   Yes.

 3          Q.   So if I'm going to be running a credit

 4     card machine in my business, I have to be --

 5     the machine has to be accessible to this

 6     company to downloading programs, correct?

 7          A.   To some company, yes, that does

 8     processing.

 9          Q.   If the machine is actually operating

10     where it's turned on processing credit card

11     transactions, is the machine accessible at that

12     time to the company that would download these

13     programs?

14          MR. ANDREOLI:   Foundation.

15     BY THE WITNESS:

16          A.   I'm not sure.  I don't know.

17     BY MR. NORA:

18          Q.   Once you set up my company or a company

19     with either Vital or CardWorks, will your

20     company be providing me with any additional

21     services in the future?

22          A.   Yes.

23          Q.   What services will your company be

24     providing the small business?
```

1    A.    We will provide normal customer service

2    questions during the daytime hours meaning 8:00

3    to 5:00 approximately central time.   If you

4    have questions on your statement, your account,

5    the way your terminal works, we have technical

6    support and customer support people that can

7    answer questions and help you out.   We also

8    send the monthly statements to the customers

9    that we receive from the processing center.

10    Q.    Does the processing center have a name?

11    A.    The one that I've been referring to is

12    CardWorks processing which is --

13    Q.    That is Merrick Bank?

14    A.    It's not at Merrick Bank.   It's in

15    Arizona.   It's now owned by Merrick Bank.   It

16    was formerly Pay By Touch Processing which

17    before that was Card Systems and before that

18    was Maverick.

19    Q.    That's Maverick?

20    A.    That's Maverick, yes.   You've heard of

21    Maverick.

22    Q.    Was it Maverick in 2004?

23    A.    I do not know.   I don't know in 2004

24    what they were referred to as.   My best

1    recollection is Maverick, yes.

2       Q.   Now, when you say customer service

3    questions, by customer, are you referring to

4    the small business operators or their customers

5    or both?

6       A.   Just the small business owners.

7       Q.   And your technical support people, are

8    they part of your staff or would you obtain

9    them elsewhere?

10       A.   Part of my staff.

11       Q.   And what other type of support staff do

12    you have besides technical support?

13       A.   Customer service, accounting,

14    salespeople.

15       Q.   When you receive customer service

16    questions, do you make records of those

17    questions that come in from the customer?

18       A.   Sometimes.

19       Q.   When you provide technical support,

20    does that technical support also include

21    reprogramming faulty machines or just

22    reprogramming advice over the phone?

23       A.   We do have -- sorry.

24       MR. ANDREOLI:  Object to the form.

BY MR. NORA:

Q.   Tell me what type of technical support your people can provide.

A.   We can program machines if they were a certain type of machine.  If we have provided that machine, more than likely we have the technology within our office to help program or reprogram that machine.  Other technical support would be a person had questions on how to operate their tip functions.  Say if they were a restaurant and they're not sure how to put a tip into their credit card machine, that would be a technical support question or if they get some kind of error message on the machine, we can often look at a guide and figure out what buttons to push to get out of that error.

Q.   Normally any reprogramming that has to be done on the machines, however, would not be handled by Translink, am I correct, after it's in operation?

A.   If we did not provide the machine, it would normally not be us to help them.  If we provided the machine, we would normally help

1  with the programming or reprogramming of that

2  machine.

3      Q.    If the business is providing its own

4  machine and does not obtain it from Translink,

5  do you still provide technical support for that

6  business?

7      A.    We will attempt to if we can.

8      Q.    Now, do I know now the scope of your

9  services for the small business that might

10 obtain them from Translink?

11     MR. ANDREOLI:  Object to the form of

12     the question.  That's an extended

13     hypothetical.

14 BY MR. NORA:

15     Q.    Not to trap you or anything, is there

16 anything else I should know that you could

17 think of as you sit there about the type of

18 services you would offer to a small business?

19     MR. ANDREOLI:  Same objection.

20 BY MR. NORA:

21     Q.    Can you answer it?

22     A.    I don't believe there is anything else

23 that's important, no.

24     Q.    That's all.  Now, have you reviewed the

```
 1     documents that Translink has submitted in

 2     discovery of this case so far?

 3         A.   Yes.

 4              (Document marked as Translink

 5              Exhibit No. 1 for identification.)

 6     BY MR. NORA:

 7         Q.   Jim, this first batch of documents that

 8     I'm showing you now is just the first

 9     production request, but I'm interested in the

10     type of document that appears at the --

11     starting at the second page of these documents.

12     Could you just tell us what kind of document

13     I'm looking at on this?

14              MR. SAMORE:  I just want to state for

15          the record that we received this response

16          yesterday even though it had been produced

17          back in August of 2008 and, therefore, we

18          object to use of these documents on grounds

19          of late disclosure.

20              Obviously you could answer

21          questions, but we want to preserve our

22          objection for the record on the grounds of

23          the late notice.  There were a number of

24          things we would have done if we had this
```

1    earlier.

2          MR. NORA:  Do you need time?

3          MR. SAMORE:  No, nothing further.

4    BY MR. NORA:

5      Q.    What kind of document is this, sir?

6      A.    That's a monthly statement.

7      Q.    Is this the statement that you provide

8    to the customer as part of the services?

9      A.    Yes.

10     Q.    And what does this statement show

11   briefly?

12         MR. ANDREOLI:  Do you have a specific

13         question, Counsel?

14   BY MR. NORA:

15     Q.    Am I correct in my understanding that

16   this statement summarizes the transactions on a

17   daily basis?

18     A.    Yes.

19     Q.    And it gives the number of transactions

20   that you processed for each day that a process

21   was actually undertaken; is that correct?

22     A.    I don't believe it does.  I could

23   answer that --

24     Q.    It shows monthly totals?

1     A.   It does show monthly totals.

2     Q.   And it shows daily totals of money,

3   correct?

4     A.   Correct, it shows daily totals of

5   money.

6     Q.   And the monthly totals break it down by

7   card -- should I say card issuer or card name?

8     A.   Issuer.

9     Q.   Now, we received additional discovery

10  from you since then.

11         MR. NORA:  You know what I'm talking

12         about?

13         MR. SAMORE:  Right, which we received

14         yesterday.

15         MR. NORA:  Some of which we received

16         yesterday too.

17  BY MR. NORA:

18     Q.   The further documents that have been

19  recently turned over or obtained from

20  Translink, are these itemized individual

21  transactions?

22     A.   Yes.

23     Q.   And would these cover all of the

24  individualized transactions for the subject

```
1    restaurant 6920 West Ogden Avenue?
2        A.   It does not cover all their
3    transactions.  There are days we could not
4    acquire.
5        Q.   And we would be able to -- okay.
6    Withdraw that question.
7             Are these records only for the store at
8    6920 West Ogden?
9        A.   Yes.
10       Q.   And similarly on the first monthly
11   processing statements that I showed you, those
12   statements are only for the store at 6920 West
13   Ogden; is that correct?
14       A.   I would have to take a look at them
15   again to be certain --
16       Q.   Yes, sir.
17       A.   -- to make sure nobody made a mistake.
18   Yes, it appears they're all 6920 West Ogden.
19       Q.   If I could go back to a few questions
20   on procedures.  You're acquainted with
21   truncation requirements that are now in force
22   under federal law for credit card machines?
23       A.   I have some familiarity, yes.
24       Q.   Are you acquainted with the truncation
```

1    requirements that went into effect over

2    2005-2006?

3        A.   I have some familiarity, yes.

4        Q.   Do you recall Translink doing anything

5    specifically to alert its customers of those

6    requirements at any time?

7        A.   Yes.

8        Q.   And if we could start at the beginning,

9    what is the first thing that Translink did with

10   respect to alerting its customers on issues

11   pertaining to truncation?

12        MR. SAMORE:  I just want to say for the

13       record I object on lack of foundation.

14       Customers is a very vague word but subject

15       to my objection.

16  BY MR. NORA:

17        Q.   Do you understand the question?

18        A.   I believe so.

19        Q.   Respecting truncation, I mean by

20   truncation the limitation of information on

21   customer receipts and including customer --

22   excuse me, customer credit card numbers and

23   expiration dates and if I use the word

24   truncation, we will share that understanding of

1     what the word means?

2        A.   Yes.

3        Q.   What is the first thing you recall

4     Translink doing about limiting or truncating

5     credit -- customer credit card receipts?

6           MR. ANDREOLI:  Not to put too fine a

7           point on it because we did have an objection

8           but you've defined the prior term, you're

9           talking about customers generally?

10          MR. NORA:  Yes, sir.  Thank you.

11    BY THE WITNESS:

12        A.   We notified customers on their

13    statements in approximately early 2005 that

14    they would have to be certain that their

15    terminals were properly programmed.  If not,

16    they could contact us or the processing center

17    and we could direct them to the place where

18    they could get help.

19    BY MR. NORA:

20        Q.   When you say notified customers, you're

21    talking about your customers using your

22    services, correct?

23        A.   Correct.

24        Q.   And that would have been on the

1    statements that you sent to your customers?

2         A.    Correct.

3         Q.    And that would be found on the

4    statements that we looked at earlier today?

5         A.    No.

6         Q.    That would be a billing statement that

7    it would appear on?

8         A.    That would be a statement that is no

9    longer available because we cannot hang on to

10   Visa and MasterCard transactions or statements

11   for more than two years.  We have no records

12   before 2006.

13        Q.    Now, these statements that you issue,

14   are those statements charging the customers

15   money for your services?  Let me try to talk

16   English.

17             Are those billing statements that these

18   warnings were put on?

19        A.    They were billing statements.

20        Q.    And did every customer you have in

21   early 2005 receive such a billing statement

22   with the warning -- with alert on the

23   truncation?

24             MR. SAMORE:  Objection, lack of

1  foundation.

2  BY THE WITNESS:

3      A.   I don't know that every customer

4  received it.

5  BY MR. NORA:

6      Q.   What do you know about sending out that

7  information in 2005?

8      A.   We sent it to every billing address in

9  our system at that time.

10      Q.   Now, earlier when we were talking as

11  though I was a small business owner, you didn't

12  tell me how I was going to pay you.  Do you

13  pull that automatically out of my checking

14  account or do you send me a statement and wait

15  for me to pay it?

16      A.   We don't take any.

17      MR. ANDREOLI:  Form.

18  BY MR. NORA:

19      Q.   How would I pay for the billing

20  services or for the services you provide?

21      A.   The bank, acquiring bank, in our case

22  Merrick Bank when we send you that statement,

23  they will ACH or automatically take that money

24  out of your checking account.  They then pay us

1  a piece of that money.

2  Q.  When you send the statement to the

3  customer, what information is contained in the

4  statement?

5  A.  The daily transaction totals, the

6  address, the number of transactions for the

7  month, any statement fees you may have or

8  monthly minimum fees you may have and any other

9  miscellaneous fees you may have in the

10  processing.

11  Q.  When you sent out this information in

12  early 2005, was it printed on the statement

13  itself or was it an insert with the statement

14  or how was it otherwise communicated?

15  A.  It was printed on the statement.  I do

16  not know if we sent an insert as well at that

17  time.

18  Q.  To the best of your recollection, tell

19  me the specific advice given to your customers

20  on that first notification.

21  A.  I don't know exactly how it was worded.

22  My best recollection would be attention all

23  customers, please take a look at your credit

24  card receipt to make sure the customer card

```
 1        number is not appearing on their copy.  If this
 2        is occurring, please contact us immediately at
 3        these numbers.
 4             Q.   Do you recall who was in charge of
 5        putting that alert together for Translink?
 6             A.   Yes, that would have been David
 7        Borosak.
 8             Q.   Would you spell his last name, please?
 9             A.   B-o-r-o-s-a-k.
10             Q.   Is he still with the company?
11             A.   Yes.
12             Q.   What is his position?
13             A.   Risk manager.
14             MR. ANDREOLI:  Counsel, I'm going to
15        pose a brief objection.  I think we referred
16        to the document that was being described as
17        ultimately a notice, a warning, an alert.  I
18        think the witness is referring to it as a
19        notice, just noting that for purposes of the
20        record.
21        BY MR. NORA:
22             Q.   Forgive me, I sound like a plaintiff's
23        attorney sometimes.  This was the notice we've
24        been talking about through this time, correct?
```

1    A.   Yes.

2    Q.   After that first notice, what is the

3    next thing you recall Translink doing about

4    truncation requirements?

5    A.   We put a list together of approximately

6    200 businesses that we felt may be subject to

7    truncation issues and we called all of those

8    customers.

9    Q.   How did Translink determine which

10   customers would probably be at risk with

11   respect to these requirements?

12   A.   Based on the type of credit card

13   machine that we knew they had in our system.

14   We did not know for sure if it would be good or

15   bad.  We felt it important to contact them,

16   make them aware that they had some

17   responsibility there.

18   Q.   Let me jump ahead a little bit.   In

19   preparation for this deposition, you looked at

20   the records for 6920 West Ogden, Bacci

21   Pizzeria?

22   A.   Yes.

23   Q.   Do you know from your review and

24   preparation what type of machine they had?

```
 1            A.    Yes.

 2            Q.    Did they have one of the machines that

 3     would have been on -- that would have qualified

 4     them for these calls that were made in 2005?

 5            A.    Yes.

 6            MR. SAMORE:    There has been no

 7     foundation as to what type of machine it

 8     was.

 9     BY MR. NORA:

10            Q.    What type of machine was it?

11            A.    A Hypercom, H-y-p-e-r-c-o-m, T7P.

12            Q.    And why was that machine a problem for

13     the truncation?

14            A.    The early versions of applications, I

15     don't know if I'm being too technical, of the

16     programs that went into those machines because

17     it was a machine that came out many years

18     before the truncation rules came out, the early

19     applications did not apply, did not truncate

20     the card number.

21            Q.    When you say the applications, are you

22     talking about the computer software inside the

23     machine?

24            A.    No.   We're talking --
```

1       Q.   What are you talking about?

2       A.   We're talking about the program that is

3  going to talk to that machine and make it

4  operate and make it function.

5       Q.   When you called the customers with this

6  old machine, what did -- what did Translink

7  instruct them to do, specifically the Hypercom

8  TC7P?

9       A.   T7P.

10      Q.  We contacted them and let them know to

11  make sure that it was properly truncating the

12  number and we gave them a telephone number in

13  Arizona to contact the processing center to get

14  their machine reprogrammed if it wasn't

15  truncating the credit card numbers?

16      MR. ANDREOLI:  I think it was contained

17    in the answer, but my objection to the

18    question had to do with the characterization

19    of instruction.

20  BY MR. NORA:

21      Q.   That was advice, right?

22      A.   Yes.

23      Q.   Would that have been the same advice

24  you gave to everyone with that machine whether

1    they leased it from you or not?

2        A.    We would have never leased that

3    machine.

4        Q.    So that machine was only for customers

5    who had obtained it elsewhere, correct?

6        A.    Correct.

7        Q.    And you were taking the extra step of

8    alerting them that they might have a problem

9    with it?

10       A.    Correct.

11       Q.    And the processing center number that

12   you gave them was something to enable them to

13   comply with their responsibilities, correct?

14       A.    Yes.

15       Q.    And who handled the calls to the 200 or

16   so customers who had this old machine?

17       A.    We had I believe two customer support

18   slash technical support people calling the

19   customers.

20       Q.    Was it their job to make contact with

21   each one of your customers who had this old

22   machine?

23       A.    We asked them to at least leave a

24   message.  We couldn't guarantee that they could

1     get ahold of the ownership or a manager but

2     they felt it important to at least get a

3     message to everybody.

4          Q.   To the best of your recollection, when

5     was this program of notification undertaken?

6          A.   In 2006.

7          Q.   Do you recall what part of 2006?

8          A.   I believe June of 2006.

9          Q.   What is the next thing you recall --

10    let me stop, a different question.

11         Do you know how successful your

12    customer reps were in contacting people about

13    this problem?

14         MR. SAMORE:   Objection, lack of

15    foundation.

16    BY THE WITNESS:

17         A.   I don't.

18    BY MR. NORA:

19         Q.   Do you have any idea how many they

20    were -- let me -- you would have a number for

21    each one of your customers, correct?

22         A.   Yes.

23         Q.   And are you able to say that your

24    customer reps would have called -- at least

```
1        called each number?

2            A.   Yes.

3            Q.   And would your customer reps have

4        called each number until they either talked

5        with someone or left a message on a recording?

6            A.   I don't know the answer to that.

7            Q.   Do you know the customer reps who

8        undertook this notification?

9            A.   Yes.

10           Q.   And what are their names?

11           A.   Noel Carey, C-a-r-a-y -- e-y, I'm

12       sorry.

13           Q.   Is Noel N-o-e-l or e-l-l-e?

14           A.   N-o-e-l and it's a man, Noel, and Doug

15       Porch, P-o-r-c-h.

16                MR. SAMORE:  Were they technical or

17           customer reps?

18                THE WITNESS:  They did both.  Some of

19           our people were cross-trained in customer

20           support and helping with the technical

21           issues.

22       BY MR. NORA:

23           Q.   Are they still with the company?

24           A.   Noel is still with our company.  Doug
```

1      is no longer with us.

2          Q.   Do you know where Doug is?

3          A.   I don't.

4          Q.   After this notification around June of

5      2006, what is the next thing that Translink did

6      respecting truncation?

7          A.   After I received notice that they made

8      all attempt at contacts, I don't believe we

9      made any other contacts with the customers.

10         Q.   The phone number that you provided your

11     customers with, was that number provided on a

12     sticker or any other piece of paper to attach

13     to the machines that were in use?

14         A.   We give a phone number on the machines

15     that we placed a little sticker for our 800

16     telephone number, but there was also an 800

17     number to the processing center depending on

18     the type of machine.

19         Q.   On the Hypercom T7P, what phone number

20     would have been placed on that machine?

21         A.   We would have sent -- we wouldn't have

22     placed any sticker on that machine.  We would

23     have sent them a sticker that they could place

24     on the machine with their welcome kit.

 1      Q.    And what number would that be for?

 2      A.    That number would be for National

 3  Translink.

 4      Q.    Now, did your company ever provide

 5  instructions on how to reprogram the Hypercom

 6  T7P for truncation?

 7      A.    I'm not sure of the question.

 8      Q.    If I had a Hypercom T7P, would I have

 9  ever been able to obtain technical assistance

10  from Translink on how to reprogram it or change

11  it in my store?

12      A.    No, no, we would have not been able to

13  reprogram it.  We would have been able to give

14  assistance so you could contact somebody else

15  that could reprogram it, but we couldn't

16  actually do any reprogramming of the machine.

17      Q.    Now, the assistance that you would give

18  me about getting someone else to reprogram the

19  machine, what kind of assistance would that

20  have been?

21      A.    It would have been giving you a phone

22  number of another place that you could contact

23  that could -- which would be the processing

24  center in Arizona that could reprogram the

1    machine.  We could -- I'll elaborate.  We could

2    after it was reprogrammed give you some advice

3    on how to use the functionality of the machine,

4    in other words, entering a tip again as the

5    example I gave earlier or how to batch out the

6    machine at the end of the day.  A batch -- I

7    don't want to talk too long.  A batch is when

8    you check out at the end of the day.

9        Q.    That's the day end report?

10       A.    Yes.

11       Q.    I've been seeing that and I didn't know

12   what that meant.  Thank you.

13       A.    Yes.

14       Q.    But that advice you just described

15   about working on the tips and helping with the

16   batches, that would have been a follow-up after

17   the machine was programmed for truncation

18   purposes?

19       A.    Typically, yes.  It could have been

20   told before I mean if you asked before it

21   happened, but more than likely, your questions

22   would come afterwards.

23       Q.    Now, if someone received advice over

24   the phone on how to reprogram their Hypercom

1    T7P for purposes of truncation, that advice

2    would have come from a company other than

3    Translink, am I correct?

4         A.    I guess it depends on the term advice.

5         Q.    I'm sorry.  If I'm getting instructions

6    on the phone for actually punching in numbers

7    or keys to change my Hypercom T7P for

8    truncation purposes, that specific advice would

9    never have come from Translink, am I correct?

10        A.    Correct.

11        Q.    The only advice you would have given

12   your customers on how to obtain truncation on

13   the Hypercom T7P would have been that 800 phone

14   number to call at the processing center?

15        A.    Yes.

16        Q.    And that processing center in 2005 to

17   2006 would have been?

18        A.    I believe at that time they were called

19   Card Systems.  I believe a little earlier they

20   were called Maverick and some of the reports

21   you may see still say Maverick at the top, but

22   I believe they were officially called Card

23   Systems was the company at the time even though

24   they kept the name Maverick on the top of some

1    of the reports that they provided.

2        Q.   If specific customers called you after

3    your notification efforts expressing a problem

4    with truncation, would you have continued to

5    provide them with that same 800 number at the

6    processing center with respect to the Hypercom

7    T7P?

8        A.   Yes.

9        Q.   Has there been any other type of

10    assistance that you provided for customers

11    since then respecting truncation on the

12    Hypercom T7P to your knowledge?

13        A.   I don't know.  I don't know.

14        Q.   You said that you had sent those first

15    notifications to all customers' billing

16    addresses.  In reviewing the documents for your

17    deposition today, did you have a billing

18    address for the pizzeria -- the Bacci Pizzeria

19    of 6920 West Ogden, Berwyn, Illinois when that

20    notification went out?

21        A.   I don't know the exact date that Bacci

22    Pizzeria joined us at that location.  I know

23    the first location that we signed up was not

24    that location in '04.  They certainly would

```
 1      have received that notification, but I don't

 2      know exactly when 6920 became a customer.

 3                  (Document marked as Translink

 4                  Exhibit No. 2 for identification.)

 5      BY MR. NORA:

 6          Q.   Here is part of the documents that we

 7      received from Translink.  Would you review that

 8      and make sure I haven't misplaced any pages and

 9      tell me if you recognize it?

10          A.   It looks like what we provided.

11          Q.   What is that, sir?

12          A.   That is a bank application for credit

13      card processing.

14          Q.   And would this have been part of that

15      initial contract procedure that you described

16      earlier with Bacci?

17          A.   Yes.

18          Q.   And are you able to tell is this for

19      the restaurant at 6920 West Ogden?

20          A.   Yes.

21          Q.   Are you able to tell from that document

22      when that document was completed?

23          A.   Yes.

24          Q.   And is that date May 11, 2004?
```

1        A.    Yes, it is.

2        Q.    And would the billing address for that

3   service have been 6920 West Ogden Avenue?

4        A.    Yes.

5        Q.    And would that billing address have

6   remained the same throughout the time that

7   Translink provided service to Bacci Pizzeria,

8   if you know?

9        A.    I don't know.

10       Q.    What would you do to find out if this

11  was the billing address throughout 2005?

12       A.    I would have to contact the processor

13  because it's information we wouldn't have held

14  onto.  I know that post -- in the statements we

15  provided that they all went to 6920.  I have no

16  reason to believe they didn't always go there

17  but they did have another location with us and

18  they may have requested at the beginning that

19  all statements went there.  It is common that

20  small business owners if they have multiple

21  locations ask for all their statements to come

22  to one location as opposed to getting mail

23  everywhere.  I know that the documents I

24  provided you for the last couple years all went

1    to 6920 West Ogden.

2       Q.  When you say the other location, are

3    you speaking of the Melrose Park restaurant

4    owned by the same owners as the 6920 West Ogden

5    restaurant?

6       A.  Yes, there were two other locations

7    that did business with us.

8       Q.  Did you contract for those two other

9    locations at the same time you contracted for

10   service at 6920 West Ogden?

11      A.  No.

12      Q.  When did you contract for services at

13   those two other locations, if you know today?

14      A.  I know the first one was in 2003 and at

15   that time they purchased one of our credit card

16   terminals that we would provide which was

17   called a Lipman 3020 Nurit.  It's a long name,

18   N-u-r-i-t, L-i-p-m-a-n 3020.  That they

19   purchased from us and that terminal we

20   programmed and provided to the first location.

21   They then signed up the two other locations

22   with the Hypercom T7Ps approximately one year

23   after signing the contract for the other

24   location.

1       Q.    Am I correct in saying that for the

2    entire time you provided contractual services

3    for Bacci Pizzeria at 6920 West Ogden Avenue,

4    the billing statements would have gone either

5    to 6920 West Ogden Avenue in Berwyn or to

6    another address that the owners directed you to

7    send the billing statements to?

8       A.    Yes.

9       Q.    And by the owners, are we speaking

10   about Chiara Didiana and Vincent Didiana?

11          MR. ANDREOLI:   Foundation.

12   BY MR. NORA:

13      Q.    Who do you know -- understand the

14   owners to be?

15      A.    I understand the owners to be Chiara L.

16   Didiana and Vincent something Didiana.

17      Q.    A husband and wife, correct?

18      A.    Yes.

19          MR. ANDREOLI:   Foundation.

20          (Document marked as Translink

21          Exhibit No. 3 for identification.)

22   BY MR. NORA:

23      Q.    Would you please examine the portions

24   of your production that I've had marked

1    Translink Deposition Number 3 and there are

2    three pages there if you could look at each one

3    of them.

4              MR. ANDREOLI:  Just a minute.

5              MR. NORA:  Do you want to take a break?

6              MR. ANDREOLI:  It's a minor point.

7        It's more clerical if anything else.

8              (Recess taken.)

9    BY MR. NORA:

10        Q.   We've amended Exhibit 3 so that is now

11    two pages.  What are those, sir?

12        A.   This is a terminal report.  We call it

13    a MCMTER that we would get from that company we

14    talked about called Maverick.  If we looked up

15    information, we could look at information about

16    customers' terminals in their system.  It's not

17    in our system, it's in their system.  Their

18    secure line we could look and see what kind of

19    terminal somebody had and if it was programmed

20    say with that tip function I keep referring to.

21        Q.   Would each of the two pages in this

22    deposition exhibit be reports that your company

23    ran from the processing center?

24        A.   Yes.

1    Q.    And I'd like to take the pages one at a

2    time.  The first page on top of the exhibit,

3    what type of report is this?

4    A.    This is a terminal report.

5    Q.    And did your company run this report?

6    A.    Yes.

7    Q.    Are you able to tell from that report

8    when you ran it?

9    A.    I do not believe that there is a date

10   on the report other than the one handwritten.

11   Q.    And when this report was run, what

12   information is found on this report from

13   Maverick that is relevant to truncation?

14   A.    The type of terminal is the most

15   relevant piece of information that we could

16   look at.

17   Q.    Is there anything else on that report

18   that would have been relevant to Translink?

19   A.    Not on the actual report from Maverick.

20   Q.    Now, were these reports run when you

21   were conducting part of your truncation

22   notification efforts?

23        MR. SAMORE:  Objection, lack of

24        foundation.

BY MR. NORA:

    Q.   I'll change it.  Do you know why this report was run?

    A.   I believe this report was run to try to help the merchant get their terminal truncated.

    Q.   Would this have been part of a system-wide effort on customers generally or would this have been a specific customer request, if you know?

    A.   I don't know in this case.

    Q.   Can you approximate the time -- other than the handwritten notes there, is there anything on the report itself that could indicate when the report was run?

    A.   No.

    Q.   Now, this report is from your company records, correct, the company that we have here today?

    A.   Yes.

    Q.   And could you please tell us what is noted on the bottom of the report with handwriting?

    A.   PLS would have been our abbreviation for please truncate.  THX I believe that would

1    be thanks Doug, only last four credit card

2    numbers to show.  It has the date written twice

3    4/28/06, Friday, 10:55 a.m.

4         Q.    And above the top date of 4/28/06, can

5    you decipher what is written above there?

6         A.    I believe it says follow up.

7         Q.    And are those initials DP after that?

8         A.    Correct.

9         Q.    And who would that be, if you know?

10        A.    Doug Porch who we referred to earlier.

11        Q.    Is Doug the representative who is still

12   with your company or who has left your company?

13        A.    He is the one no longer with our

14   company.

15        Q.    That's how it works.  Do you recognize

16   his handwriting?

17        A.    I do not.

18        Q.    And when you say you do not recognize

19   it, you do not know if it is his handwriting or

20   not?

21        A.    I do not know.

22        Q.    Can you tell, assuming that these dates

23   are correct, was 4/28/06 the time you were

24   conducting any of your general truncation

1      notifications?

2          A.   I believe this is after the written

3      notification, but it appears to be before we

4      made our telephone call effort.

5          Q.   Now, the words please truncate, would

6      these have been instructions to Doug or --

7          A.   No.  Doug would not have the ability to

8      make the numbers truncate on their terminal.

9      Doug would have the ability to contact the

10     processing center and request that they build a

11     new download and have again the customer call

12     them or even work it out the other way.  There

13     were occasions when the processing center would

14     actually call the customer to help them do that

15     download.

16             MR. ANDREOLI:  By way of objection,

17         what's written on the page I believe there

18         is a lack of foundation for the testimony.

19     BY MR. NORA:

20         Q.   When customers called in for truncation

21     assistance after that notification in 2006, on

22     this Hypercom machine we've been discussing

23     today, would the practice of your customer

24     representatives have been to give them the

1    number on the card processing center?

2         A.    That would have been one of the things

3    that they would have done.

4         Q.    And what else would they have done?

5         A.    They would have contacted the

6    processing center to have them build the

7    program for this machine in advance of their

8    call.

9         Q.    What type of follow-up would have been

10   undertaken by Doug on the customer call?

11        A.    I don't know what Doug would have done.

12        Q.    In preparing for this deposition today,

13   did you talk to your other customer

14   representative who handled these requests in

15   2006?

16        A.    Briefly, yes.

17        Q.    And when you talked with him, what, if

18   anything, did he tell you about what was done

19   in 2006 on these customer services?

20             MR. ANDREOLI:   Form.

21             MR. NORA:   Pardon?

22             MR. ANDREOLI:   Form.

23   BY MR. NORA:

24        Q.    Tell me what he told you and what you

1    said to him during your conversation with him

2    in preparing for your deposition today.

3        A.    I asked him if we still had records of

4    all the telephone calls that we attempted to

5    make at that time.  He informed me that there

6    was a checkoff list that he had held onto which

7    showed all the customers that were contacted

8    with either a Y or an N next to their name, all

9    the customers we suspected may have a

10   truncation issue and he was able to produce

11   that report for me.

12       Q.    And that would have concerned the time

13   after this first initial notification went out,

14   correct?

15       A.    Yes.

16       Q.    Now, this record that you recovered

17   respecting Bacci Pizzeria 6920 West Ogden, how

18   is this kept by your company, this specific

19   record we're looking at?

20       A.    We're a company that has to print the

21   screen because we cannot make customer service

22   notes in Maverick's systems, so we print the

23   information we get on the screen, make

24   handwritten notes and place it in a manual

1    file.

2        Q.    And is that manual file customer

3    specific?

4        A.    Yes.

5        Q.    Is this a customer service record for

6    customer service done for 6920 West Ogden,

7    Berwyn, Illinois?

8        A.    Yes.

9        Q.    And it was recovered from the

10   service -- customer service file for that

11   business, correct?

12       A.    Yes.

13       Q.    Now, if you could turn to the page 2,

14   could you please tell us what this customer

15   service record shows?

16       A.    This appears to be the same MCMTER

17   which is a terminal report for the same

18   terminal at Bacci's Pizzeria which is provided

19   to us by Maverick.

20       Q.    And is this a service record for that

21   terminal at that location?

22       A.    It appears to be, yes.

23       Q.    And was this also found on the customer

24   service file for Bacci Pizzeria at 6920 West

1      Ogden?

2       A.   Yes.

3       Q.   Does this also appear to be notes by

4    the same service representative?

5       A.   It appears to be one or possibly two,

6    the second penmanship at the top, I'm not sure.

7       Q.   When you say there's different --

8    possibly different penmanship, are you

9    referring to truncation is complete?

10      A.   Yes.

11      Q.   Do you -- does that handwriting appear

12    to be similar to anyone else's at Translink?

13      A.   I don't know.  I don't know.

14      Q.   The signature underneath that notation,

15    what does that appear to be?

16      A.   That appears to be Doug Porch's

17    signature.

18      Q.   And with the date July 14th, '06, or

19    7/14/06?

20      A.   Yes.

21      Q.   Now, could you please read what appears

22    underneath that notation for July 14th?

23      A.   Underneath it, it says July 13th, '06,

24    or 07/13/06.  PLS again is the short for please

1    truncate and let me know when done so I could

2    have them initialized, thanks Doug.

3        Q.    Now, who would Doug have directed this

4    communication to to please truncate?

5        A.    This would have been directed to

6    Maverick or Card Systems.  That's the company

7    that would do the programming for this

8    terminal.

9        Q.    How would he communicate that request

10    to them?

11        A.    He would have sent a separate fax to

12    them.

13        Q.    And would that fax have included the

14    copy of this note that is in your file?

15        A.    Not likely this exact note.  It also is

16    a possibility that this note was written to

17    somebody else in technical support that may

18    have -- like Noel who may have been just in

19    charge of contacting Maverick at that time.  I

20    do not know if Doug would have contacted or

21    somebody else in my company would have

22    contacted Maverick or Card Systems that same

23    company at that time.

24        Q.    Now, why would this MagCARD system

1      report have been pulled in the first place?

2          A.    Either the business owner contacted us

3      because he had been notified and wanted to get

4      it taken care of or somebody in our company may

5      have contacted them.  It could have even been

6      on another customer service issue and noted

7      that their terminal may have needed changing at

8      the time.

9          Q.    So all we know from the record is that

10     for some reason there was a customer service

11     record made for 6920 West Ogden on this machine

12     respecting truncation July 13th and July 14th,

13     2006?

14             MR. ANDREOLI:  I'm going to object to

15         your characterization of --

16             MR. NORA:  I'll withdraw the question.

17     BY MR. NORA:

18         Q.    Would this service have necessarily

19     involved some communication with the company at

20     6920 West Ogden Avenue?

21         A.    Would -- I'm not sure I understand the

22     question.  Would the -- which service?

23         Q.    I want to make sure I'm not jumping to

24     a conclusion here.  If you have a record

1    showing a customer service effort respecting

2    truncation on July 13th and 14th, 2006, does

3    that mean that the people at 6920 West Ogden

4    knew anything about it?

5         MR. SAMORE:  I want to object.  He's

6         already testified that his understanding of

7         the note was that it was directed to the

8         credit processing company and not the

9         customer.

10   BY THE WITNESS:

11       A.   I don't believe this note was generated

12   for the customer, but I believe this report was

13   generated because of some kind of contact with

14   the customer.

15   BY MR. NORA:

16       Q.   Would it have been possible for you to

17   provide service like this for a customer on

18   this machine without contacting the customer?

19       A.   Again, I'm not sure.  Would it be

20   possible to provide credit card processing

21   service?

22       Q.   If I own the company at 6920 West Ogden

23   Avenue using this machine and your company

24   attempted the type of service that's reported

1  in this report, could you have done all of this

2  without ever letting anyone at my company know

3  you were doing this work for me?

4      A.   We could not have changed your machine

5  without letting you know.

6      Q.   So the effort recorded in this report

7  could not have been undertaken without

8  contacting the company?

9          MR. SAMORE:  No, no, I mean that's not

10  what he testified.  He said that the -- I'll

11  let him answer.

12          MR. NORA:  Could you read back my --

13          (Record read as requested.)

14          MR. SAMORE:  The only service that he's

15  described specifically that's referenced in

16  this document is notifying the credit

17  processing company to prepare a truncation

18  program for a download and there is no other

19  service that's referenced in this document.

20  BY MR. NORA:

21      Q.   Let me ask this, the notation here

22  truncation is complete, how would someone at

23  your company learn that truncation is complete?

24      A.    I can only -- I can't give you a

1    certain answer there, but I could give you my

2    best estimation.  I do not believe anybody

3    would write that and sign off on it unless they

4    believed that the program was done at the

5    processing center and unless they believed that

6    the small business owner was contacted.

7         Q.    Are these the only two customer service

8    records kept in the manual file for 6920 West

9    Ogden Avenue?

10        A.    I don't know the answer to that.

11        Q.    If there were any other customer

12   service requests from 6920 West Ogden Avenue,

13   would it have been your custom and practice to

14   make a report out like this and put it in the

15   customer service file?

16        A.    Yes.  We also have other systems of

17   customer service within our own system.  This

18   is terminal specific customer service.  If

19   there is a question on a billing statement or

20   something else, that would go in separate notes

21   within our own computer system where we could

22   place notes.

23        Q.    Would all requests for service on the

24   Hypercom terminal that we've been discussing at

1  6920 West Ogden Avenue have been kept in a

2  format like this and in the file where you

3  recovered these reports?

4      A.   Not necessarily all of them.  Again, if

5  somebody just called with a question on how to

6  operate the machine, we may have put that in

7  our regular notes.  This would be a customary

8  form primarily just for a change in a download

9  to a terminal.  This is a terminal problem

10 specific customer service technique.

11     Q.   Would all requests for services on

12 truncation in the terminal have generated a

13 report like this?

14     A.   Yes.

15     Q.   Are these all the reports in your file

16 for requests for services on truncation for the

17 Hypercom terminal at 6920 West Ogden?

18     A.   Yes.

19     Q.   Are these the only requests for

20 services that Translink received from 6920 West

21 Ogden respecting truncation on that terminal?

22     A.   I don't know if you asked if they asked

23 for service.

24     Q.   That's good.  Are these the only

1    records of any service respecting truncation on

2    the Hypercom terminal at 6920 West Ogden?

3        A.    I believe there was also records of the

4    build of the download in the file, but this is

5    the only one regarding a service type help desk

6    issue on a terminal for that location.

7        Q.    If someone had called your company in

8    October or November of 2007 for assistance in

9    truncating this Hypercom terminal at 6920 West

10   Ogden, would there be a report like this in

11   your files?  I'm referring to Deposition

12   Exhibit Number 3.

13       A.    I don't know the answer to that.  It

14   would depend on if we talked to them earlier.

15   We could contact the processing center.  If you

16   don't mind me elaborating, if they build that

17   file, they could call us, we could say that

18   file is already built, so we wouldn't

19   necessarily generate this again and they could

20   contact the center and have that done.

21       Q.    Before I mark another exhibit, would

22   you take a look at that?

23            MR. ANDREOLI:  Jerry, would you mind if

24       we went off the record for a minute?

```
 1              (Discussion had off the record.)
 2              (Document marked as Translink
 3         Exhibit No. 4 for identification.)
 4    BY MR. NORA:
 5         Q.   Mr. Tracy, what is Exhibit Number 4,
 6    Translink Number 4?
 7         A.   This is a request for a download and a
 8    notice of a completion of a download from Card
 9    Systems which we've also referred to as
10    Maverick.
11         Q.   When was this done?
12         A.   I don't know.
13         Q.   Would this have -- does this report
14    reflect the type of activity that would have
15    been undertaken when the service was commenced
16    for 6920 West Ogden?
17         A.   I don't understand the question, I'm
18    sorry.
19         Q.   What type of service -- is this all for
20    one download?
21         A.   Yes.
22         Q.   And what kind of download is it, if you
23    could tell me?
24         A.   A credit card programming download for
```

1    a restaurant which is named as Bacci Pizzeria

2    for programming of their machine.

3         Q.   And can you tell what type of

4    programming was undertaken in this download?

5         A.   I cannot tell anything specific from

6    it, no.

7         Q.   When service was started for Bacci

8    Pizzeria, would a download have been necessary

9    before you could provide service to that

10   terminal?

11        A.   Yes.

12        Q.   Would that have required the type of

13   download that's recorded in this report?

14        A.   Yes.

15        Q.   Would a report like this have been

16   typically made when that download was

17   completed?

18        A.   Yes.

19        Q.   Is there any reason -- is this the only

20   download report in your files for Bacci

21   Pizzeria?

22        A.   For this location, yes.

23        Q.   For that location?

24        A.   Yes.

1      Q.   Now, when did your service for Bacci

2   Pizzeria at this location end, if you know,

3   offhand?

4      A.   I believe it was November of '07.

5      Q.   Now, at that time, were you also

6   providing services at the two other locations

7   you mentioned in this deposition?

8      A.   Yes.

9      Q.   Did you continue to provide service at

10  those two other locations after November 2007?

11     A.   No.

12     Q.   Did you, yourself, deal with the owners

13  of Bacci Pizzeria at 6920 West Ogden on

14  anything during your business history with

15  them?

16     A.   No, I never spoke to them.

17     Q.   Did you have a customer representative

18  who did deal with them?

19     A.   Yes.

20     Q.   And who was that?

21     A.   There could have been many people that

22  talked to them over time but from customer

23  service notes I saw that Doug Porch who we

24  mentioned and Katrina Hansen, H-a-n-s-e-n, had

1    notes in our regular customer service.

2        Q.   And who is Katrina?

3        A.   She is a former customer service

4    representative for us.

5        Q.   And what type of service did she

6    provide?

7        A.   What you would refer to as traditional

8    customer service, answering questions about

9    their statement or their account.

10        Q.   She had no technical expertise?

11        A.   No.

12        Q.   I'm correct when I say she had no

13    technical expertise?

14        A.   I don't believe she did, no.

15        Q.   Ed Satala, what is his position in your

16    company today?

17        A.   He's a sales representative.

18        Q.   And he is a sales representative who

19    originally contracted for your company or

20    handled the -- he was your first sales

21    representative to this location, correct?

22        A.   I don't know if he was the first.

23        Q.   Was he the one who negotiated the

24    contract or agreement?

1      A.    Yes.

2      Q.    Did he have -- was that his primary

3  responsibility respecting this store and the

4  owners of this store?

5      A.    Yes.

6      Q.    Did he have any ongoing

7  responsibilities for that store after taking

8  care of that contract?

9      A.    No.

10     Q.    The notes that you saw for Katrina

11 Hansen, are they in the production that your

12 company has provided to us?

13     A.    I don't know.

14     Q.    What type of records would her notes

15 have been found on?

16     A.    On the computer.

17     Q.    Computerized record?

18     A.    Correct.

19     Q.    Of her notes?

20     A.    Correct.

21     Q.    Do you know where Katrina Hansen is

22 today?

23     A.    I do not.

24     Q.    Now, during your breaks or else wise,

1    has the name of your contact with the acquiring

2    bank -- can you think of that?

3       A.   Fred Horn, H-o-r-n.

4       Q.   And at the processing center, who would

5    your company's primary contact be at the

6    processing center?

7       A.   My primary contact would be different

8    than other people's.  My primary contact would

9    be Margie White.

10       Q.   What is her position there?

11       A.   Operations manager.

12       Q.   Can you give us an address from memory

13    for that company?

14       A.   I can't.

15       Q.   What city is it in?

16       A.   Just outside of Phoenix, Arizona.  I

17    think it would be easy to find.

18       Q.   One moment, please.  The material that

19    was not familiar to you before, I'm not sure if

20    it -- let me show it to your attorney to see if

21    that's part of your production.

22       When you reviewed the records for this

23    case on the Bacci restaurants, were you able to

24    determine or do you otherwise know why they

1    discontinued service with your company?

2        A.    No, I do not know why.

3        Q.    To your knowledge, did Translink

4    receive any complaints from them respecting

5    truncation -- failures to truncate their

6    Hypercom terminal in 2007?

7            MR. SAMORE:  Objection, lack of

8        foundation.

9    BY MR. NORA:

10       Q.    If you have knowledge from any source.

11       A.    I don't, no.

12       Q.    You have no such information, correct?

13       A.    No, I do not.

14           MR. NORA:  All right.

15           MR. SAMORE:  Could I see Exhibit

16   Number 2?

17           MR. ANDREOLI:  I apologize, just a

18       thought --

19           MR. NORA:  Number 1, we'll strike that.

20           MR. ANDREOLI:  Just that portion of it,

21       what do you want to do with it?

22           MR. NORA:  I'm going to limit 1 to the

23       first three pages because that's all I had

24       the witness look at.  Exhibit Number 1 will

1    just be the first three pages of the packet

2    I just handed to you.

3                    **EXAMINATION**

4                 by Mr. Samore

5    Q.   Now, Exhibit Number 2 is a complete

6    copy of the merchants processing application

7    that was signed by Bacci in May of 2004,

8    correct?

9    A.   Yes.

10   Q.   And you'll see it appears the second

11   and third page there is some terms entitled

12   merchant processing agreement?

13   A.   Yes.

14   Q.   Were those part of the application

15   form?

16   A.   Yes.

17   Q.   And were they on the back side or is

18   there a separate page?  If you had the original

19   in front of you, how would that look?

20   A.   If I had the original in front of me,

21   it would be on the back side, front side, back

22   side.

23   Q.   So the original application would be

24   two pages with a front and back?

1    A.    It folds, the original.

2    Q.    And the size of the type print under

3    the merchant processing agreement is accurate

4    in terms of the way the original would look, am

5    I correct about that?

6    A.    It appears to be, yes.

7    Q.    And at the top of the first page of

8    Exhibit 2, there is the number 693, do you see

9    that top right?

10    A.    Yes.

11    Q.    Do you know what that refers to?

12    A.    I do.

13    Q.    And what is that?

14    A.    That is a credit score.

15    Q.    Makes sense.  And there is also the

16    words download H something 7PH?

17    A.    T.

18    Q.    What does that refer to, if you know,

19    or what is your understanding of what that

20    refers to?

21    A.    My understanding that's the type of

22    terminal that this location had, the credit

23    card terminal.

24    Q.    Now, if you look elsewhere at the first

1    page, there is a box that says keyed with

2    imprint card and then there is a 35 and that's

3    crossed off and 25 percent, do you see that?

4        A.   Yes.

5        Q.   What does that refer to as far as your

6    understanding is concerned?

7        A.   When we sign up a customer, we ask them

8    what percentage of the credit cards they

9    receive would be swiped actually through the

10   machine and what percentage they estimate would

11   be manually entered into the machine because

12   the credit card would not be present.

13       Q.   And printed without an electronic

14   device, correct?

15       A.   It would still be approved through the

16   electronic device but my understanding here

17   would be maybe it's pizza delivery where

18   somebody would give their credit card number

19   either by telephone or to the deliveryman and

20   he would be giving it to somebody at the

21   establishment to enter into the machine.

22       Q.   The percentage refers to the number or

23   the approximate percentage of credit card

24   receipts that are imprinted as opposed to

1   electronically imprinted; is that correct?

2         MR. NORA:   Objection.

3   BY THE WITNESS:

4      A.   I believe they both would be printed up

5   on the printer.   The second where it says keyed

6   with imprint card would be manually pressed

7   into the machine --

8   BY MR. SAMORE:

9      Q.   I see.

10     A.   -- because the credit card would not be

11  handed to somebody that had access to that

12  machine.

13     Q.   Thank you.   Now, turn to page -- on

14  Exhibit 3, do you have that?

15     A.   Yes, I do.

16     Q.   Now, there is handwritten notes here by

17  somebody I believe named Doug Porch.   Who did

18  Doug Porch report to?

19     A.   Katrina Hansen.

20     Q.   And who did Katrina report to?

21     A.   David Borosak.

22     Q.   And David Borosak reported to who?

23     A.   Me.

24     Q.   And would it be fair to say that it was

1    not part of your day-to-day responsibilities to

2    review the handwritten notes of Dave -- or Doug

3    Porch?

4        A.    I did not review handwritten notes.

5        Q.    And you have no personal knowledge with

6    respect to any of the information set forth on

7    this -- in handwriting on this document,

8    correct?

9        A.    I don't.

10       Q.    And would it be fair to say you were

11   not in regular contact with Doug Porch during

12   his employment with your firm?

13       A.    I saw him on a daily basis, but I did

14   not have regular contact about customers.

15       Q.    That responsibility was with Katrina to

16   supervise him on a day-to-day basis?

17       A.    Correct.

18       Q.    Now, you mentioned that Katrina and

19   others may have prepared typewritten notes that

20   would go into the regular customer file I think

21   it was called, I'm probably misstating that,

22   but there were -- there was another section of

23   notes that would be typed into the system,

24   computerized records?

1    A.    Yes.

2    Q.    And what was that called?

3    A.    That was our regular -- I don't know

4    what I would call it, our regular customer

5    system within our own company, our regular

6    customer files.

7    Q.    And do you know whether or not a search

8    was made in response to the subpoena that was

9    issued in this case for those regular customer

10   file notes?

11   A.    Yes, there was.

12   Q.    And I did not see any such notes that

13   were produced as part of this.

14   A.    I don't know if they were requested.

15   MR. SAMORE:  Who -- I would ask that --

16   and I'll do this whatever way works best for

17   you, but I would ask for a copy of the

18   customer notes that were typed in because

19   there is nothing here in any of the records

20   that I've seen.

21   MR. ANDREOLI:  It may be the case that

22   any notes that exist weren't responsive to

23   the subpoena.

24   MR. NORA:  The subpoena might have been

1     too narrow.

2          MR. SAMORE:   I'm just making that

3     request and I'll be happy to follow up with

4     a letter or an additional subpoena or what

5     have you, but I'd just like to see the

6     actual notes, okay, just stating that for

7     the record here today.

8          MR. ANDREOLI:   Fair enough.

9     BY MR. SAMORE:

10         Q.   So now --

11         MR. NORA:   And I want a copy of

12    everything, of course.

13         MR. ANDREOLI:   That I can't agree to.

14    That's a joke.

15    BY MR. SAMORE:

16         Q.   Do you have any idea what prompted Doug

17    Porch to write the notes set forth on this

18    Exhibit Number 3?

19         A.   I don't and I don't know honestly that

20    they're Doug's notes.

21         Q.   And actually the date that's shown here

22    4/28/06 is not the -- is prior to the time in

23    which your company had this program of

24    notifying customers of the truncation law

1    requirements?

2         MR. NORA:  Objection, I think you want

3    to clarify which program.

4    BY THE WITNESS:

5    A.   It's post our written notification on

6    the statements but pre our call notification.

7    BY MR. SAMORE:

8    Q.   Are you aware of any program or

9    instruction to employees such as Doug Porch

10   with respect to notifying by phone or voice of

11   customers' truncation requirements in April of

12   2006?

13   A.   I'm not aware of any.

14   Q.   So in terms of what actually prompted

15   the handwriting here, you have no personal

16   knowledge?

17   A.   I don't.

18   Q.   And you would not know what Doug said

19   to the customer or what the customer said to

20   Doug?

21   A.   I would not.

22   Q.   And you also said that there was

23   another report that was generated that showed a

24   list of customers that were contacted pursuant

1    to the oral notification program regarding

2    advising companies of the truncation

3    requirements; is that right?

4       A.   Yes, I did.

5       Q.   And is that list available by any

6    chance and would that be -- could that be

7    produced or not or would there be large -- I

8    mean did you see that in preparation of your

9    deposition today, for example?

10      A.   Yes, I did see it in preparation.

11      MR. SAMORE:  Could we see a copy of

12    that?  Do you want to think about it a

13    little bit before committing?

14      MR. ANDREOLI:  I think our purpose here

15    is to get all of the appropriate information

16    to both sides so that parties of litigation

17    have all the facts.  That being said, I

18    haven't seen the list.  I would like to take

19    a look at it before I make a decision.

20      MR. SAMORE:  Fair enough.

21  BY MR. SAMORE:

22      Q.   Now, was Doug Porch -- can you describe

23    what terms he left on, left the company on?

24      A.   He was laid off.

1    Q.   Was it -- it was unrelated to his job

2  performance?

3    A.   No, it was not related to his job

4  performance.

5    Q.   And what about Katrina, what was the

6  terms of her severance?

7    A.   She was laid off as well.

8    Q.   Now, if we go to exhibit -- the second

9  page of Exhibit Number 3, again, you have no

10  personal knowledge with respect to any of the

11  communications that gave rise to these

12  handwritten notes, correct?

13    A.   I do not.

14    Q.   And the note truncation is complete, on

15  this page, isn't it entirely possible

16  they're -- that that note is simply referring

17  to the fact that the credit processing company

18  has prepared a program for download?

19      MR. NORA:   Objection to speculation.

20    Go ahead.

21  BY THE WITNESS:

22    A.   It is possible that that's the only

23  reason it's there.

24

BY MR. SAMORE:

Q.    And there is a fax number -- a date at the bottom of this exhibit says July 13, 10:28. Do you know how that fax date came to appear on this exhibit?

A.    I don't.

Q.    Doesn't that suggest that this was actually a document that was faxed to your company as opposed to the other way around?

A.    I would assume so, yes.

Q.    So would it at least be possible that this document was faxed to Doug or to your company by the credit card processing company?

MR. NORA:    Objection to speculation.

Go ahead.

BY THE WITNESS:

A.    It is possible.

BY MR. SAMORE:

Q.    In terms of who Doug actually spoke to before he wrote the phrase truncation is complete, you have no personal knowledge of, correct?

A.    No, I do not.

Q.    And as I --

1    MR. ANDREOLI:  Before you ask the

2    question, Counsel, can I take a break?

3         (Discussion had off the record.)

4    BY MR. SAMORE:

5    Q.   As I understand it, with respect to the

6    companies that you -- or strike that.

7         With respect to the customers that your

8    company identified being at risk of not having

9    compliance with the truncation requirements,

10   your policy and practice was to notify Maverick

11   or the credit card processing company of the

12   need to prepare a download; is that correct?

13   A.   On certain types of terminals, yes.

14   Q.   And was it the practice and policy of

15   your company to receive notification from the

16   credit processing company when the program had

17   been prepared for download?

18   A.   Yes.

19   Q.   And then at the bottom, you'll see that

20   just above Doug's name is the word initialized,

21   what is your understanding of that word in this

22   context?

23   A.   We use the term initialize to run a

24   test transaction to make sure the program --

1     when I say them, I mean the customer or small

2     business owner, to test a transaction through

3     their terminal and make sure that the program

4     has been complete.

5          Q.    If we turn to Exhibit Number 4, at the

6     top of Exhibit Number 4, there appears to be a

7     fax number that is cut off that could be due to

8     copying or what have you, would you agree with

9     that statement?

10         A.    It appears that there is something that

11    looks like it's from a fax.

12         Q.    This document was contained in what

13    file at your company?

14         A.    In the Bacci Pizzeria file.

15         Q.    The same -- is that a different file

16    than what was used for Exhibit Number 3?

17         A.    I don't know which file this came out

18    of.  We had three files, one for each location,

19    from Bacci.  This would be the merchant number

20    that matches the one at 6920.

21         Q.    So there would just be one hard copy

22    file for each merchant that you had a business

23    relationship with; is that correct?

24         A.    Yes.

1    Q.    So Exhibits 3 and 4, if things were

2    working properly in the file, they would have

3    been set forth in the same hard copy location?

4    A.    Yes.

5    Q.    And this appears to be a request to

6    the -- to Card Systems to prepare a download

7    program for truncation for Bacci Pizzeria,

8    correct?

9    A.    It appears to be a download request.

10   It does not specifically say it's for the

11   truncation.

12   Q.    And you have no idea when this request

13   was made --

14   A.    I do not.

15   Q.    -- from reviewing this?

16   Would it be possible to search again

17   for the -- through the original file to see if

18   there is a clean copy of the -- with the fax

19   number at the top of the page?

20   A.    It's possible to search.

21   Q.    Could you please ask somebody to do

22   that and I'll confirm in a letter to your

23   lawyer my request, okay?

24   A.    That's fine.

1    Q.   Can you describe your understanding of

2    the second page of Exhibit Number 4?

3    A.   This appears to be a request to build a

4    download by Card Systems or Maverick as we keep

5    referring to them to create a program that

6    contains a tip function and no auto batch

7    meaning they were going to batch out the

8    terminal themselves each evening.

9    Q.   Do you recognize the handwriting on

10   that page?

11   A.   I don't but the smiley face I think

12   I've seen Katrina use before.

13   Q.   Has a feminine touch to it, right?

14   A.   Yes.

15   Q.   Now, am I correct that your company

16   does not know the identities, the name,

17   address, phone number of any of the customers

18   of Bacci Pizzeria that entered into credit card

19   transactions?

20   A.   That is correct.

21   Q.   And am I correct also that you -- your

22   company would have no way of obtaining the

23   identities of any of the customers of Bacci

24   Pizzeria that entered into credit card

1    transactions with it?

2        A.    I don't know the answer to that.    It

3    may be possible through some kind of Visa or

4    MasterCard request, but I am not aware of a

5    current way for us to get them.

6        Q.    And now, am I correct that Bacci

7    Pizzeria does not have any -- does not have

8    access to the identities of any of its

9    customers that purchased food through a credit

10   card and by identities I mean name -- strike

11   that.    I ruined the question.    I'll start over

12   again.

13        Am I correct that Bacci does not have

14   access to the address information and phone

15   number information for any of its customers

16   that purchased food in a credit card

17   transaction to the best of your knowledge?

18        MR. NORA:    Objection, speculation,

19   someone else's knowledge.

20   BY THE WITNESS:

21        A.    Yeah, I don't know.

22   BY MR. SAMORE:

23        Q.    At least with respect -- for purposes

24   of -- in a typical credit card transaction

1    though, at least there is nothing in that

2    process that would disclose the customer's

3    address and phone number to the merchant,

4    correct?

5        MR. ANDREOLI:  I'm going to object to

6        the form.

7        MR. NORA:  And I join.

8    BY THE WITNESS:

9        A.   No, there is nothing to give them an

10   address or phone number from using their credit

11   card.

12   BY MR. SAMORE:

13       Q.   And now with respect to the written

14   notification of the truncation change in law,

15   you testified that occurred in early 2005,

16   correct?

17       A.   Yes.

18       Q.   Now, you also testified that you didn't

19   have any written records relating to the actual

20   notice to -- that was provided to the merchants

21   at that time, correct?

22       A.   That's correct.

23       Q.   Does your company have any kind of

24   template or internal record that would show

1    exactly what notice was provided at that time?

2        A.    No.

3        Q.    And am I correct also that it's been

4    more than three years since you saw that

5    notification?

6        A.    Yes.

7        Q.    And so your recollection with respect

8    to what the content of that notification was

9    could be erroneous?

10       A.    It was my best guess.

11       Q.    And am I also correct that you -- you

12   did not play a dominant role in the drafting of

13   that notice?

14       A.    I would have looked at it.

15       Q.    You would have looked at it but in

16   terms of actually writing the words that were

17   used for that notification, you did not play a

18   role in that, correct?

19       A.    I did not.

20       Q.    Who is the person that was primarily

21   responsible for drafting that notification

22   other than Tom?

23       A.    I would guess that that would have been

24   David Borosak.

1    Q.   And David Borosak is still with the

2    company?

3    A.   Yes.

4    Q.   And so as you sit here today, there is

5    absolutely no way of actually obtaining a hard

6    copy of the words that were used in that

7    notification?

8         MR. ANDREOLI:   Form.

9    BY MR. SAMORE:

10   Q.   There is no way that you could think of

11   at least as you sit here today through which

12   you could see a copy of the words that were

13   used to notify merchants of the change in law?

14   A.   We made every attempt to get a copy by

15   even calling customers we thought might have

16   old statements before and we were not able to

17   obtain one.

18   Q.   Do you have any written records

19   indicating that this notification was actually

20   put in the U.S. mail to Bacci Pizzeria?

21   A.   I do not.

22        MR. SAMORE:   That's all I have.   Thank

23   you.

24

## FURTHER EXAMINATION

### by Mr. Nora

1  Q.   I'm sorry to do this to you, I have a
2  few more.  When you sent out those
3  notifications in early 2005, my understanding
4  is that you sent one for each billing address;
5  is that correct?

6  A.   That's correct.

7  Q.   For the Bacci Pizzeria owners, would
8  they have received three billing statements in
9  early 2005 when that notification went out?

10  MR. SAMORE:  Objection.  He's asking
11  about receiving, assumption.

12  BY MR. NORA:

13  Q.   I'm sorry, would you have sent three
14  different billing statements to the owners of
15  Bacci Pizzeria for each billing statement in
16  2005?

17  A.   I believe I mentioned this before, I
18  don't know in early 2005 if they used one
19  billing address or three, but whatever
20  addresses we had on file we would have sent the
21  statement to with that information.

22  Q.   Now, they had three locations at that

1    time that you serviced, correct?

2         A.   Yes.

3         Q.   When you sent the billing statements

4    for these three different locations whether it

5    was sent to one address or to three addresses,

6    would you have sent three different pieces of

7    mail?

8         A.   Yes.

9         Q.   And each of those pieces of mail would

10   have contained this notification, correct?

11        A.   Yes.

12        Q.   And those three pieces of mail would

13   have gone to whichever addresses the owners of

14   6920 West Ogden Avenue instructed you to send

15   them to, correct?

16        A.   Yes.

17        Q.   Now, counsel -- Mr. Samore asked you

18   some questions about your recollections of that

19   notification, did that notification in early

20   2005 go to all of your customers?

21        A.   I don't know.

22        Q.   Was it intended to go out to all of

23   your customers?

24        A.   Yes.

1    Q.   Approximately how many customers did

2  you have in early 2005?

3    A.   A round number would be 5,000.

4    Q.   Now, at the time this notification was

5  sent out, was it the intention of Translink to

6  accurately notify your customers of the legal

7  requirements respecting truncation customer

8  credit card receipts?

9       MR. ANDREOLI:  Just a minute, Counsel.

10   Go ahead.

11  BY THE WITNESS:

12    A.   The answer would be yes.

13  BY MR. NORA:

14    Q.   And notwithstanding the fact that you

15  do not recall exactly what was in that

16  notification, can you tell us have you received

17  any complaints or other reports since then that

18  the notification you sent out in 2005 was

19  inaccurate or incomplete?

20    A.   No.

21    Q.   You have not received such reports or

22  complaints, have you?

23    A.   No.

24    Q.   Meaning I am correct?

1          A.    I have not received any complaints from

2    any other customers.

3          Q.    Now, on the Exhibit 3 on that second

4    page where we looked at the notifications

5    about -- so I could have them initialized, is

6    my understanding correct that Doug Porch there

7    appears to have recorded an intention to call

8    the owners of Bacci Pizzeria at 6920?

9          A.    I don't know his intention.

10         Q.    The notation have them initialized

11   would have meant having the customer do

12   something with the Hypercom terminal at

13   6920 West Ogden?

14         A.    We would have used the term initialized

15   to run what we call a test transaction to make

16   sure the terminal was working at 6920 properly.

17         Q.    And that would have required someone at

18   6920 West Ogden doing something with the

19   Hypercom terminal?

20         A.    Yes.

21         Q.    Thank you.   We noted on that one piece

22   of paper that there might be a missing fax

23   number, otherwise, all the documents that you

24   looked at in the exhibits today are true and

1    accurate copies of your business records, am I

2    correct?

3         A.    Yes.

4         Q.    And they are kept in the normal course

5    of business by Translink?

6         A.    Yes.

7         Q.    And you have custody and control over

8    those records, correct?

9         A.    Yes.

10        Q.    And also your answer -- you have

11   custody and control of the other records that

12   have been produced pursuant to subpoena in this

13   case, correct?

14        A.    Yes.

15        Q.    And those are -- those are kept in the

16   normal course of business, correct?

17        A.    The secondary big file is not kept in

18   the normal course.

19        Q.    That was specially run?

20        A.    That was specially created for this.

21        Q.    And how is that created?

22        A.    I had to have three employees spend

23   about a week running individual day reports for

24   this location by accessing them through

1    Maverick's computer system.

2        Q.   So those were obtained from Maverick --

3    from Maverick's business records, correct?

4        A.   From their system.  We have access

5    within our office.

6        Q.   So those are from records that your

7    business has routine access to when you need

8    it, correct?

9        A.   Yes.

10       Q.   And to your knowledge, they're kept in

11   the normal course of business by Maverick,

12   correct?

13       A.   Yes.

14            MR. NORA:  That's all.  Thanks.

15                 **FURTHER EXAMINATION**

16                   by Mr. Samore

17       Q.   I appreciate all the time and effort

18   you put into this.  If you go to the second

19   page of Exhibit Number 2, if you look at the

20   signature at the bottom, it says Doug and then

21   under truncation is complete, would you agree

22   with me -- look at the signature at the bottom

23   Doug versus the signature below truncation is

24   complete, would you agree that handwriting

1    looks different, one appears to -- the top one

2    appears to be -- certainly includes a number of

3    letters above and beyond Doug?

4         MR. NORA:  Objection, speculation,

5      foundation, et cetera, but go ahead.

6    BY THE WITNESS:

7      A.   Yeah, I don't know people's signatures.

8    I don't know if that's two different people.

9    BY MR. SAMORE:

10     Q.   So as you sit here today, would it be

11   fair to say you do not know whether the

12   statement truncation is complete was written by

13   Doug or by somebody else?

14     A.   I do not know.

15     Q.   And isn't it at least very possible

16   that -- is it possible that the phrase

17   truncation is complete was written by an

18   employee with the credit card processing

19   company and faxed to your company?

20     A.   It's a possibility.

21     Q.   And if it was written by someone

22   outside of your company, in particular by the

23   credit processing company, then that phrase

24   could simply mean that the download had been

1    prepared?

2         A.    Correct.

3              MR. SAMORE:  Thank you very much.

4              MR. NORA:  For the record, we were just

5         talking about Exhibit Number 3.

6              MR. ANDREOLI:  One minute with Jim and

7         then we could switch off.

8              (Recess taken.)

9                        **EXAMINATION**

10                   by Mr. Andreoli

11        Q.    Jim, you remember counsel Mr. Nora

12   asked you about Katrina Hansen, yes?

13        A.    Yes.

14        Q.    And, in particular, he asked you

15   whether she had any technical expertise, do you

16   remember that?

17        A.    Yes.

18        Q.    And you answered no, correct?

19        A.    Yes.

20        Q.    When you answered no, it's my

21   understanding that you meant she had no

22   technical expertise as to the particular

23   terminals we've been discussing here and, in

24   particular, programming these terminals, that

1    is correct, right?

2        A.   Yes.

3        Q.   She had other technical expertise in

4    her job, correct?

5        A.   She did.

6            MR. ANDREOLI:   Thank you.

7                    **FURTHER EXAMINATION**

8                      by Mr. Nora

9        Q.   Why don't you tell us what that

10   technical expertise was?

11       A.   She worked for us for ten years and

12   helped customers with a broad range of things,

13   just not specific to the programming of their

14   terminals.

15       Q.   So she could -- she was a generalist in

16   the company?

17       A.   She could help them with just about

18   everything else other than the programming of

19   the machine.

20           MR. NORA:   Thank you very much.

21           MR. SAMORE:   Thank you very much.

22           MR. ANDREOLI:   We'll reserve.

23                (Witness excused.)

24                FURTHER DEPONENT SAITH NOT

```
1          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                   COUNTY DEPARTMENT, CHANCERY DIVISION
2

3    CHRISTOPHER D. SHURLAND,         )
     individually and as the          )
4    representative of a class of )
     similarly-situated persons,      )
5                                     )
              Plaintiffs,             )
6                                     )
         vs.                          ) No. 08 CH 10786
7                                     )
     BACCI CAFE` & PIZZERIA ON        )
8    OGDEN, INC., and DOES 1-10,      )
                                      )
9             Defendants.             )

10           I, JAMES TRACY, being first duly sworn,

11   on oath say that I am the deponent in the

12   aforesaid deposition taken on December 10,

13   2008; that I have read the foregoing transcript

14   of my deposition, consisting of pages 1 through

15   97 inclusive, and affix my signature to same.

16           _____ as it now appears

17           _____ as it now appears with corrections

18

19           _____
                     JAMES TRACY
20

21

22   SUBSCRIBED AND SWORN TO
     before me this _____ day
23   of _____, 2008.

24   _____
            Notary Public
```

```
1        STATE OF ILLINOIS   )
                             ) SS.
2        COUNTY OF C O O K   )

3              I, MICHELE J. LOSURDO, a notary public

4        within and for the County of DuPage and State

5        of Illinois, do hereby certify that heretofore,

6        to-wit, on the 10th day of December, A.D.,

7        2008, personally appeared before me at

8        233 South Wacker Drive, Suite 7800, in the City

9        of Chicago, County of Cook, and State of

10       Illinois, JAMES TRACY, a witness, called by the

11       Plaintiffs in a certain cause now pending and

12       undetermined in the Circuit Court of Cook

13       County, Illinois, wherein CHRISTOPHER D.

14       SHURLAND, et al., are the plaintiffs and BACCI

15       CAFE` & PIZZERIA ON OGDEN, INC., et al., are

16       the defendants.

17             I further certify that the said

18       witness, JAMES TRACY, was by me first duly

19       sworn to testify the truth, the whole truth and

20       nothing but the truth in the cause aforesaid;

21       that the testimony then given by him was by me

22       reduced to writing by means of shorthand in the

23       presence of said witness and afterwards

24       transcribed upon a computer, and the foregoing
```

1    is a true and correct transcript of the

2    testimony so given by him as aforesaid.

3          I further certify that the reading and

4    signing of said deposition was reserved by the

5    witness.

6          I further certify that the taking of

7    the deposition was pursuant to notice, and that

8    there were present at the taking of the

9    deposition the aforementioned parties.

10          I further certify that I am not counsel

11   for nor in any way related to any of the

12   parties to this suit, nor am I in any way

13   interested in the outcome thereof.

14          In testimony whereof, I have hereunto

15   set my hand and affixed my notarial seal this

16   29th day of December, A.D., 2008.

17

18

19   _Michele J. Losurdo_

20   Michele J. Losurdo, CSR
     Notary Public, DuPage County, IL
21   Illinois License No. 084-004285

22   "OFFICIAL SEAL"
     Michele J. Losurdo
23   Notary Public, State of Illinois
     My Commission Exp. 11/01/2009

24

*Download/HTTP* ✓ New Account ☐ Additional Location

*#693*

# MERCHANT PROCESSING APPLICATION

**NATIONAL TRANSLINK CORPORATION**

MID # Existing Location _____

Contractor _CORP_ # _____

Rep. Name _ED SATALA_

Rep # _1080_ Rep SS # _____

**BBB** MEMBER *Owner in*

WHEN COMPLETED DELIVER TO: One Tower Lane, Suite 1900 Oakbrook Terrace, IL 60181

## BUSINESS LOCATION

| Business/Corporate Name | Statement Mailing Address (If different from location address) |
|---|---|
| DBA (Doing Business As) Name _BACCI PIZZERIA_ | City, State, Zip |
| Location/Site Address _6820 W. Ogden Ave_ | Federal Tax ID Number _342566876_ |
| City, State, Zip _BERWYN, IL 60402_ | E-mail Address | Telephone Number _(708) 788-1700_ | Hours of Operation _12 HRS 8/day_ |

☑ Sole Proprietorship ☐ Partnership ☐ Corporation ☐ LLC ☐ Not for Profit

| How long in present business? _6_ yrs | Do you currently accept credit cards? ☐ Yes ☑ No | Has business or associate principal been previously terminated as a Visa/MC merchant? ☐ Yes ☑ No |
|---|---|---|

**Equipment/Software Information**

Terminal/Software: _HTTP_

Serial Number: _____

Printer _____

Serial No: _____

PIN Pad: _____

Dial Access Code: ☐ 9 ☐ 8 ☐ Call Waiting ☐ Other

| Merchandise/Service Sold _Pizza Rest_ | Monthly Bank Card Limit $ _8000-_ | Average Ticket Amount $ _10-30_ | Highest Ticket Amount $ _100-_ |
|---|---|---|---|

| PERCENT OF BUSINESS (MUST = 100%) | | | SALE METHOD (MUST = 100%) | | |
|---|---|---|---|---|---|
| CARD SWIPED _75_ % | KEYED WITH IMPRINT CARD _25_ % | KEYED WITHOUT IMPRINT CARD % | STORE FRONT _75_ % | OFF PREMISE _25_ % | MAIL/PHONE ORDER % |
| | | | TRADE SHOW % | INTERNET % | OTHER % |

## OWNERS/OFFICERS INFORMATION (MUST REFLECT 50% OR MORE OWNERSHIP)

| Name (Print) _CHIARA L. DIDIANA_ | Title _OWNER_ | Residence Address _10810 Ridgewood Dr_ | City, State, Zip _Palos Park, IL 60464_ |
|---|---|---|---|
| Social Security Number _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_ | Telephone Number _708·671·9984_ | % Equity Ownership _100_ | Driver's License # |
| Name (Print) _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_ | Title | Residence | City, State, Zip |
| Social Security Number | Telephone Number | % Equity Ownership | Driver's License # |

## TRADE REFERENCES (PLEASE COMPLETE SECTION IN FULL)

| Name _Greco_ | Name _B+B_ |
|---|---|
| Address | Address |
| City, State, Zip | City, State, Zip |
| Contact | Contact |
| Phone _630·668·1000_ | Phone _708·652·6023_ |

**EXISTING ACCOUNT NUMBERS**

1. Amex _____
2. Discover _____
3. Diners _____
4. Other _____

EXHIBIT
_Translink #2_
_12/10/08 MB_

## MERCHANT SITE SURVEY (TO BE COMPLETED BY SALES REPRESENTATIVE)

Merchant Location ☑ Store Front ☐ Office Building ☐ Warehouse ☐ Residence ☐ Other _____

The Merchant ☐ Owns ☐ Leases the business premises | Landlord Name | Landlord Telephone #

| Yes | No | | Yes | No | |
|---|---|---|---|---|---|
| ☐ | ☐ | Merchant appears to be conducting business as represented in this application. | ☐ | ☐ | Have you taken pictures inside and outside of the premise? |
| | | Merchant is adequately staffed and stocked to do business. | ☐ | ☐ | Have you confirmed the identity of the person who signed the contract? |

| Comments: | Complete if MOTO, Internet or Future Services |
|---|---|
| | 1) How does the customer order the product? ☐ Mail ☐ Telephone ☐ Fax ☐ Internet ☐ Other _____ |
| | 2) Are consumers required to provide a deposit? ☐ Yes ☐ No |
| | 3) Delivery Time Frame: ☐ 0-7 days ☐ 8-14 days ☐ 15-30 days ☐ More than 30 days |
| | 4) Refund Policy |

I hereby verify that I have physically inspected the business premises of the merchant at this address and the information stated above is correct to the best of my knowledge.

| Inspected by (Print Name) | Signature | Date |
|---|---|---|

# MERCHANT PROCESSING AGREEMENT

In consideration of the mutual covenants and Agreements herein Provident Bank ( BANK ) National Translink Corporation ( NTC ) acting on behalf of and for Acquirer and the undersigned merchant ( MERCHANT ) have agreed as follows as of the date of acceptance by A    nd issuance of a valid merchant number.

**1.0      ties, Duties, and Responsibilities of Merchants**

1.1         ERCHANT shall honor all cards provided:

(a)   The Card is valid and is presented to MERCHANT at the time of the sale by the Cardholder or an authorized user of the Card account. A Card is valid only if it is presented on or after the valid date, if any, and before the expiration date shown on its face.
(b)   The Card is used as payment for goods or services ( Products ) which are sold or rendered by MERCHANT under this Agreement.
(c)   The MERCHANT has followed procedures as established by BANK for completion of  Sales Drafts, including the requirements that regardless of dollar amount each transaction must be authorized.

1.2         MERCHANT agrees to complete Sales Drafts in conformity with the terms of this Agreement and the Card Associations Rules and Regulations. Each sales draft will include:

(a)   For transactions that are not mail order/telephone order/internet order ( MO/TO/IO ), the Imprint of the Card, including name of the Cardholder, Cardholder Account number and the Card s expiration date;
(b)   MERCHANT may not accept MO/TO/IO transactions unless MERCHANT has specifically informed BANK of the percent of MO/TO/IO transactions to be conducted and BANK, in writing, has specifically authorized MERCHANT to accept such transactions. Acceptance of such transactions without written authorization from BANK will constitute a breach of this Agreement. If MERCHANT is authorized to accept MO/TO/IO, MERCHANT must, in addition to the other provisions hereof, conduct such activity in accordance with Section V;
(c)   The signature of the Cardholder or authorized Card user;
(d)   The date of the Sale;
(e)   A short description of the Products sold or rendered;
(f)   The total cash price of the Sale or the words deposit or balance if full payment is to be made in this manner at different times on different Sales Drafts; and
(g)   The city and state wherein such transaction occurred.
(h)   MERCHANT shall deliver a completed copy of the Sales Draft to the Cardholder.

1.3         MERCHANT s policy for the exchange or return of goods sold and the adjustment for services rendered shall be established and posted in accordance with operating regulations of the applicable Card Association s regulations. MERCHANT agrees to disclose, if applicable, to a Cardholder before a Card sale is made, that if merchandise is returned:

(a)   No Refund, or less than full refund, will be given;
(b)   Returned merchandise will only be exchanged for similar merchandise of comparable value;
(c)   Only a credit toward purchases will be given; or
(d)   Special conditions or circumstances apply to the sale (e.g. late delivery, delivery charges, or other non-credit terms).

If MERCHANT does not make those disclosures, a full refund in the form of a Credit to the Cardholder s Card account must be given. MERCHANT shall under no circumstances issue cash for returns of Products where Products were originally purchased on a Card transaction. Disclosures must be made on all copies of Sales Drafts or invoices in letters approximately 1/4 inch high in close proximity to the space provided for the Cardholder s signature or on an invoice issued at the time of the sale or on invoice being presented for the Cardholder s signature.

1.4         MERCHANT shall not request any Cardholder to pay any of Discount or charge imposed upon MERCHANT by this Agreement, whether through any increase in prices or otherwise. MERCHANT shall not require a customer presenting a Card for payment to pay any charge not also required from a person paying cash. This term shall not, however, be construed as prohibiting discounts to customers for payments in cash.

1.5         MERCHANT agrees to obtain an authorization on all transactions. Any transaction which cannot be authorized electronically through a   term   l   subject to a Voice Authorization call at a cost of $0.95 per call. MERCHANT will obtain an Authorization prior to completing a Sale. If     any transaction which is not properly authorized is made with full resource and may be charged back to MERCHANT; furthermore, any   _   action will be subject to additional charges for a mid or a non-qualifying transaction. MERCHANT hereby acknowledges that an authori    ex received indicates the availability of credit for the Card at the time the authorization is given, but does not constitute a warranty that the person presenting the Card is the rightful Cardholder, nor an unconditional promise or guarantee that BANK will arrange for payment for the debt that underlies the requested transaction (or will not charge back to MERCHANT a debit against any payment thus arranged).

1.6         MERCHANT agrees to electronically deposit Sales Drafts and Credit Vouchers no later than five business days following the transaction date.

1.7         MERCHANT shall at all times maintain an account (Account ) at a bank that is a member of the  Federal Reserve ACH System. MERCHANT will maintain sufficient funds in the Account to accommodate all transactions, including fees, contemplated by this Agreement. All credits for collected funds and debits for fees, payments and Chargebacks under the terms of this Agreement shall be made to the Account by check or otherwise provided herein. MERCHANT may not close or change the Account without written notice to BANK. BANK will assess a $5.00 fee for each change to the Account made by MERCHANT. MERCHANT will be solely liable for all fees and costs associated with the Account and for all overdrafts. MERCHANT hereby grants to BANK a security interest in the Account to the extent of any and all fees, payments and Chargebacks which may arise under this Agreement, and MERCHANT shall execute any document and obtain any consents or waivers from the bank at which the Account is maintained as required by BANK to perfect its security interest therein.

1.10       MERCHANT will promptly examine all statements relating to the Account, and immediately notify BANK in writing of any errors. MERCHANT s written notice must specifically (i) MERCHANT name and account number; (ii) the dollar amount of the asserted error; (iii) a description of the asserted error, and (iv) an explanation of why MERCHANT believes an error exists and the cause of it, if known. That written notice must be received by BANK within 30 days after MERCHANT received the periodic statement containing the asserted error.

1.11       MERCHANT shall pay any fees charged to MERCHANT by the telephone company for the preparation of the site(s) prior to the installation of electronic data capture terminals and/or peripheral equipment.

1.12       MERCHANT shall provide BANK with a minimum of 60 days prior notice of intent to:

(a)   Transfer or sell any substantial part of its total assets, or liquidate;
(b)   Change the basic nature of its business, including selling any Products or services not related to its current business;
(c)   Change ownership or transfer control of its business; or
(d)   enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in MERCHANT s business. Failure to provide notice as required above may be deemed as a material breach and shall be sufficient grounds for immediate termination of MERCHANT. In the event any of the changes listed above should occur, BANK shall have the option to renegotiate the terms of this Agreement or provide MERCHANT with written notice of termination.

1.13       MERCHANT agrees that it shall not submit any Sales Draft to BANK if MERCHANT is aware of any circumstance which would give the Cardholder any right to initiate a Credit or Chargeback or which would allow the BANK to refuse a Sales Draft. For each a prior settlement as allowed hereunder, MERCHANT agrees that it is liable for repayment to BANK for all valid Chargebacks. BANK will comply with Card Associations providing Rules and Regulations in processing any Chargebacks which result from Cardholder disputes. However, all disputes which are not or cannot be resolved through established Chargeback procedures shall be settled between MERCHANT and the Cardholder.

1.14       MERCHANT will use the reasonable, best efforts to recover any Card:

(a)   On Visa Cards, if the printed four digits above the embossed account number do not match the first four digits of the embossed account number;
(b)   If MERCHANT is advised by BANK (or its designee), the issuer of the Card or the designated voice authorization center to retain it;
(c)   If MERCHANT has reasonable grounds to believe the Card is counterfeit, fraudulent or stolen, or not authorized by the Cardholder; or
(d)   For MasterCard Cards, the embossed account number, indent printed account number and/or encoded account number do not agree, or the Card does not have a MasterCard hologram on the lower right corner of the Card face.

1.15       MERCHANT warrants and agrees that MERCHANT shall fully comply with all federal, state, and local laws, rules and regulations, as amended from time to time, including the Federal Truth-in-Lending Act and Regulation Z of the Board of Governors of the Federal Reserve System.

1.16       MERCHANT agrees to comply with any instructions provided in the  Manuals/Instructions  ) regarding Chargebacks, terminal processing and other operational compliance matters supplied to MERCHANT by the BANK. MERCHANT agrees to follow the procedures in the Manuals/Instructions in connection with each Card transaction. If there should be any conflict between this Agreement and the Manuals/Instructions, this Agreement shall control.

**2.0      Discount Schedule and Fee Schedule.**

2.1         Through ACH, BANK will debit MERCHANT s Account daily or monthly, at the option of the BANK, for discounts and fees. Discounts shall be calculated by BANK by multiplying the discount rate, expressed in the Pricing Schedule section of the Merchant Processing Application by the gross dollars deposited by MERCHANT on a daily basis. BANK reserves the right to immediately increase   discount rate without notice to MERCHANT if there is any material variance in any information asserted in Merchant Proce     sitation and/or Merchant Processing Agreement, including, but not limited to, average ticket size, projected monthly volume, type   or services sold, the ratio of keyed to swiped transactions, the amount of mail and telephone order or internet transactions.

2.2         The discount rate in  Schedule of Charges  is applicable only to qualified transactions. MERCHANT acknowledges that there are many different types of transactions which will be assessed additional discount. Any transaction which is subject to the following Visa and MasterCard interchange categories shall be assessed up to a 1.42% mid-qualified addition to discount rate: Standard Visa and MasterCard, Bill in Rate II, Data Rate II, CPSRetail 2, CPSHotel and Auto Rental, CPS Card Not Present, CPSCAT, ERP, Int Std Key-Entered, Merit I, Data Rate II,  Non-qualified transaction which is subject to the following Visa and MasterCard interchange categories as set forth and Intl Comml. Any transaction which is subject to the following Visa and MasterCard interchange categories as set forth non-qualifying category shall be assessed up to a 1.62% non-qualified addition to discount rate: Standard, World MasterCard T & E; Non-qualified: Standard; International Corporate: International Standard; Standard Interchange Rate; Corporate T&E I; Corporate Standard; International Interchange Rate; Signature  Elec and Signature Std.

NOTE:  Days allowed for settlement are based on the BANK and when MERCHANT s account daily or monthly at the option of the BANK, for the fees due under this Agreement. See Sections 1.3, 1.9, 2.6, 8.1, 8.4 and 9.8, for additional fees which may apply.

2.4         MERCHANT is obligated to pay all taxes and other charges imposed by any governmental authority on the services provided under this Agreement.

2.5         Unless written notice to MERCHANT, unless a later date is provided, BANK may adjust discount rate and/or fee charges.

2.6         If MERCHANT has opted for Merchant Club Services, BANK shall provide MERCHANT with a terminal/printer replacement service, described below, and a maximum quantity of two (2) rolls of paper per quarter and (1) printer ribbon per six (6) months. MERCHANT hereby authorizes BANK s agent to initiate debit/credit entries to MERCHANT s checking account for any additional supplies or services ordered from BANK or BANK s agent, or for additional program fees assessed, as specifically described below. The right to purchase the above described quantity of supplies shall, with regard to roll of paper, extinguish each quarter and, with regard to printer ribbons, extinguish each 6 month period Any supplies shipped pursuant to the terms of this program shall be shipped at the BANK s cost. With regard to terminal/printer replacement at the request of MERCHANT, BANK shall replace broken or malfunctioning units  ( failed units (with limit of one (1) terminal and one (1) printer replacement per year. Units which have suffered abuse, physical breakage or electrical surge at the  site (termination of BANK s Agent shall not be covered by this program. All replacement requests received by BANK before 3:00 p.m. CST Monday through Friday, holiday-excepted, shall be deployed on the same day. Shipping of the replacement shall be at MERCHANT s sole expense. Any replacement request cancelled post shipment or a returned and refused order shall be assessed $20.00 administration fee plus a 15% restocking fee. Replacement units shall be warranted by BANK s Agent for 10 calendar days, and units failing during this period shall be replaced at no cost to MERCHANT, provided the failure was not as a result of electrical surge abuse or breakage by MERCHANT, which determination shall be in BANK s Agent s sole discretion. BANK makes no other warranties to MERCHANT either express or implied. MERCHANT shall ship, at MERCHANT s sole expense, the failed unit(s) to BANK and failure to do so within 10 business days of the replacement request shall result in a debit to MERCHANT s checking account for the full replacement cost of the failed unit(s). In the event MERCHANT returns the failed unit(s) within 10 days after the debit has been initiated, MERCHANT will receive a credit in the amount of the aforementioned debit less a $25.00 processing fee. If MERCHANT does not want to become a Member Club member, MERCHANT must notify BANK in writing. Merchant Club membership may be cancelled at any time during the term of this Agreement upon receipt by BANK or 10 days prior written notice.

**3.0      Rights, Duties and Responsibilities of BANK**

3.1         BANK will accept for processing all Sales Drafts presented by MERCHANT that comply with the terms of the Agreement. Except as may otherwise be allowed under this Agreement, BANK will initiate  provisional payment from this settlement account ( Settlement account ) to MERCHANT within two (2) business days after transaction date, the total face amount of such Sales Draft, less any credits, discounts, fees or adjustments determined daily or monthly. However, BANK cannot guarantee the timeliness with which any payment may be credited to and/or by MERCHANT s bank. All payments, credits and charges are subject to audit and final checking by BANK, and prompt adjustment shall be made for inaccuracies discovered. This Agreement is a contract whereby the BANK is extending financial accommodations to MERCHANT within the meaning of Section 365(c) of the Bankruptcy Code.

3.2         Notwithstanding any other provisions of this Agreement, BANK may refuse to accept any Sales Draft, or revoke its prior acceptance, in any of the following circumstances:

(a)   merchandise is returned, and a credit is not received by BANK for processing;
(b)   the sales records or agreement is, or is alleged to have been executed, accepted, endorsed, completed or assigned improperly, without authority, or not in accordance with the authorization requirements or any other provisions of this Agreement;
(c)   regardless of any authorization obtained, MERCHANT completes a transaction when the cardholder was present and did not sign the sales records, the signature on the record was unauthorized as compared to the signature appearing on the Card, the signature panel on the Card was blank or a limited purpose business purchasing card was accepted without appropriate authorization of the nature of the goods or services purchased in addition to the transaction amount;
(d)   the sales record is incorrectly completed, incomplete or illegible;
(e)   the Cardholder disputes the sale, quality or delivery (or availability for pre-arranged pick-up) of merchandise or the performance or quality of service covered by the sales records or agreement accepted by such Cardholder;
(f)   the circumstances in which the sales records or agreement was created or submitted, or credit was received, by MERCHANT constituted or otherwise, involved a breach of any term, condition, representation, warranty or duty of MERCHANT hereunder;
(g)   multiple sales records or agreements were executed to avoid the need to obtain authorization necessary to complete the transaction;
(h)   the extension of credit for merchandise sold or rental or service performed was in violation of law or the rules or regulations of any governmental agency, whether federal, state, local or otherwise;
(i)   a duplicate copy of the sales record or agreement or credit memo cannot be produced by MERCHANT upon request within 5 days of BANK s request;
(j)   the Cardholder asserts against BANK any claim or defense which the Cardholder may have as a buyer against MERCHANT;
(k)   the Cardholder disputes the validity of a telephone or mail order card sale or electronic commerce sale; or
(l)   the transaction is otherwise subject to Chargeback by the Card issuer or Cardholder in accordance with Association Rules or applicable law.

3.3         BANK will provide electronic data capture, monthly activity statements, and will assign customer service phone numbers which will accept all customer service calls and other communications from MERCHANT relating to the services provided under this Agreement including but not limited to, disbursement of funds, account charges, monthly statements and Chargebacks.

3.4         BANK will process all request for drafts and chargebacks from Card issuers and will provide  MERCHANT with timely notice of requests and Chargebacks for documentation.

3.5         MERCHANT acknowledges that BANK, may use an independent sales organization/member service provider ( ISO/MSP ) operating under applicable VISA and MasterCard rules and regulations. ISO/MSP is an independent contractor and not an agent of BANK. ISO/MSP has no authority to execute the Agreement on BANK s behalf or to alter the terms hereof without  BANK s prior written approval. Any alteration of the terms of this Agreement must be initialed and approved by BANK.

3.6         If MERCHANT applies for check guarantee services, MERCHANT is contracting directly with the provider of such services. BANK shall not be responsible for check guarantee services.

3.7         The BANK s sole responsibility for transactions involving Cards issued by American Express, Diners Club/Carte Blanche, Discover Financial Services, Inc. (the issuer of Discover Cards and certain other cards), and JCB (such a Card Issuer) and other Cards specified in the Application, will be to provide  the services as specified in the Application. Unless the BANK otherwise agrees in writing to provide additional services for any of these additional Card Programs, BANK will provide authorization and/or draft processing services only, and all settlement and Chargeback obligations and similar financial responsibilities arising from the MERCHANT s transactions involving Cards other than Visa and MasterCard will be governed exclusively by the MERCHANT s agreement with the respective Card Issuer, and the MERCHANT agrees that such authorization for or submit for processing of settlement any transactions involving  Cards other than Visa and MasterCard unless the MERCHANT has in effect a valid lessor Agreement with the applicable Card Issuer, except to the extent the BANK has agreed to provide settlement services with respect to JCB, Diners Club, Carte Blanche or Discover Card transactions. The MERCHANT must notify the BANK immediately upon termination of any lessor Agreement. Upon such termination , the BANK will have no further obligation to provide any services for transactions involving the Cards covered by the terminated lessor Agreement (except to the extent the BANK has agreed to provide settlement services with respect to JCB, Diners Club/Carte Blanche or Discover Card transactions). The BANK does not warrant or bear any responsibility for any Card Issuer or for its performance of any obligations to the MERCHANT. If any lessor Agreement requires a Card Issuer s consent for the BANK to perform the services contemplated by this Agreement, the MERCHANT is responsible for obtaining that consent.

**4.0      Account Monitoring**

4.1         MERCHANT acknowledges that BANK will monitor MERCHANT s daily credit and transaction activity. MERCHANT agrees that BANK may upon reasonable grounds determine that on escrow/security account the disbursement of MERCHANT funds and/or temporarily suspend processing under this Agreement. Reasonable grounds shall include, but not be limited to the following: suspicious or unusual transaction activity; material variance in the nature of MERCHANT s business, type of product and/or service sold, average ticket size, monthly volume or swiped/keyed percentages, from such information asserted by MERCHANT in this Agreement. MERCHANT does not authorize transactions; BANK receives excessive retrieval requests against MERCHANT s prior activity; excessive Chargebacks are debited against MERCHANT s prior activity; MERCHANT does not deliver product or render full service on or before the transaction date; MERCHANT accepts a foreign card transaction. If the MERCHANT s funds are diverted by BANK or BANK  has temporarily suspended processing under this Agreement, such diversion or suspension shall be for any reasonable period of time required by BANK to fully investigate MERCHANT s account activity and resolve, to BANK s sole satisfaction, the subject transaction or activity of MERCHANT. Any funds diverted shall be maintained by BANK in a non-interest bearing account, which may be a commingled account, BANK shall have no liability for any losses, either direct or indirect, which MERCHANT may attribute to any diversion of funds, or postponement of processing.

**5.0      Warranties; Disclaimer of Warranties**

5.1         MERCHANT unconditionally represents and warrants to BANK that all Sales Drafts submitted to BANK hereunder will represent the indebtedness of Cardholder with whom MERCHANT has completed a Card sale in amounts set forth herein for Products or for fully rendered services, shall not involve any element of credit for any other purposes, and shall not be subject to any defense, dispute, offset or counterclaim which may be raised by any Cardholder under the Card Associations Rules and Regulations, the Consumer Credit Protection Act (15 USC 1601) or other relevant state or federal statute or regulations.  Further, MERCHANT warrants that any credit voucher which it issues represents a bonafide refund or adjustment on a Card sale or for services fully rendered by MERCHANT with respect to which a Sales Draft has been accepted by the BANK.

**6.0      Limitations of Liability; Identification; Due Care**

6.1         BANK shall have no liability for any negligent design or manufacture of any point-of-sale terminal, printer or other equipment used by MERCHANT for the acceptance of credit card transactions.

BANK MAKES NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, CONCERNING ANY EQUIPMENT, OR OTHER SERVICE PROVIDED BY OTHERS AND, IN PARTICULAR, MAKES NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

6.2         MERCHANT agrees to indemnify and hold the BANK harmless from and against all losses, liabilities, damages and expenses (including attorneys and collection fees and expenses) resulting from: any breach of any covenant or agreement or any misrepresentation by MERCHANT under this Agreement; any transaction processed by MERCHANT or submitted through Card Association Rules and Regulations; MERCHANT s negligence or willful misconduct in connection with Card transactions, or otherwise arising from MERCHANT s provision of goods and services to Cardholder. Further, the MERCHANT agrees to indemnify and hold the BANK harmless from and against all losses, liabilities, damages and expenses (including attorneys and collection fees and expenses) by reason of: any amount the BANK may incur pursuant to any Card Association rule or regulation resulting from MERCHANT s actions or inaction; or any amount the BANK may incur as a result of any action MERCHANT may institute against any Card Association or Card issuer following a Chargeback.

6.3         BANK will use due care in providing services covered by this Agreement, and the performance of all services called for in this Agreement shall be consistent with industry standards. The liability, if any, of BANK under this agreement for any claims, costs, damages, losses and expenses for which it is or may be legally liable, whether rising in negligence or other tort, contract, or otherwise, shall not in the aggregate the amount of fees paid by MERCHANT to BANK hereunder. In no event shall BANK, its interchange and assessments, over the previous 12 month period, calculated from the date the liability accrued. In no event will BANK or its agents, officers, directors or employees be liable for indirect, special, or consequential damages, including, but not limited to, any losses which may result from MERCHANT being unable to transact business.

**7.0      Display of Materials; Trademarks**

Chiara L. Didiana
Vincent Didiana
10510 Ridgewood Dr.
Palos Park, IL 60464

1096

70-936/719

20____

PAY to
the ORDER of _____ $ _____

VOID

STANDARD BANK
AND TRUST CO.

_____ DOLLARS

for _____ _____ MP

⑈071909363⑈ 460577100⑈7⑈ 1096

MERCHANT hereby authorizes t
to remain in full force and effect t
arisen under this Agreement hav

m the same. The authority an
RCHANT to BANK that have

ccount title.

STAPLE CHECK
HERE

## PRICING SCHEDULE

Discount Visa **1.62** %

Discount MasterCard **1.62** %

| Transaction/ACH Fee | Retail | MOTO |
|---|---|---|
| MasterCard | $.25 | $.30 |
| Visa | $.25 | $.30 |
| Other | $.30 | $.30 |

| | |
|---|---|
| ACH Rejection | $25.00 |
| Basic Service Fee | $10.00 |
| Charge Back Fee | $30.00 |
| Checking Acct. Change | $20.00 |
| Imprinter Fee | $30.00 |
| Merchant Club | $ 7.95 |
| Minimum Discount Fee | $25.00 |

| | |
|---|---|
| On-line Access | $ 6.00 |
| Retrieval Fee | $12.50 |
| Semi-Annual Fee | $52.50 |
| Voice Auth. Setup | $25.00 |
| Voice Authorization | $ .95 |
| Wireless Fee | $25.00 |

RESTAURANT W/TIPS ☐          OTHER W/TIPS ☐          RETAIL ☑          MOTO/INTERNET ☐

## MERCHANT ACCEPTANCE

By signing below, I represent that the information I have provided on the Application is complete and accurate and that I have the requisite authority to sign on behalf of the Merchant. The Merchant has read and agrees to be bound by the terms and conditions of the Merchant Processing Agreement. The Merchant authorizes the BANK or any credit reporting company agency utilized by the BANK or any agent of the BANK to make whatever inquiries the bank deems appropriate to investigate, verify or research references, statements or date obtained from Merchant for the purpose of this Application. The Merchant agrees that the BANK may accept and act in reliance upon a copy or facsimile of this application bearing signatures and that any such copy or facsimile shall be deemed and treated for all purposes as an original of the Application as bearing their original signatures.

AGREED AND ACCEPTED                    Print Business Name: **BACCI PIZZERIA**

**X** _Chiara D. Diona_ _____ (Signature)

**CHIARA L. DIDIANA** _____ (Printed Name)          **5-11-04**
                                                                      Date

Its _____

## DISCOVER ACCEPTANCE

**1.73.1** Discount Rate          Initial box for Discover Card Acceptance **CD**          $25 Membership Fee (Charged directly by Discover)
Discover will charge a Transaction Fee of $.10 on all Discover Transactions

PERSONAL GUARANTY: FOR VALUE RECEIVED, and in consideration of the mutual undertaking contained in the MERCHANT PROCESSING AGREEMENT (the "Agreement") by and between the Merchant and PROVIDENT BANK ("Bank") the undersigned jointly and severally if more than one, unconditionally guarantees to the BANK and its successors and assigns the full prompt payment when due of all of the obligations of every kind and nature of MERCHANT arising directly or indirectly out of the agreement or any document executed and delivered by the MERCHANT in accordance with the terms of the Agreement. The undersigned further agrees to pay the BANK all expenses (including attorney fees and court costs) paid or incurred by the BANK in collecting such obligations and enforcing this Guaranty.

**X** _Chiara D. Diona_ (Signature)     **5-11-04**          By: X _____ (Signature)
                                                    Date
**CHIARA L. DIDIANA** (Printed Name)                              _____ (Printed Name)

FOR BANK USE ONLY

Application Approved by: _____          _____          _____
                          Signature                          Title                          Date

```
Program: MCMTER                   MAVERICK's MagCARD System
                                  Terminal File Maintenance
                                         Mer Id  :    810002024869   81 MRB-TRNLK
Terminal Id:8122486901                   Mer Name:BACCI PIZZERIA
Name:██████████████                      Valid Activity:    Unlocked     Track:2
Addr1:6920 W. OGDEN AVENUE               Terminal Type :T7P HYPERCOM T7P TERMINAL
Addr2:                                   Program Code :HKR HYPERCOM VISAK REST.
City :BERWYN          State:IL           Printer Type  :  NO PRINTER ATTACHED
Zip :60402       Phone:(708)788-1700     CDPD Modem    :    None        Baud:1200
Comments:#224869016
SIC Code:5812 EATING PL  Upd/1st Prefix Phone   2nd Prefix Phone        PreDial
                            N      18005104346  N     18005106811
                                            0                    0       Y
Tymnt:                             18005104346        18005106811       Y
Vnet :K0.433551812248690101                 0                    0       Y
Bnet :                                      0                    0       Y
Amex :                                      0                    0       Y
Disc :                                      0                    0       Y
JCB  :                                      0                    0       Y
Priv :

Mer: Amex:       0  Disc:601101326394911  T&E:         0  JCB:              0
Amex PIP :       0  Priv:                     0            TeleCrdt:        0
Option   :___
Current Mode: Inquire
```

```
Program: MCMTER          MAVERICK's MagCARD System
                         Terminal File Maintenance
Terminal Id:8122486901          Mer Id  :    810002024869   81 MRB-TRNLK
Name :BACCI PIZZERIA            Mer Name:BACCI PIZZERIA
Addr1:6920 W. OGDEN AVENUE      Valid Activity:   Unlocked      Track:2
Addr2:                          Terminal Type :T7P HYPERCOM T7P TERMINAL
City :BERWYN        State:IL    Program Code  :HKR HYPERCOM VISAK REST.
Zip  :60402     Phone:(708)788-1700  Printer Type :  NO PRINTER ATTACHED
Comments:#224869016             CDPD Modem    :    None      Baud:1200
SIC Code:5812 EATING PL  Upd/1st Prefix Phone   2nd Prefix Phone    PreDial
                              N    18005104346   N    18005106811
Tymnt:                               0                  0        Y
Vnet :K0.433551812248690101        18005104346         18005106811    Y
Bnet :                               0                  0        Y
Amex :                               0                  0        Y
Disc :                               0                  0        Y
JCB  :                               0                  0        Y
Priv :                               0                  0        Y

Mer: Amex:      0  Disc:601101326394911  T&E:      0  JCB:           0
Amex PIP :      0  Priv:             0              TeleCrdt:        0
Option   :___
Current Mode: Inquire
```

*Truncation is complete*
*Don ___ 7·14·06*

*☐ 7/13/06*
*PIS Truncate &*
*let me Know when*
*Done SO I can have*
*Them Initialed*
*Thx Davy*

TO: _david_

FAX: _630-574-0965_

5D

# CARDSYSTEMS
# HYPERCOM DOWNLOAD NOTICE

**MERCHANT NAME** _Bacci Pizzeria_

**MERCHANT NUMBER** _810002024869_

**HYPERCOM TERMINAL NUMBER** _224869016_

**APPLICATION:** (RESTAURANT)   RETAIL

**AUTOCLOSE TIME** _____

**INIT TELEPHONE NUMBER** 18886963376

**NMS TELEPHONE NUMBER** 18886963376

If you have any questions or problems, please call 1-888-999-6477.

_708 343 2600_



EXHIBIT
_Translink #4_
_12/10/08 MB_



```
Program: MCMTER          MAVERICK's MagCARD System
                         Terminal File Maintenance
Terminal Id:8122486901             Mer Id  :    810002024869    81 PROV-TRNLK
Name :BACCI PIZZERIA               Mer Name:BACCI PIZZERIA
Addr1:6920 W. OGDEN AVENUE         Valid Activity:   Unlocked      Track:2
Addr2:                             Terminal Type :T7P HYPERCOM T7P TERMINAL
City :BERWYN          State:IL      Program Code  :HKR HYPERCOM VISAK REST.
Zip  :60402     Phone:(708)788-1700 Printer Type  :  NO PRINTER ATTACHED
Comments:                          CDPD Modem   :    None        Baud:1200
SIC Code:5812 EATING PL  Upd/1st Prefix Phone    2nd Prefix Phone      PreDial
                         N       18005104346   N       18005106811
Tymnt:                                     0              0       Y
Vnet :K0.433551812248690101        18005104346        18005106811
Bnet :                                     0              0       Y
Amex :                                     0              0       Y
Disc :                                     0              0       Y
JCB  :                                     0              0       Y
Priv :                                     0              0       Y

Mer: Amex:        0  Disc:        0  T&E:        0  JCB:             0
Amex PIP :        0  Priv:        0              TeleCrdt:          0
Option   :
Current Mode: Add
TERMINAL RECORD ADDED TO DATA BASE
```

Please

build

w/Tips, no autobatch

thanks !!

*Download/HTTP* *#693*

☑ New Account
☐ Additional Location

**NATIONAL TRANSLINK CORPORATION**

# MERCHANT PROCESSING APPLICATION

MID # Existing Location

Contractor  CORP  #

Rep. Name  ED SATALA

**WHEN COMPLETED DELIVER TO:** One Tower Lane, Suite 1900
Oakbrook Terrace, IL 60181

Rep #  1080        Rep SS #

## BUSINESS LOCATION

| Business/Corporate Name | Statement Mailing Address (if different from location address) |
|---|---|
| DBA (Doing Business As) Name  BACCI PIZZERIA | City, State, Zip |
| Location/Site Address  6920 W. Ogden AVE | Federal Tax ID Number  342566876 |
| City, State, Zip  Berwyn, IL 60402  E-mail Address | Telephone Number  (708) 788-1700  Hours of Operation  12 HRS P/day |

☐ Sole Proprietorship  ☐ Partnership  ☐ Corporation  ☐ LLC        ☐ Not for Profit

| | | | Equipment/Software Information |
|---|---|---|---|
| How long present business?  6 yrs | Do you currently accept credit cards? ☐Yes ☑No | Has business or associate principal been previously terminated as a Visa/MC merchant? ☐Yes ☑No | Terminal/Software:  HTTP |
| MERCHANDISE/SERVICE SOLD  PIZZA Rest | MONTHLY BANK CARD LIMIT  $ 8000 | AVERAGE TICKET AMOUNT  $ 10-30 | HIGHEST TICKET AMOUNT  $ 100 |
| | | | Serial Number: |

| PERCENT OF BUSINESS (MUST = 100%) | | | SALE METHOD (MUST = 100%) | | | Printer |
|---|---|---|---|---|---|---|
| CARD SWIPED  75 | KEYED WITH IMPRINT CARD  25 25 | KEYED WITHOUT IMPRINT CARD | STORE FRONT  75 % | OFF PREMISE  25 % | MAIL/PHONE ORDER % | Serial No: |
| 75 % | 25 % | % | TRADE SHOW % | INTERNET % | OTHER % | PIN Pad: |
| | | | | | | Dial Access Code: ☐9 ☐8 ☐Call Waiting ☐Other _____ |

## OWNER/OFFICERS INFORMATION (MUST REFLECT 50% OR MORE OWNERSHIP)

| Name (Print)  TIARA L. DIDIANA | Title  OWNER | Residence Address  10810 Ridgewood Dr | City, State, Zip  Palos Park, IL 60464 |
|---|---|---|---|
| Social Security Number  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 | Telephone Number  708-671-9984 | % Equity Ownership  100 | DRIVER'S LICENSE # |
| Name (Print)  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 | Title | Residence | City, State, Zip |
| Social Security Number | Telephone Number | % Equity Ownership | DRIVER'S LICENSE # |

## TRADE REFERENCES (PLEASE COMPLETE SECTION IN FULL)

EXISTING ACCOUNT NUMBERS

| Name  Greco | Name  B+B | 1. Amex |
|---|---|---|
| Address | Address | 2. Discover |
| City, State, Zip | City, State, Zip | 3. Diners |
| Contact | Contact | 4. Other |
| Phone  630-668-1000 | Phone  708-652-6023 | |

## MERCHANT SITE SURVEY (TO BE COMPLETED BY SALES REPRESENTATIVE)

Merchant Location  ☐ Store Front  ☐ Office Building  ☐ Warehouse  ☐ Residence  ☐ Other _____

| Merchant | Landlord Name | Landlord Telephone # |
|---|---|---|
| ☐ Owns  ☐ Leases the business premises | | |

| Yes | No | | Yes | No | |
|---|---|---|---|---|---|
| ☐ | ☐ | Merchant appears to be conducting business as represented in this application. | ☐ | ☐ | Have you taken pictures inside and outside of the premise? |
| ☐ | ☐ | Merchant is adequately staffed and stocked to do business. | ☐ | ☐ | Have you confirmed the identity of the person who signed the contract? |

| | Complete if MOTO, Internet or Future Services | | |
|---|---|---|---|
| | 1) How does the customer order the product? | ☐ Mail  ☐ Telephone ☐ Fax  ☐Internet ☐ Other _____ | |
| | 2) Are consumers required to provide a deposit? | ☐ Yes  ☐ No | |
| | 3) Delivery Time Frame: | ☐ 0-7 days ☐ 8-14 days ☐ 15-30 days ☐More than 30 days | |
| | 4) Refund Policy | | |

I hereby verify that I have physically inspected the business premises of the merchant at this address and the information stated above is correct to the best of my knowledge.

| Completed by (Print Name) | Signature | Date |
|---|---|---|
| | | |