```
 1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3
      CHRISTOPHER D. SHURLAND,        )
 4    individually and as the         )
      representative of a class of    )
 5    similarly-situated persons,     )
                                      )
 6              Plaintiff,            )
                                      )
 7         -vs-                       )  No. 08 C 2259
                                      )
 8    BACCI CAFE & PIZZERIA ON OGDEN, )
      INC.,                           )
 9                                    )
                Defendant.            )
10

11                  DEPOSITION OF:
                 DOUGLAS ALAN PORCH
12

13            The deposition of DOUGLAS ALAN PORCH,

14    called as a witness pursuant to the Rules of Federal

15    Procedure for the taking of depositions, taken

16    before Donna L. Volante, a Certified Shorthand

17    Reporter for the State of Illinois, at the Grundy

18    County Courthouse, Morris, Illinois, commencing on

19    the 29th day of January, 2009, at 10:25 a.m.

20

21

22

23

24
```

1    PRESENT:

2                    ANDERSON & WANCA
                     BY:  MR. GERALD E. NORA
3                    3701 Algonquin Road
                     Suite 760
4                    Rolling Meadows, Illinois 60008
                 Appeared on behalf of the Plaintiff;

5
                     SMITH AMUNDSEN, LLC
6                    BY:  MS. MOLLY ARRANZ
                     150 North Michigan Avenue
7                    Suite 3300
                     Chicago, Illinios 60601
8                Appeared on behalf of the Defendant,
             Bacci Cafe and Pizzeria;

9
                     SONNENSCHEIN, NATH & ROSENTHAL, LLP
10                   BY:  MR. THOMAS A. ANDREOLI
                     8000 Sears Tower
11                   233 South Wacker Drive
                     Chicago, Illinois 60606
12               Appeared on behalf of Douglas Porch.

13

14                        I N D E X

15   THE WITNESS

16        DOUGLAS ALAN PORCH

17   EXAMINATIONS                                    PAGE

18        By Ms. Arranz ........................    3
          By Mr. Nora ..........................   94
19        By Ms. Arranz ........................  117

20   DEPOSITION EXHIBITS

21        No. 1  ...............................   28
          Nos. 2-3  ............................   29
22        No. 4  ...............................   53
          No. 5  ...............................   81
23        No. 6  ...............................   92

24

1               (The Witness was duly sworn.)

2               MS. ARRANZ:  Sir, would you state and

3      spell your name for the record, please.

4               THE WITNESS:  Douglas, D-o-u-g-l-a-s.

5      Alan, A-l-a-n.  Porch, P-o-r-c-h.

6               MS. ARRANZ:  Let the record reflect that

7      this is the subpoenaed deposition of Douglas Porch

8      taken in accordance with the Federal Rules of Civil

9      Procedure and any applicable local rules of the

10     Northern District of Illinois.

11               DOUGLAS ALAN PORCH,

12     called as a witness herein, having been first duly

13     sworn, was examined and testified as follows:

14               E X A M I N A T I O N

15     BY MS. ARRANZ:

16          Q.   Mr. Porch, have you ever given your

17     deposition before?

18          A.   I have done a deposition before.

19          Q.   Okay.  How many times before have you

20     given your deposition?

21          A.   Once.

22          Q.   And what kind of a case was that?

23          A.   Car accident.

24          Q.   Were you a party to that lawsuit?

1        A.    Yes, I was the person that had the

2    accident, so --

3        Q.    And how long ago was the car accident and

4    the deposition?

5        A.    Approximately 20 years.

6        Q.    Well, I'm going to go through some ground

7    rules for the deposition today in case you've

8    forgotten from 20 years ago.

9             If at any time you don't understand a

10   question that I have asked, I would ask that you ask

11   me to rephrase the question because if you answer a

12   question, I'm going to assume that you understood

13   the question and that you've answered accordingly;

14   is that fair?

15       A.    That's fair.

16       Q.    Please answer all the questions that I ask

17   and that Mr. Nora asks out loud because the court

18   reporter is here and she can't take nods of the head

19   down in a way that we'll all understand later.  Does

20   that make sense?

21       A.    Yes.

22       Q.    Also don't answer uh-huh or uh-uh.  I will

23   try and pick up on it if you do.  Please answer yes

24   or no and other verbal ways; is that okay?

```
1          A.   Yes.

2               MR. NORA:   Can we go off the record for a

3     second.

4                    (Discussion had off the record.)

5     BY MS. ARRANZ:

6          Q.   And also sometimes it gets where you

7     anticipate what I'm going to ask.   Please wait until

8     I finish asking my question before you answer.   I

9     will try to do the same with you before I ask my

10    next question, okay?

11         A.   Okay.

12         Q.   And if you need to take a break obviously

13    at any time, please let us know.

14         A.   Okay.

15         Q.   Are you represented by Counsel here today?

16              MR. ANDREOLI:   Yes, he is.

17    BY MS. ARRANZ:

18         Q.   Okay.   And it's Mr. Andreoli; is that

19    right?

20         A.   Correct.

21         Q.   Did you meet with Mr. Andreoli before

22    today's deposition?

23         A.   Before we walked in, yes.

24         Q.   Okay.   For just approximately how long?
```

1    Was it just a few minutes?

2         A.    15 minutes.

3         Q.    Okay.   Have you spoken to Gerry Nora

4    before today's deposition?

5         A.    No.

6         Q.    Have you spoken with anybody at National

7    Translink prior to today's deposition?

8         A.    Yes.

9         Q.    And to whom did you speak?

10        A.    I called my boss when I received the

11   subpoena, my ex-boss, because I signed a piece of

12   paper that I said I would not -- you know, when I

13   got my severance package, that I would not, you

14   know, disclose company business or anything, you

15   know, and when I got the subpoena, I called and told

16   him that I was going to honor the subpoena.   He said

17   I should do so and that is the gist of it.

18        Q.    And whom -- Your boss' name is?

19        A.    Mr. Tracy.

20        Q.    And you talked to Mr. Tracy approximately

21   when you got the subpoena for your deposition; is

22   that right?

23        A.    Correct.

24        Q.    And the only thing you spoke to him about

1    was the fact that you were coming in for your

2    deposition; is that right?

3          A.    Right, I was protecting myself because I

4    did sign the paper.  I said, just -- Well, he says,

5    that is besides the point.  You have to honor that,

6    and that is where we left it.

7          Q.    And he didn't tell you anything about his

8    deposition in this case, right?

9          A.    No, not at all.

10         Q.    What is your current address?

11         A.    109 West Jackson, apartment No. 32, right

12    here in Morris.

13         Q.    And how long have you lived at 109 West

14    Jackson?

15         A.    Ten months.

16         Q.    And where were you living prior to that

17    address?

18         A.    Aurora.  Do you need the address?

19         Q.    No, that is okay.  Do you have any

20    intention to move any time soon?

21         A.    Not that I can see right now, no.

22         Q.    What is your current phone number?

23         A.    815-513-5048.

24         Q.    Your date of birth?

1            A.   7/8 of 1964.

2                 MS. ARRANZ:   Can we go off the record for

3       a minute.

4                      (Discussion had off the record.)

5       BY MS. ARRANZ:

6            Q.   Mr. Porch, what is your highest level of

7       education?

8            A.   12th grade.  I went to high school.

9            Q.   And where was your high school located?

10           A.   East Aurora.

11           Q.   And when did you graduate from high

12      school?

13           A.   1983.

14           Q.   Do you have any certificates or degrees

15      behind your high school education?

16           A.   No, I do not.

17           Q.   Are you working now?

18           A.   Currently I'm unemployed.

19           Q.   Where was your last place of employment?

20           A.   The Super Pantry down the street.  It's a

21      gas station in Morris.

22           Q.   And how long ago did you work there?

23           A.   November was when I left there.

24           Q.   November of 2008?

1      A.   Yes.

2      Q.   And how long did you work at the Super

3  Pantry?

4      A.   Five months.

5      Q.   And before Super Pantry, where were you

6  employed if anywhere?

7      A.   National Translink.

8      Q.   And when did you leave National Translink?

9      A.   January of '08.

10      Q.   So between January 2008 and November 2008,

11  were you employed?

12      A.   I was on unemployment and then I got the

13  job at the gas station.

14      Q.   Okay.  How long were you employed at

15  National Translink?  What was your first day of

16  employment I guess is a better question.

17      A.   I know I was there going on five years.  I

18  believe it was -- Couldn't tell you the exact date

19  off the top of my head.  I got it written down at

20  home.

21      Q.   Do you recall if it was the beginning of

22  2003 or the end of 2002?

23      A.   No, it was in January, so I'm -- it was

24  four years -- four years plus.  I was going on five

1    years.  Couldn't tell you.  I got -- I couldn't tell

2    you honestly right now exactly for sure that I know

3    the date.

4         Q.   But you recall it being in January.  Is

5    that the --

6         A.   Right.

7         Q.   -- day you started?

8              And you stated that you ended your

9    employment there in January of 2008; is that right?

10        A.   Right.

11        Q.   And you think it was about five years?

12        A.   It was going on five years, yes.

13        Q.   So could it have been January 2003 to

14   January 2008?

15        A.   Right.  Yes, excuse me.

16        Q.   Okay.  Did you leave on good terms with

17   the company?

18        A.   Yes.

19        Q.   When you were working for National

20   Translink, where was your office located?

21        A.   I was in -- on the main floor.  On the

22   19th floor of One Tower Lane.

23        Q.   In what city?

24        A.   Oak Brook Terrace.

1    Q.    During your time of employment with

2    National Translink, was that your only office?

3    A.    Yes.

4    Q.    What was your job title or position when

5    you first started at National Translink?

6    A.    Customer service.

7    Q.    Were you a customer service

8    representative?

9    A.    Yes.

10   Q.    Did you have any managerial position with

11   the company at that point?

12   A.    No, I did not.

13   Q.    Did your position with the company change

14   over time?

15   A.    No, I was pretty much customer service the

16   whole time I was there.

17   Q.    And you were always a customer service

18   agent or representative?

19   A.    Correct.

20   Q.    Can you give me a description of your,

21   like, duties and responsibilities as a customer

22   service agent?

23   A.    Reconciling statements, paper orders,

24   complaints, fielding the customer service queue

1    call, you know, people asking about their rates and

2    different -- You know, it's a wide assortment of

3    calls just handling the customer service phone.

4        Q.    So you would field calls essentially?

5        A.    Field calls, correct.

6        Q.    Did you have any kind of written

7    correspondence with customers over that five year

8    time period?

9        A.    Written correspondence with -- from myself

10    or -- you know, I know they got their statements.

11    Other than that, I didn't have any correspondence

12    with people, no.

13        Q.    Okay.  So your interaction on a one-on-one

14    basis with a customer was only over the phone?

15        A.    Correct.

16        Q.    Did you do any kind of technical support

17    at National Translink?

18        A.    No, I didn't.  I was not in technical.

19        Q.    So you wouldn't have helped with

20    programming or reprogramming of terminals?

21        A.    I did not reprogram or program terminals.

22    If, you know, someone needed an override or a HALO

23    adjustment or something to that point, we had -- you

24    know, we would tell them what buttons to push

1    according to, you know, a piece of paper that we had

2    out there, but as far as programming their terminal

3    with their parameters, no, I had nothing to do with

4    that.

5        Q.    Do you have any experience or education in

6    that sort of technical field of computers and

7    terminals, credit card terminals?

8        A.    Not to program them, no.  To -- knowing

9    what buttons to push for certain things and how to

10   do a sale and how to operate, yes.  As far as how to

11   program, no.

12       Q.    Okay.  And you were saying before that

13   your understanding of helping somebody do an

14   override, for example, is something that you would

15   have to follow a sheet, a layout of instructions?

16       A.    Correct.

17       Q.    And you didn't have any understanding or

18   experience separate and apart from that kind of

19   instruction sheet, right?

20       A.    Correct.

21       Q.    Did you -- This is slightly redundant.

22   Did you ever hold a position of risk manager at

23   National Translink?

24       A.    No.

1  Q. Did you ever hold a position in sales?

2  A. No.

3  Q. If someone wanted to reach you at National

4 Translink, did you have a direct phone line?

5  A. They would call the customer service line

6 or they could call National Translink and go through

7 the operator.  I had an extension.

8  Q. You did have an extension?

9  A. Quite a few.  You know, I moved from desk

10 to desk and they give you a different extension, but

11 you know --

12  Q. So you didn't have a direct line?

13  A. No, I didn't have my own line.  It was

14 just a basic common line, you know, and they said,

15 Doug, pick up line two, you know, and it would be

16 for me.

17  Q. So if somebody called National Translink

18 when you were employed there and asked for Doug

19 Porch, the operator would essentially direct them to

20 you --

21  A. Right.

22  Q. -- where you were sitting?

23  A. Yeah, wherever I happened to be at that

24 time.

1          Q.    Okay.  What was the number, just out of

2     curiosity, for National Translink's customer service

3     line if you know?

4          A.    I can't recall the number.  I know the

5     number for -- to get directly in there, but I never

6     called the customer service line, so I never

7     really --

8          Q.    Okay.  Was this customer service phone

9     number separate and apart from, like, the general

10    phone number --

11         A.    Yes.

12         Q.    -- for National TransLink?

13         A.    Yes.  It was an 800 number opposed to the

14    other one would be a direct line.

15         Q.    Was there a separate phone number for

16    technical support separate and apart from the

17    customer service line?

18         A.    No, they would call in on the customer

19    service line and be transferred to technical support

20    after it was screened if they really needed it

21    because lots of people, you know --

22         Q.    They think they want technical support but

23    they really don't need it?

24         A.    Right.  They want to order paper, you

1    know.  It's --

2         Q.  All right.  Now generally speaking, what

3    kind of company was -- or is National Translink?

4         A.  Credit card processor.

5         Q.  And when you say credit card processor,

6    does that mean that they would facilitate services

7    of credit card machines at the point of sale?

8         A.  Can you --

9         Q.  I will withdraw the question.  Why don't

10   you just tell me what you mean by credit card

11   processor.  What were --

12        A.  They process -- Businesses work with them

13   and they process their credit card transactions.

14        Q.  Do you know anything about how that was

15   processed?  You know, it's my understanding from a

16   previous deposition in this case, Mr. Tracy

17   actually, that National Translink would use a

18   processing center separate and apart from National

19   Translink, and that processing center would

20   essentially run the transactions there.

21             Does that make sense?

22        A.  Yes.

23        Q.  And is that accurate?

24        A.  Yes.  I believe it was out of California,

1    yes.

2         Q.    Do you recall the names of the processing

3    centers that National Translink used during the time

4    you were employed there?

5         A.    Now as I remember, CardSystems.

6         Q.    Any other ones?

7         A.    Not that I can recall.

8         Q.    Was CardSystems always the processing

9    center during that five year time of employment?

10        A.    They were -- As long as I was there they

11   were there.  I know they had a time when they

12   weren't processing cards.  Who they used at that

13   time there, I couldn't tell you.

14        Q.    Does the name Maverick ring a bell with

15   you?

16        A.    Yes.

17        Q.    Was that another name for CardSystems?

18        A.    I believe so.

19        Q.    Did National Translink while you were

20   employed there have the capacity to provide both,

21   like, a credit card terminal and the services for

22   the credit card terminal?

23        A.    Yes, they sold point of sale terminals.

24        Q.    What kind of terminals if you know or

1  recall did National Translink sell while you were

2  employed there?

3      A.   The Nurits.

4      Q.   Can you spell it for me.

5      A.   N-u-r-i-t.  Can't recall the other one.

6  It was a little one that they had towards the end of

7  when I was there.  I can't recall the name.

8      Q.   Okay.  So for the five years that you were

9  at National Translink, you do recall that they sold

10  Nurits?

11     A.   Correct.

12     Q.   And what kind of -- I know you have talked

13  a little bit about, you know, overrides and that

14  sort of thing.  Can you give me a general idea of

15  what kind of services National Translink provided to

16  its customers?

17     A.   They would handle people's credit card

18  transactions.  I know -- and they did -- they had

19  some risk management going on there.

20     Q.   To kind of bypass some of this, would you

21  defer to Jim Tracy and his description of the kind

22  of services that National Translink provided?  Would

23  he be a better person to --

24     A.   Yes.

1       Q.    -- get that information?

2       A.    Yes.

3       Q.    Did you have a supervisor while you were

4  at National Translink?

5       A.    My immediate supervisor was Katrina

6  Hansen.

7       Q.    Was she your supervisor for the entire

8  time you were employed by National Translink?

9       A.    Yes.

10      Q.    Did you report to anybody else besides

11 Katrina?

12      A.    Chain of command went to Katrina, but if

13 asked questions by Mr. Tracy or Mr. Boursack or any

14 of the people above me, of course I would answer,

15 but my general person that I reported to was

16 Katrina.

17      Q.    And it's your understanding that Katrina

18 Hansen essentially reported to Mr. Boursack, who

19 reported to Mr. Tracy?

20      A.    Chain of command, she was above me.

21      Q.    Okay.  But that is essentially chain of

22 command?

23      A.    Correct.

24      Q.    So it would be fair to say then in 2006

1    through 2007 you would have been reporting to

2    Katrina Hansen?

3         A.   That is correct.

4         Q.   Were you in a division or department

5    within customer service at National Translink?

6         A.   Customer service was pretty much Katrina,

7    myself, and the people in risk would take calls when

8    necessary, but it was usually just a couple people,

9    her and I.

10        Q.   Okay.  So it was essentially you and

11   Katrina?  I mean, you said there were some people

12   that would do kind of risk managing.  Who were those

13   folks, do you recall?

14        A.   I can give you first names.

15        Q.   That would be great.

16        A.   Nina, David and Jennifer.

17        Q.   Was there an individual by the name of

18   Noel who worked with you at any point in time?

19        A.   Noel was in technical support.

20        Q.   Do you remember when Noel was employed by

21   National Translink?

22        A.   He was there when I started and there when

23   I left.

24        Q.   Okay.  I know you told me that technical

1    support would be like a separate group from customer

2    service.

3         A.    Separate group from customer service on

4    the other side of the building.

5         Q.    Okay.  And do you know how many people

6    were in technical support for the five years that

7    you were at National Translink?

8         A.    It fluctuated.  Terry and Noel.  Couple

9    other guys.  I couldn't tell you their names.

10        Q.    Okay.  Do you have, like, an approximate

11   number of the people that would be in technical

12   support?

13        A.    When I left there, there was two people

14   running tech support.  When I started there they had

15   up to four.

16        Q.    And was that essentially the amount that

17   would be in technical support during the time you

18   were at National Translink, between two and four

19   people?

20        A.    Correct.

21        Q.    What about customer service?  I know you

22   mentioned there was a couple of you.  I got probably

23   about five names down including yours, five or six

24   names.

1    Was that the amount of people that was in

2    the customer service group from the time that you

3    started at National Translink until the time you

4    left?

5    A.    They had a couple young ladies that they

6    tried out.  Lasted a month, two weeks, and were

7    gone, but I couldn't recall their names, but

8    essentially those other people that I mentioned were

9    our team.

10    Q.    And they were pretty much there the whole

11    time you were there; is that right?

12    A.    Yes.

13    Q.    Do you know what a credit card terminal

14    is?

15    A.    Yes.

16    Q.    And what is it exactly?

17    A.    It is a device that is used for running

18    their card through and approving sales.

19    Q.    So it is essentially a machine that you

20    would see at a restaurant, for example, when you --

21    they swipe something down the side, the credit card,

22    and it reads up something and prints out a receipt;

23    is that right?

24    A.    Correct.

1      Q.   And that would be what those Nurits were;

2    is that right?

3      A.   Correct.

4      Q.   Are there different makes and models of

5    these terminals?

6      A.   Yes, we had different makes out there that

7    they could download.

8      Q.   What does that mean exactly?

9      A.   Just -- Well, you asked what we had sold

10   before.

11     Q.   Uh-huh.

12     A.   But, you know, there is other makes and

13   models out there of various -- in restaurants that

14   are something that we didn't sell that we could

15   download their information into and they could use.

16     Q.   So the hardware could remain the same, the

17   terminal could remain the same, but you folks could

18   download a different kind of --

19     A.   Right.   What we sold was Nurits.

20     Q.   Okay.

21     A.   And what was out there could be, you know,

22   a VeriFone, a Hypercom, you know, different types --

23   There's all kinds of different credit card machines

24   out there.

1       Q.   Okay.  I don't know a whole lot about it,

2  so you are educating me today.  I'm not asking

3  questions out of knowledge.  Trust me.

4       A.   Okay.

5       Q.   So you are saying that you would have,

6  like, a Nurit for example.  That was the hardware

7  that you would sell and that you could download a

8  different software on to that Nurit?  Is that what

9  it would be?

10      A.   No, there is different machines.  If

11 someone came and said, I have this machine --

12      Q.   Okay.

13      A.   -- are you -- was, say, CardSystems able

14 to put their program in this machine?  Might not

15 take it; it might.

16      Q.   Okay.  So your understanding of different

17 makes and models is that essentially the processing

18 center would somehow be able to configure the

19 existing model and make that essentially a different

20 model; is that right?

21           MR. NORA:  Objection.

22           THE WITNESS:  No, not change the model.

23           MR. NORA:  Objection.

24           MR. ANDREOLI:  I've got a form objection.

1          MS. ARRANZ:  You can answer the question

2     if you understood it.

3          THE WITNESS:  Can you rephrase it.

4          MS. ARRANZ:  Can you read back the

5     question actually.

6               (Whereupon, the record was read.)

7          THE WITNESS:  No, that would be wrong.

8     You are not changing the model.

9          MS. ARRANZ:  Okay.

10         THE WITNESS:  You are putting people's

11    information into it and there is always different

12    buttons to push to get that information into the

13    different models, you know, so that would be -- you

14    didn't actually change the model of the machine.

15    You just put the program in there.

16    BY MS. ARRANZ:

17         Q.   So it's a new program on an existing

18    machine, correct?

19         A.   Correct.

20         Q.   Did you ever have any personal involvement

21    in that sort of programming?

22         A.   No.

23         Q.   Do you know if anybody at National

24    Translink would have had the capability of doing

1    what you have just described, reprogramming a

2    terminal?

3         A.    Our technical support people programmed

4    terminals.

5         Q.    If National Translink did not sell a

6    company its terminal, they just provided service for

7    a terminal, who would -- if there needed to be a

8    reprogramming of a terminal, who would do that sort

9    of reprogramming, do you know?

10        A.    It would depend on the type.

11        Q.    Of terminal?

12        A.    Correct.

13        Q.    Okay.  If National Translink sold a

14   company a terminal, would National Translink always

15   be the company that would then do, like, the

16   programming, reprogramming or --

17        A.    Yes.

18        Q.    And that was true for the entire time that

19   you were at National --

20        A.    We sold the terminal and we programmed it.

21        Q.    So my answer is correct, right?

22        A.    Correct.

23        Q.    Question is correct?  Now I'm going to

24   hand you some documents.  We'll start with 1.  I may

```
1    not use all of these, but -- I think I have copies
2    actually.
3              MR. ANDREOLI:  Is this the whole set?
4              MS. ARRANZ:  It should be.  I may not use
5    all of them.
6              MR. ANDREOLI:  All right.
7    BY MS. ARRANZ:
8         Q.   Mr. Porch, I'm handing you a document.
9    The first page is a photocopy of a green card.  It
10   looks like this actually -- I will show you the
11   original.
12        A.   Yes.
13        Q.   Do you recognize that document?
14        A.   It's the subpoena that I got, right?
15        Q.   Yeah, you can look.  There's other
16   documents behind it.
17        A.   Yes.
18        Q.   So you have seen this document before,
19   correct?
20        A.   Yes.
21             MS. ARRANZ:  We are going to have this
22   marked as Exhibit 1 for the deposition today.
23             MR. ANDREOLI:  Are we going to go straight
24   through, 1, 2, 3, 4, 5, or are we going to go
```

1    Plaintiff's 1, Defense 1?  Do you guys have a

2    preference --

3          MR. NORA:  Let's do Porch 1.

4          MS. ARRANZ:  Yeah, I would prefer to do it

5    per deposition, so we'll do it Porch 1.

6               (Whereupon, a document was marked

7               Porch Deposition Exhibit 1 for

8               identification as of 1/29/09.)

9    BY MS. ARRANZ:

10       Q.  In Exhibit 1 that is in front of you now,

11    that you said was a subpoena you received in this

12    case, correct?

13       A.  Correct.

14       Q.  And was that the document about which you

15    contacted Mr. Tracy?

16       A.  Yes.

17       Q.  And did you contact him on or about

18    January 15th?

19       A.  Yes.

20       Q.  When you received this Exhibit 1, did you

21    look for any documents?

22       A.  No.

23       Q.  Did you take any documents with you when

24    you left National --

1      A.   Absolutely -- No.

2      Q.   Did you review any documents prior to

3  today's deposition?

4      A.   No.

5      Q.   So you haven't seen the deposition of

6  James Tracy, right?

7      A.   No.

8      Q.   I am correct?

9      A.   You are correct.

10     Q.   I'm going to mark now two additional

11  Exhibits.  This will be Exhibit 2.  It's the notice

12  of subpoena records deposition from July 8, 2008,

13  and the subpoena records deposition for this matter

14  from December 26, 2008.  The July 2008 subpoena will

15  be Exhibit 2 and the December 2008 exhibit will

16  be -- or 2008 subpoena will be Exhibit 3.

17          MR. ANDREOLI:  December 26th?

18          MS. ARRANZ:  Yes.

19          MR. ANDREOLI:  Okay.

20               (Whereupon, documents were marked

21               Porch Deposition Exhibits 2-3 for

22               identification as of 1/29/09.)

23  BY MS. ARRANZ:

24     Q.   Mr. Porch, the court reporter has handed

1    you Porch Exhibits 2 and 3. Can you look through

2    those documents for me, please, and let me know when

3    you are done reviewing them.

4         MR. ANDREOLI: Counsel, we are going to go

5    one at a time when we get to them?

6         MS. ARRANZ: Yeah. Off the record.

7              (Discussion had off the record.)

8    BY MS. ARRANZ:

9         Q.   Okay. Have you seen Exhibit No. 2 prior

10   to today's deposition?

11        A.   No.

12        Q.   If you look at the last page of Exhibit 2,

13   the top of the page says, rider, and then it says,

14   documents to produce.

15             Did anybody contact you regarding

16   production of any of the documents listed there?

17        A.   No.

18        Q.   And then with Exhibit No. 3, the last two

19   pages of this Exhibit, it says, documents to

20   produce. You will notice that your name is listed

21   in Paragraph 1 of documents to produce on page -- Is

22   it Page 4 of Exhibit 3. And then on the following

23   page, your name is also listed in certain of these

24   paragraphs, paragraph 3 for example.

```
 1           Did anyone go through this particular
 2  rider of Exhibit 3 with you at any point in time?
 3      A.   No.
 4           MR. ANDREOLI:  Counsel, if you don't mind,
 5  I'm going to note for purposes of the record that
 6  items 3 and 4 on Porch Exhibit 3 were withdrawn
 7  consistent with an agreement between Counsel for
 8  National Translink and Counsel for the Plaintiffs.
 9           MR. NORA:  That is correct.
10           MR. ANDREOLI:  Item 1 was effectively
11  mooted by Mr. Porch's appearance at the deposition
12  today.
13  BY MS. ARRANZ:
14      Q.   So nobody had National Translink has
15  contacted you regarding those documents listed under
16  the riders for either Exhibit 2 or 3, correct?
17      A.   That is correct.
18      Q.   Did you have a computer, your own,
19  personal computer while you were employed by
20  National Translink?
21      A.   There was a computer at my desk, yes.
22      Q.   Did you have the same computer for the
23  five years that you were at National Translink?
24      A.   No.
```

1      Q.   How many different computers did you have

2   while employed there?

3      A.   I believe it was three.

4      Q.   Do you recall approximately when your

5   computer changed in that five year period of time?

6      A.   I don't recall.

7      Q.   Was the monitor changed, but your -- Let

8   me strike that.

9           Did National Translink have a, like,

10  common database or common intranet while you were

11  employed there?

12     A.   We all worked off the same program, yes.

13     Q.   What was the name of the program that you

14  worked off of while there?

15     A.   I'm trying to remember.  Sorry.  I don't

16  recall.  The only program they had, so --

17     Q.   What exactly was the program?  Can you

18  describe it to me, please?

19     A.   Well, you just bring it up and you would

20  have -- Everybody's information was in it.

21     Q.   Was it a customer database that you are

22  referring to?

23     A.   Correct.

24     Q.   And you're saying that everybody in the

1    customer service division of National Translink

2    would have had access to this customer database,

3    correct?

4        A.    Correct.

5        Q.    Have you used other kinds of databases

6    like Excel, Excel spreadsheets and other, like,

7    entry databases before?

8        A.    No, this was -- no.

9        Q.    Okay.  Can you -- If I started at National

10   Translink and I wanted you to show me how to use

11   this customer database, how would you show me how to

12   use it?  Essentially how does it work?

13       A.    You would have to log on and go into

14   different windows, you know -- it's been -- Tell you

15   exactly how to do it, I couldn't.

16       Q.    Abstractly, though, you can't tell me?

17       A.    Right.

18       Q.    Was there -- Was the customer database

19   something that there was a separate file for each

20   customer that National Translink had?

21       A.    Yes.

22       Q.    And could anybody within customer service

23   access a customer file in this customer database?

24       A.    Yes.

1     Q.   And could anybody in technical support

2   access a customer file in that customer --

3     A.   No.

4     Q.   -- database?

5     No, okay.  Now if somebody in technical

6   support wanted to make a notation in a customer

7   file, do you know how they would go about doing

8   that?

9     A.   They could make a note in there, but they

10   couldn't get into, like -- Statements, no.  They

11   couldn't get into anything of that.

12     For -- As far as where they would order

13   paper or there was a technical thing done, they

14   could enter in, ordered paper for such person,

15   redownloaded machine and put in the date, yeah, they

16   would leave notes.

17     Q.   Could somebody in technical support access

18   a customer file in the customer database and not

19   necessarily add a note or change it, but review the

20   file, if you know?

21     A.   If it was -- For where the notes were for

22   ordering paper and such, they could review that.

23     Q.   If somebody in technical support for

24   example wanted to access a customer's file to find

```
1    out what kind of terminal they were using, could

2    they do that if you know?

3         A.   If it was listed, yes.

4         Q.   What kind of information generally

5    speaking would have been on a customer file in the

6    customer database?

7         A.   Name, address, point of contact for a

8    person.

9         Q.   When you say -- I'm sorry to interrupt

10   you.  When you say point of contact, are you talking

11   about --

12        A.   Owner's name.  If you had to call there

13   and ask for the owner.

14        Q.   Okay.  Anything else?

15        A.   And normally we would put their HALO on

16   there.

17        Q.   What is a HALO?

18        A.   HALO is a High Amount Lock Out.  Sales

19   over -- okay.  Sales over -- Let's say your HALO is

20   at 2,000.  You couldn't do a sale over 2,000 without

21   calling in.  It's a risk tool.

22        Q.   So besides name, address, point of contact

23   or owner name and HALO, was there anything else?

24        A.   There would be notes on correspondence
```

1   with the customer.

2            MR. ANDREOLI:  Counsel, do you mind if I

3   interrupt because I have a question.

4                    Is HALO an acronym?

5            THE WITNESS:  Yeah, HALO is High Amount

6   Lock Out.

7            MR. ANDREOLI:  Thanks.

8            MR. NORA:  High altitude-low opening.

9            MR. ANDREOLI:  I apologize for

10  interrupting you.

11           MS. ARRANZ:  That's okay.

12  BY MS. ARRANZ:

13      Q.   Was this customer database that you

14  accessed on your computer, was it the only sort of

15  program that was on your computer?

16      A.   No.  That would be for ordering paper and

17  technical support notes and then I could also go

18  into a different -- For statements.  They had a

19  different program for people's account information.

20      Q.   Okay.

21      A.   You know, so if you are calling in to talk

22  about money, you only can go through customer

23  service.  There's only certain people you could talk

24  to.  If you want to talk about my machine, the paper

1    is not working or it's not forwarding, something in

2    technical support for the actual machine, then they

3    put notes in, yeah.

4         Q.   Besides the financial statement program

5    and the customer database program, did you have any

6    other kind of programs on your computer?

7         A.   No, I did not.

8         Q.   Now you stated that you changed computers

9    three times.  Does that mean that you just moved

10   from one computer station to another?

11        A.   No, I had actually -- the fan quit working

12   and the computer got really hot and they had to

13   change towers and give me a new whole computer.

14        Q.   When your towers changed or when the

15   computer itself changed, the hardware changed, could

16   you still access this customer database?

17        A.   Yeah, after they gave me a new computer, I

18   could access the database.

19        Q.   Okay.  So the hardware might have changed,

20   but the software, everything you could --

21        A.   Nothing changed.  The software was always

22   the same.  It didn't change.

23        Q.   Do you know -- I'm sorry.  Strike that.

24             Did you have any -- Could you keep any

1    personal files on your computer at work?

2         A.   No.

3         Q.   So any of the work that you did while you

4    were at National Translink on your computer was

5    something that everybody else could access in

6    customer service; is that correct?

7         A.   Correct.

8              MR. NORA:  Objection.  Everything he did

9    could be accessed by technical support?

10             MS. ARRANZ:  I said customer service.  And

11   he answered --

12             MR. NORA:  Oh, customer service.

13             MS. ARRANZ:  Yeah.

14             MR. NORA:  I'm sorry.

15   BY MS. ARRANZ:

16        Q.   Do you know that there is a federal

17   statute regarding the shortening of credit card

18   numbers on customer receipts?

19        A.   Yes.

20        Q.   When did you become aware of that federal

21   statute?

22        A.   The exact date, I do not recall.

23        Q.   Can you give me an approximate time frame?

24        A.   Within the last year I was there.  I would

1    say approximately six months before I left.

2         Q.   All right.  And my notes indicate that you

3    stated you left in January of 2008, correct?

4         A.   Correct.

5         Q.   And so your recollection is that you found

6    out about this federal statute in mid 2007; is that

7    right?

8         A.   That's -- Yes, that is my estimation.  You

9    know, I can't give you an exact date.

10        Q.   Was it then in the summer of 2007 that you

11   learned about this federal statute?

12        MR. ANDREOLI:  Objection to the form.  Not

13   to put too fine a point on it, but it might be

14   useful to identify the statute.

15        MS. ARRANZ:  I will do that in a minute.

16   I just want to get -- I'm trying to get a general

17   idea of what your -- Was it warm outside when you

18   were hearing about this federal statute, do you

19   know?

20        THE WITNESS:  It went on for quite a

21   while.  I mean, we had months of -- you know,

22   repeatedly we were -- put into our heads, make sure

23   you get the machines truncated.  So this went on for

24   quite a while.  It was part of our normal spiel is,

1    you know, you can only show the last four numbers,

2    so that was a real big thing with the government.

3    BY MS. ARRANZ:

4        Q.   Okay.   The federal statute I've been

5    referring to is called FACTA, F-A-C-T-A, and you are

6    stating to me that you recall that the company

7    essentially told you about this FACTA statute,

8    right?   Is that correct?

9        A.   Correct.

10       Q.   And who at the company told you about the

11   FACTA statute?

12       A.   It kind of came down in the business

13   meetings.   It came down from the top, Mr. Tracy.

14   Come all the way down through the chain of command,

15   and, you know, that truncation was a big deal that

16   we had to do.

17       Q.   Okay.

18       A.   Okay.

19       Q.   Did Jim Tracy have, you know, like in a

20   conference room, for example, business meetings

21   where he had all of his customer service

22   representatives present and he told you about what

23   the statute was?

24       A.   Yes.

1     Q.    When was the -- I know you were having

2  difficulty identifying a particular time frame, but

3  if you can think back, when exactly did those

4  meetings start?  When was the first meeting if you

5  recall?

6     A.    I can't recall an exact date.

7     Q.    Okay.  But sometime in mid 2007; is that

8  right?

9     A.    Correct.

10    Q.    And was there more than one meeting

11 regarding FACTA?

12    A.    I believe there was the meeting and there

13 was plenty of memos.

14    Q.    Can you give me an approximate number of

15 meetings that you recall having been present for?

16    A.    I recall one.

17    Q.    Okay.  And the -- You said there was

18 papers circulated regarding FACTA, right?

19    A.    Yes.

20    Q.    And do you recall how often there was a

21 memo sent around regarding FACTA?

22    A.    I couldn't give you an exact date, no.

23    Q.    But I mean, how many times -- Was there

24 just one memo circulated or was there more than one

1    memo circulated if you recall?

2        A.   There was numerous memos circulated.  It

3    was on a sign on our desk, you know, don't forget to

4    truncate.

5        Q.   And you gave me a little idea of what you

6    recall learning at these business meetings that the

7    only -- the last four numbers were supposed to be

8    included on a customer receipt; is that right?

9        A.   Right.

10        Q.   Was there anything else told to you about

11    the FACTA statute, what it required?

12        A.   There was a -- if your machine -- There

13    were certain machines out there that couldn't

14    truncate, had -- the machine had to be replaced.

15        At that point, if you couldn't obey the

16    rules, you know, and get your machine truncated, you

17    know, we had -- at one point there where you

18    couldn't process.

19        Q.   What do you mean by they couldn't -- you

20    couldn't process?

21        A.   If your machine was showing all the

22    numbers and you didn't call in to get it truncated

23    or update your machine, you could be shut off.

24    There was a -- you know, that is what we were told.

1    Q.    And by being shut off, do you mean that

2    they would literally not be able to use their credit

3    card --

4    A.    The machine --

5    Q.    -- machine?

6    A.    -- wouldn't work.

7    Q.    Okay.  So you found out about FACTA.  You

8    have this one business meeting that you can recall

9    and there were certain memos circulated.

10         What happened next with regard to National

11   Translink's making its customers aware of this

12   statute from your recollection?

13   A.    They had a list of people we called.  We

14   would let them know, and it would be reflected in

15   notes, you know, that we called this person about

16   truncation.

17         There is a -- We put it on the statement

18   when we sent out their statements at the -- you

19   know, on the bottom it would say that you must have

20   your machine truncated by such a date.

21   Q.    Anything else?

22   A.    That was pretty much it in repetition, you

23   know.

24   Q.    Now you stated that this notification of

1    FACTA and the need to truncate was put on

2    statements.  Was that something that you personally

3    were involved in?

4         A.   No, I didn't print the statements.  That

5    was just -- you know, the company put a disclaimer

6    on the bottom, you know, a little memo on the bottom

7    that says, hey, you must -- or not hey, but you have

8    to have your machine truncated.

9         Q.   Okay.

10        A.   And by such a date within -- to comply

11   with the law.

12        Q.   But you weren't personally the person who

13   put that memo on the statement, correct?

14        A.   No, I was not.

15        Q.   And then you have mentioned that there was

16   also calls about truncation.  Was every customer of

17   National Translink called regarding this truncation

18   requirement during the summer of 2007?

19        A.   I couldn't tell you that every customer

20   was, no.

21        Q.   Did you call any customers regarding

22   truncation in 2007?

23        A.   I had a list of people I had to call at

24   one point, yes.

1          Q.    Do you recall how long that list of

2     persons was?

3          A.    Several pages.

4          Q.    Over 200?

5          A.    I couldn't tell you an exact number.

6          Q.    Okay.  And if you weren't able to get a

7     hold of a customer when you called about truncation,

8     what would you do then?

9          A.    Put it in notes.

10         Q.    Would you call again?

11         A.    Yes.

12         Q.    Would you call customers until you reached

13    somebody and were able to in your best estimation

14    tell them about this need to truncate?

15         A.    I would call until I got a response, and

16    if I didn't, I would put it in notes.

17         Q.    So there -- Strike that.

18              Do you recall there being customers that

19    you tried calling about this requirement and you

20    never were able to reach them, and so you just had

21    to reflect that in notes?  You never actually talked

22    to a live person about truncating?

23              MR. NORA:  Objection to the compound, the

24    form.

1        THE WITNESS:  I don't recall.  You know, I

2   couldn't give you an exact person, no.

3   BY MS. ARRANZ:

4        Q.   But do you recall there being one or two

5   people or one or two owners that you were unable to

6   get in touch with regarding this truncation

7   requirement when you tried calling them?

8        A.   There were people we could not get a hold

9   of, yes.

10       Q.   And you stated that was something you,

11   Doug Porch, would have put in your notes in that

12   customer database, right?

13       A.   Right.  If I was going on the list and I

14   called and they weren't there, I would put in, tried

15   to reach customer on such date with no answer.

16       Q.   Okay.  Let's say that you were able to

17   reach somebody and you told them that they needed to

18   truncate.  You know, that they needed this

19   requirement.  What would be the next step for the

20   customer -- From your conversation, what would be

21   the next step for the customer?

22       A.   Depending on the machine, they would need

23   to make themselves available to push buttons on the

24   machine so it could be truncated.

1      Q.   And was that something that you would do

2   for them?

3      A.   No, I would not do that.  That would be

4   technical support.

5      Q.   So if you reached somebody about this need

6   to truncate and they said, oh, okay.  We're ready to

7   do that, then you would -- would you transfer them

8   to technical --

9      A.   Then I would transfer to technical

10  support.  They would take over.

11     Q.   Okay.  If it was an older machine, an

12  older credit card terminal, would it be something

13  that potentially the processing center would have

14  been involved in for purposes of truncating?

15     A.   For certain machines they would have to go

16  through in California.

17     Q.   Could you directly transfer them to the

18  processing center in California for purposes of

19  truncating, or would they have to make a separate

20  call?

21     A.   No, they would have to make a separate

22  phone call.

23     Q.   Give me just one second here.  Are you

24  familiar with a credit card terminal type of T, as

1    in Tom, 7, P, as in Paul, Hypercom?

2         A.   Yes.

3         Q.   What do you know about that terminal, that

4    kind of terminal?

5         A.   Hypercoms were generally done by

6    CardSystems, downloaded, and all the parameters done

7    through the people in California.

8         Q.   Okay.  So this Hypercom -- and I will

9    refer to that machine as a Hypercom from here on out

10   if that is okay?

11        A.   Sure.

12        Q.   The Hypercoms would be one of those

13   machines that would have to be -- for purposes of

14   truncating, that would be something covered by the

15   California processing center, correct?

16        A.   Correct.

17        Q.   So if you reached somebody, a customer who

18   had a Hypercom and you said, "Listen, there is this

19   Federal statute in place.  You need to start

20   truncating your credit card numbers," and they said,

21   "Okay, well, what do we need to do now?" and they

22   had a Hypercom, would you then have given them the

23   phone number for the folks in California?

24        A.   Yes, and they could call the technical

1     support out there and they would help them.

2          Q.   If you were able to reach an owner like I

3     just described and you gave them the phone number to

4     call California, would you have any additional

5     conversations with them regarding the truncating?

6          A.   If they had some problems, I guess they

7     would have to call us back.  I couldn't -- You know,

8     I didn't have a follow-up call, no.

9          Q.   Do you have any personal knowledge of what

10    Card Services would have needed to have done to help

11    facilitate a customer getting their machine to

12    truncate -- a Hypercom for example to truncate?  Do

13    you know anything about that?

14         A.   No.

15         Q.   And you said that if they had problems

16    with this thereafter, they could call you folks,

17    customer service?

18         A.   If they had problems with their machine,

19    they are going to call the place that was doing the

20    programming.

21         Q.   Right.

22         A.   The reason we sent them there is because

23    we couldn't do it.

24         Q.   Okay.  So any follow-up issues they would

1    have would be those same issues of call batches

2    or -- I mean, batches at the end of the day or --

3        A.    How to operate the machine, they could

4    call us.

5        Q.    Okay.  But not with regard to the

6    truncating?

7        A.    But as far as programming or making the

8    machine do something different, the program, it

9    would all be through -- through CardSystems.

10       Q.    I think you said earlier too that there

11   was also a sign on your desk regarding the, like,

12   instructions too; is that right?

13       A.    Oh, there were instructions to, like, do

14   an override.  You know, nothing to do with

15   truncation.  This is just like to make the

16   machine -- Let them do the sale over that amount is

17   what I was referring to.

18       Q.    But I think you also said that there was

19   kind of like a note on your desk about -- you know,

20   make sure to tell them about truncating when you

21   called customers or they called you; is that right?

22       A.    Or when I had the list that "You call

23   these people.  They need to be truncated," you know.

24   I had a boss who wrote little memos on everything.

1      You know, "Don't forget to put in notes.  Don't --"

2      You know, so she was sticky-note-happy.

3          Q.   Okay.  Did she use smiley faces on her

4      notes too?

5          A.   Pretty much so.

6          Q.   We might get to that in a little bit.  We

7      are here specifically regarding a former customer of

8      National Translink and its name is Bacci Cafe and

9      Pizzeria on Ogden Avenue.

10             Have you ever heard of that customer

11     before?

12         A.   I have heard of Bacci Pizza.

13         Q.   What have you heard about the company?

14         A.   I remember the name, dealing with them.  I

15     don't, you know --

16         Q.   Do you remember having any contact with

17     any owners or employees of Bacci Cafe?

18         A.   I don't recall.

19         Q.   Do you recall a time frame in which you

20     would have had any contact with the folks at Bacci

21     Cafe?

22         A.   I talked to a lot of people every day.  I

23     couldn't tell you exact time, no.

24         Q.   Do you know when you -- when you first

1    heard of the company or customer of Bacci Cafe?

2         A.   I couldn't give you an exact date, no.

3         Q.   Do you recall having had any conversations

4    with anybody at Bacci Cafe regarding truncating of

5    credit card numbers on their credit card machine?

6         A.   The exact conversation, no.  I remember

7    the name.

8         Q.   Okay.  So I'm correct then, you don't

9    recall having had any conversations specifically

10   with Bacci Cafe regarding truncating of credit card

11   numbers on their credit card machines, correct?

12             MR. NORA:  Objection to the form.

13             THE WITNESS:  No, I talked to a lot of

14   people.  It would be in notes if I spoke to them.  I

15   couldn't tell you exactly yes or -- yes or no.

16   BY MS. ARRANZ:

17        Q.   So you don't recall --

18        A.   I don't recall.

19        Q.   -- one way or the other, correct?

20        A.   Correct.

21        Q.   Do you recall having ever spoken to anyone

22   at National Translink about Bacci Cafe?

23        A.   I don't recall directly, no.

24        Q.   Have you spoken to anyone at National

1    Translink since you left the company regarding Bacci

2    Cafe?

3         A.   I saw the name on the subpoena I got, and

4    that is -- You know, I called and like I said

5    before, and I talked to Jim, and he said you got to

6    answer these people's questions, and that's fine,

7    but that's it.

8         Q.   So it was only in that context that you

9    even brought up the name Bacci Cafe?

10        A.   Correct.

11        Q.   All right.  I'm going to mark as Exhibit

12   No. 4 for your deposition documents that have a

13   date -- It's got a cover letter on the front of it,

14   and it's dated August 20, 2008.

15                    (Whereupon, a document was marked

16                    Porch Deposition Exhibit 4 for

17                    identification as of 1/29/09.)

18             MR. ANDREOLI:  Do you want Doug to go

19   through the whole set?

20             MS. ARRANZ:  Yeah, let me identify a

21   little better for the record.  This is -- Porch

22   Exhibit 4 are documents starting with Bates label

23   SH/BA/NTC-001 through 0059, and I would like you to

24   just look through these documents.  I'm going to

1    pinpoint some for you, but just generally speaking,

2    I guess my question would be if you've ever seen

3    these documents before.

4                 THE WITNESS:  I have seen the statement.

5    This was one of our statements.

6                 MR. NORA:  Why don't we let the Witness --

7                 MS. ARRANZ:  Yeah, review it first and --

8                 MR. NORA:  -- go through the entire

9    Exhibit.

10                MS. ARRANZ:  And then we'll talk about it.

11                MR. ANDREOLI:  And just by way of a clean

12   record, the objection I would have is there is quite

13   a few documents here and having him go through and

14   then indicate as to the entire set, it may -- if

15   there is -- It might be better if there is a

16   particular one, to ask him about it, just one way to

17   look at it.

18                Would it be all right if he just --

19   if he crossed each one and I know this one --

20                MS. ARRANZ:  Yeah, you know, we can start

21   speaking about it specifically.  I just didn't want

22   to hand you a bunch of documents and then ask you to

23   answer questions without looking at --

24                THE WITNESS:  This is a bunch of

1    statements.

2    BY MS. ARRANZ:

3        Q.   Well, let's go -- I'm going to pinpoint

4    some pages for you and you will notice on the bottom

5    right-hand corner of these pages except for the --

6    one of the first pages.

7            MR. NORA:  While we talk about this

8    Exhibit 4, why don't we talk about pages 1, 2 --

9            MS. ARRANZ:  That is exactly what I was

10   going to go through.

11   BY MS. ARRANZ:

12       Q.   In the bottom right-hand corner of these

13   pages you will see --

14       A.   (Indicating.)

15       Q.   Yes.  There is different numbers and I

16   have just identified what the first number is, 1,

17   and the last number is 59, so I'm going to refer you

18   to certain pages in these documents and that is kind

19   of what I'm referring to is that number in the

20   bottom right-hand corner.

21           MR. ANDREOLI:  Quickly, these are numbers

22   that attorneys put on a document that let them

23   identify a document between themselves and then

24   later possibly for the Court.

George E. Rydman & Assoc., Joliet, Illinois (815) 727-4363

1          THE WITNESS:  Okay.

2          MR. ANDREOLI:  It's just an identifying

3    number.  It's not something that originally came

4    with --

5          THE WITNESS:  Yeah, it's nothing that I

6    would recall.

7          MR. ANDREOLI:  Right.

8    BY MS. ARRANZ:

9          Q.  Okay.  And I think you were saying that

10   Page 2, that first page after the cover letter, that

11   you said that that is a statement, right?

12         A.  Correct.

13         Q.  Is this a statement that would have been

14   sent to from your recollection -- or experience I

15   should say, a statement that would have been sent to

16   the customer here, Bacci Pizzeria?

17         A.  Correct.

18         Q.  Okay.  I want you to look and find Page

19   47.  Do you recognize this document?

20         A.  Yes.  I recognize my -- this is my writing

21   and stuff, yes.

22         Q.  Let's first talk about -- It looks like

23   there is a portion of this that is typewritten and

24   there's a portion that is handwritten, right?

1          A.    Correct.

2          Q.    Okay.  The typewritten -- typewritten

3    portion of this Page 47 of Exhibit 4, what is that?

4    Can you tell me what that is?

5          A.    MCMTER.   This is the terminal parameters

6    for their machine, Bacci's machine.   It was faxed to

7    the people in California.   It says, please truncate

8    and it's faxed --

9          Q.    Okay.  We're going to -- I'm sorry.   I

10   don't mean to interrupt you.  We'll get to the

11   handwritten portions.  I just -- for my own

12   edification and knowledge, I just want to know --

13   because I didn't do this.  I have never done this

14   before.  I have never worked at National

15   Translink -- what exactly the typewritten portion

16   is.

17              Now you were saying it's terminal

18   parameters.  I mean, was there a short way of

19   referring to this kind of -- the typewritten portion

20   of the document?

21         A.    This is the type of machine, MCMTER.

22         Q.    Okay.

23              MR. ANDREOLI:  That is the term in the

24   upper left M-C-M-T-E-R, correct?

George E. Rydman & Assoc., Joliet, Illinois (815) 727-4363

1              THE WITNESS:  Correct.

2    BY MS. ARRANZ:

3         Q.   How would you go about getting this

4    MCMTER?

5         A.   I would go into the program, print it out

6    of the computer.  This is the kind of machine they

7    have.

8         Q.   And when you say the type of machine --

9         A.   Listed under terminal type, it says T7P

10   Hypercom.

11        Q.   So let me make sure I understand this

12   correctly.  You would print out this page from the

13   customer database; is that right?

14        A.   Correct.

15        Q.   Okay.  And it prints out -- it is called a

16   MCMTER and it's per customer, correct?

17        A.   Correct.

18        Q.   Okay.  And here we can see that this

19   particular MCMTER on Page 47 of Exhibit 4, that that

20   regards Bacci Pizzeria, right?

21        A.   Correct.

22        Q.   And you are saying that it also includes

23   what type of terminal they have, correct?

24        A.   Correct.

1          Q.   All right.   Is there any other

2     information?   I see that there is an address on

3     here.   Is there any other information relevant to

4     the customer from what you can see in strictly the

5     typewritten portion of this page?

6          A.   You got their address on it.

7          Q.   Right.

8          A.   Name of -- The owner's name has been

9     blocked out, but other than that, yeah, it's just

10    got their -- just the machine and what type it is.

11         Q.   Okay.   Would the processing center have

12    access to this MCMTER information?

13         A.   In California?

14         Q.   Yes.

15         A.   Yes.

16         Q.   They would, okay.   Do you know -- Would

17    they essentially be able to access this information

18    through a secure line from California if you know?

19         A.    They would be able to pull up this

20    information, just as I did on the computer.

21         Q.   Okay.   Do you know is it something they

22    would be able to access then up on their computer

23    then also?

24         A.   Yes.

1        Q.    Do you know what date the report was run

2    that is on Page 47 of Exhibit 4?

3        A.    No.

4        Q.    Do any of the MCMTERs show what date a

5    specific report is run just in the typewritten

6    portion of the report?

7        A.    Not that I see here.  No, not at all.

8        Q.    Separate from what you are looking at

9    right there though.  Do you recall that --

10       A.    I don't recall.

11       Q.    Okay.  Looking at this page, can you tell

12   me what kind of customer Bacci Cafe was, whether

13   they were one that had only services through

14   National Translink or whether they had purchased a

15   terminal from National Translink also?

16            MR. NORA:  Objection to form.

17            THE WITNESS:  No, I can't -- I couldn't

18   tell by looking at this piece of paper.

19   BY MS. ARRANZ:

20       Q.    Okay.  And we already talked about the

21   fact that the -- It's indicated here on Page 47 they

22   had a Hypercom terminal, correct?

23       A.    Correct.

24       Q.    Do you know if National Translink sold

1    that sort of terminal?

2          A.   No.

3          Q.   No, you don't know, or no, they did not?

4          A.   I can't tell you whether they sold it or

5    not.  You know, in all the time I was -- They went

6    on for a long time before I got there.

7          Q.   Okay.  So you have no knowledge one way or

8    the other?

9          A.   I have no knowledge one way or the

10   another.

11         Q.   But National Translink would have provided

12   services for that kind of terminal, correct?

13         A.   Correct.

14         Q.   All right.  Now let's look at the

15   handwritten portions of Page 47 of Exhibit 4.  Do

16   you know whose handwriting this is at the bottom of

17   that page?

18         A.   That is my handwriting.

19         Q.   All of the handwriting -- let's put -- I

20   think that No. 4 is probably not your handwriting,

21   correct?  Do you see where your left hand is?

22         A.   No, that is not mine.

23         Q.   So but everything aside from --

24              MR. NORA:  Excuse me.  Just for the

1    record, by the 4, you are talking about the numeral

2    4 followed by a period, not the other 4 that might

3    be part --

4                    THE WITNESS:  Correct.

5                    MR. NORA:  Okay.

6    BY MS. ARRANZ:

7        Q.   So all the handwritten notes on the

8    right-hand lower portion of this Page 47, all of

9    those handwritten notes are your handwritten notes,

10   correct?

11       A.   Correct.

12       Q.   Can you tell me what exactly your

13   handwritten notes are then, please?

14       A.   It says the day I faxed this to Arizona to

15   truncate their machine.

16       Q.   I just want to know if you could --

17   because I'm not very good with reading other

18   people's handwriting.  Just literally from the top

19   to the bottom, if you could read to me what it says.

20       A.   It says, faxed.  My initials, DP.  The

21   date, 4/28/06.  It says 04/28/06, Friday.  10:55

22   a.m.  Please truncate.  Thanks, Doug.  Only last

23   four credit card numbers to show.

24       Q.   Okay.  Why did you write this down on this

1    report, do you know?

2        A.    Because they had to do the download

3    through the computer work in Arizona.    Then they had

4    to call them and push buttons to pick up the program

5    on their machine.

6        Q.    Okay.    When you say they, I mean, you --

7        A.    The customer.

8        Q.    Okay.

9        A.    Would have had to call Arizona -- or yes.

10   Call CardSystems in Arizona to get the -- and push

11   buttons on their machine while they are on the phone

12   to pick up the program --

13       Q.    Do you know specifically --

14       A.    -- through the phone lines.

15       Q.    Do you know specifically when you made

16   these handwritten notes, though?    For example, this

17   is why I'm asking this.    It looks -- You have two

18   dates -- the same date, but you have the date

19   written twice here and the time written.    Do you

20   know why you wrote the date down twice?

21       A.    When I faxed it and I always put the date

22   and time on the top here for when I had to enter it

23   in notes.

24       Q.    Okay.

1        A.    Sounds redundant, but that is, you know,
2    the way I did it at that time.
3        Q.    So I'm still confused.  You say that it
4    says, faxed.  DP, Doug Porch.  And then it says the
5    date --
6        A.    Well --
7        Q.    Let me just finish.
8        A.    Okay.
9        Q.    And then you wrote the date again when you
10   faxed it?
11       A.    Correct.
12       Q.    And essentially what that number then --
13   and maybe I'm incorrect.  Correct me if I'm wrong.
14   You basically put down April 28, 2006, Friday at
15   10:55 a.m.
16            Does that from your knowledge in looking
17   at this today make you think that that was the time
18   and date that you faxed this to Arizona?
19       A.    Correct.
20       Q.    Okay.  Now it says, please truncate.
21   Thanks, Doug.  Only last four credit card number to
22   show.  Was -- Who is that written for?
23       A.    The people in technical support in Arizona
24   where I faxed it to.