**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER D. SHURLAND, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 08 CV 2259 |
| BACCI CAFÉ & PIZZERIA ON OGDEN INC., and DOES 1-10, | ) ) ) | Judge Pallmeyer |
| Defendants. | ) ) ) | Mag. Judge Brown |
| _____ | ) ) | |
| BACCI CAFÉ & PIZZERIA ON OGDEN INC., | ) ) ) | |
| Third-Party Plaintiff, | ) ) | |
| vs. | ) ) | |
| NATIONAL TRANSLINK CORP. | ) ) | |
| Third-Party Defendant. | ) ) | |

**DEFENDANT, BACCI CAFÉ & PIZZERIA ON OGDEN INC.'S
LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL UNDISPUTED FACTS**

Pursuant to Local Rule 56.1(a)(3), by its attorneys, Defendant, Bacci Café & Pizzeria on Ogden Inc. ("Bacci"), respectfully submits the following Rule 56.1(a)(3) Statement of Material Undisputed Facts in Support of its Motion for Summary Judgment.

**Procedural Background.**

1. Mr. Shurland's Class Action Complaint avers that Bacci violated the Fair and Accurate Transactions Act of 2003 ("FACTA") by providing credit or debit card receipts at the

Case No. 08 CV 2259                                                      3006974 ELS/MAA

point of sale or transaction that contained more than the last five digits of the card number. (Plaintiff's Class Action Complaint, ¶¶ 1-2 attached hereto as **Exhibit A**.) In the Class Action Complaint, plaintiff seeks relief on behalf of Christopher Shurland ("Mr. Shurland" or "Plaintiff"), individually, and on behalf of a class of persons, in accordance with 735 ILCS 5/2-801. (*Id.*, ¶¶ 1, 23.)

2.Defendant, Bacci, filed an answer to the Complaint and affirmative defenses thereto. (Def.'s Answer and Affirmative Defenses attached hereto as **Exhibit B**.)

3.Mr. Shurland is a resident of Illinois. (Exh. A, ¶ 18.) Defendant, Bacci, is an Illinois corporation located at 20 West Ogden Avenue in Berwyn, Illinois. (Exh. B, ¶ 19.)

4.This matter was removed by Bacci from the Circuit Court of Cook County, Illinois, on grounds that the United States District Court for the Northern District of Illinois has original jurisdiction under the provisions of 28 U.S.C. § 1331, because a claim pursuant to FACTA arises under federal law. FACTA provides: an "action to enforce any liability created under this title [15 U.S.C. Section 1681] may be brought in any appropriate United States district court, without regard to the amount in controversy." 15 U.S.C. § 1681p.

5.Venue is proper in the Northern District of Illinois because the events giving rise to the Plaintiff's claims occurred in Cook County, Illinois. (Exh. A, ¶ 17.)

**Background of The Case.**

6.This case arises out of Plaintiff's claim according to FACTA, which prohibits merchants who accept credit cards and debit cards from issuing electronically-generated receipts displaying more than the last five digits of the card number. (*See* Exh. A, ¶ 10.) Plaintiff avers that Bacci violated FACTA recklessly by failing to protect against identity theft and credit or debit card fraud. (*Id.*, ¶ 13.)

Case No. 08 CV 2259  3006974 ELS/MAA

7. Plaintiff alleges that on August 11, 2007, after FACTA's final truncation requirement went into effect, he received from Bacci a computer-generated case register receipt displaying Plaintiff's entire credit card number and expiration date. (Exh. A, ¶ 22.) Plaintiff alleges that the printing of this receipt was in violation of FACTA's requirement that merchants comply with the federal statute as of December 4, 2006. (*See* Exh. A, ¶¶ 11-12.) He seeks statutory damages. (*Id.*, ¶ 15.)

8. In response, Bacci has denied any wrongdoing and has asserted affirmative defenses, including that Plaintiff has failed to state a cause of action in its Complaint. (Exh. B.)

9. In May 2004, Bacci obtained a credit card processing machine for use in its restaurant in Berwyn, Illinois. (*See* Vincent DiDiana Dep. at 21-22, attached hereto as **Exhibit C**.) This was a "simple to operate" credit card terminal known as a Hypercom T7P (hereinafter referred to as a "Hypercom"). (V. DiDiana Dep. at 22; James Tracy Dep. at 32-33, attached hereto as **Exhibit D**.) Bacci only had one terminal for this restaurant location. (V. DiDiana Dep. at 20.)

10. To use the Hypercom, Bacci had to contract with a processing company to activate service to the credit card machine. (V. DiDiana Dep. at 22.) Bacci contacted National Translink Corp. by phone to set up processing for the Hypercom. (*Id.* at 22-23; *see also* Tracy Dep. at 43-44.)

11. National Translink would provide its customer with a bank application, and after the application had been completed, National Translink would review this document and get approval from a processing center for the customer. (Tracy Dep. at 14-15.) National Translink would coordinate the processing center's programming of the customer's machine and the credit card approvals necessary to do transactions on the terminal. (*Id.*)

Case No. 08 CV 2259                                                                      3006974 ELS/MAA

12. After National Translink had contacted a processing center on behalf of one of its customers, the processing center would send a download—a computer program—to the customer's machine. (Tracy Dep. at 16-17.)

13. Thereafter, National Translink provided to its customers, including Bacci, "normal customer service." (Tracy Dep. at 17-18.) If a customer had questions on its account or regarding the way the credit card terminal worked, National Translink provided technical support and customer service support. (*Id*.)

14. As for technical support, National Translink could program certain types of machines or could assist in trouble-shooting certain error messages on the machine. (*Id*. at 20-21.) If a business, such as Bacci, had provided its own machine, National Translink would attempt to help its customer if it could. (*Id*. at 21.)

15. National Translink also had a provision in its contract with Bacci known as the "Merchant Club." (Douglas Porch Dep. at 103-06, attached hereto as **Exhibit E**.) Bacci paid a fee in order to be a member of this Merchant Club, and through this membership, Bacci could get service on its machine or a replacement terminal from National Translink. (*Id.*)

**National Translink's Interaction Or Lack Of Contact With Bacci.**

16. In early 2005, National Translink generated a notice to include in its customers' billing statements regarding the need to have their credit card terminals "properly programmed" such that the machines would limit or truncate credit card numbers on credit card receipts. (Tracy Dep. at 27.)

17. National Translink could not verify that every customer received this notice. (Tracy Dep. at 28-29, 90.)

18.     Then, National Translink compiled a list of approximately 200 businesses that the company believed "may be subject to truncation issues" in order to call these particular customers.  (Tracy Dep. at 32.)  This list was produced and marked as Exhibit 6 for the deposition of Douglas Porch, a former employee of National Translink who worked in customer service.  (Porch Dep. at 90-92; *see* also Exh. 6 thereto.)  Bacci was one of the companies included on that listing.  (*Id.* at 92.)

19.     No representative of National Translink has been able to verify that Bacci was, in fact, contacted regarding the requirements of truncation pursuant to its inclusion on this list.  (*See* Porch Dep. at 92-94; Noel Carey Dep. at 35-36, 55, 108-09, attached hereto as **Exhibit F**.)  This listing does not show any notation of contact, and Bacci's name is not crossed off.  (Porch Dep. at 93; *see also* Exh. 6 to Porch Dep.)  If Mr. Porch contacted a person or company on this list about truncation, "it would be reflected in [his] notes" as he would write down that a particular customer had been contacted.  (*Id.* at 69-70.)  This listing was a "checkoff list" that showed customers to be contacted with a "Y" or a "N" next to the name to indicate contact.  (Tracy Dep. at 52-53.)

20.     Mr. Porch has testified that there were "people [National Translink] could not get a hold of" and that he has no specific recollections of having had any conversations with Bacci regarding truncating of credit card numbers.  (Porch Dep. at 46, 52.)

21.     National Translink had access to a MCMTER program maintained by the processing center.  (Carey Dep. at 57-58, 112; Porch Dep. at 59.)  These MCMTERS could be printed, on occasion, and customer service representatives would make handwritten notes regarding a particular customer.  (Porch Dep. at 57-61.)

Case No. 08 CV 2259                                                                                          3006974 ELS/MAA

22.     In April 2006, Douglas Porch made handwritten notes on print outs of MCMTERS for Bacci.  (*Id.* at 56-58, 61.)  These notes indicate that Mr. Porch had communications with a processing center, Card Systems, to arrange for the preparation of software for download at the Bacci restaurant for truncating on or about April 28, 2006.  (*See id.* at 62-65.)  However, Mr. Porch had no specific recollection of having spoken to anyone at Bacci regarding the need for truncation at the time of making these notes.  (*Id.* at 65-66.)

23.     Thereafter, on or about July 13, 2006, Mr. Porch made additional handwritten notes on another print out of a customer page for Bacci.  (*Id.* at 70-73.)  Mr. Porch's handwritten notes regard the issue of truncating and are directed to Card Systems.  (*Id.* at 72-74.)  There is another set of handwriting on the July 13th customer print out that is not Mr. Porch's handwriting.  (*Id.* at 73.)  This handwriting states: "truncation is complete."  (*See id.*)

24.     Mr. Porch testified that after Card Systems had uploaded software that would enable a credit card machine to truncate numbers—that "truncation is complete"—the customer, such as Bacci, would have to hit a button on its credit card machine to initialize the software that enables truncation.  (*Id.* at 78-79.)  Mr. Porch did not have any recollection of any conversations with anyone at Bacci or at Card Systems on July 13, 2006 or July 14, 2006.  (*Id.* at 79-80.)

25.     National Translink also maintained an Access customer database for its customers. (Tracy Dep. at 19, 60; Porch Dep. at 83-84; Carey Dep. at 62, 127-30.)  These entries contain comments made by customer service representatives and technical support representatives at National Translink. (Porch Dep. at 84-87.)

26.     One such entry of July 14, 2006 indicates that Bacci complained of "sticky buttons" to National Translink.  (*Id.* at 87-88; *see also* Exh. 5 attached thereto.)  On that date, National Translink informed Bacci that it would be sending "a replacement terminal" to Bacci

Case No. 08 CV 2259 3006974 ELS/MAA

due to this problem. (*See id.* at 87-88.) National Translink "program[med] [a] new terminal and sent" it to Bacci. (*Id.* at 88.)

27. Before sending Bacci a new credit card terminal on July 14, 2006, National Translink's technical support coordinated with Card Systems for files to be placed on the new terminal for Bacci. (Carey Dep. at 90-91.) The files to be initialized on the new terminal sent by National Translink to Bacci on July 14, 2006 included "truncation information." (Carey Dep. at 153.)

28. Specifically, technical support got a new terminal—another Hypercom—and utilized a program code provided by Card Systems to download files onto the new terminal for Bacci's use. (*Id.* at 137-38, 142-43.) Before the new terminal was sent to Bacci in July 2006, all the information and program files—including the program for truncation on a Hypercom—would have been downloaded onto the credit card terminal. (*Id.*) The machine would have worked with the truncation software uploaded so the customer simply had to take the terminal out of the box and plug it in; it could then "do sales." (Porch Dep. at 107-108.)

29. Bacci's owner recalls having had a problem with "sticky buttons" in July 2006 and recalls a National Translink representative telling him that a replacement terminal would be sent. (Vincent DiDiana Aff., ¶¶ 3-4, attached hereto as **Exhibit G**.) Bacci sent its old terminal to National Translink at that time. (*Id.*, ¶ 5.) Bacci began using the replacement credit card, sent by National Translink, for its credit and debit card transactions starting at that time. (*Id.*, ¶ 6.) Mr. DiDiana believed that the replacement credit card terminal would have met all of the requirements found in all laws, rules and regulations governing the use of credit card terminals. (*Id.*, ¶ 7.)

Case No. 08 CV 2259 3006974 ELS/MAA

**Bacci's Lack Of Any Knowledge Of Truncation Requirements.**

30. Sometime in October 2007, an unidentified patron of the restaurant alerted one of the employees, Oscar Mendoza, to the fact that too many credit card numbers were printed on the credit card receipt. (V. DiDiana Dep. at 38-40; Oscar Mendoza Dep. at 13-15, attached hereto as **Exhibit H**.) Prior to that statement by one of Bacci's customers, no representative or employee of Bacci recalled receiving any notification of the need to truncate credit card numbers on customer credit card receipts. (*See e.g.,* V. DiDiana Dep. at 36, 38-42; Dominico DiDiana Dep. at 10-11, attached hereto as **Exhibit I**; Pasquale DiDiana Dep. at 10-11, 19-20, attached as **Exhibit J**; Oscar Mendoza at 13-15.)

31. Bacci is a small, family-owned company and restaurant. (V. DiDiana at 9, 25-27.) The restaurant does not belong to any business associations, and it does not read any business journals or commercial journals. V. DiDiana at 55-56.) The restaurant had not received or read any material provided by Visa or MasterCard regarding treatment of credit cards. (*Id.* at 56; *see also* Mendoza Dep. at 26-27; D. DiDiana Dep. at 10.) The owner of Bacci had not read anything regarding this need to truncate prior to the customer letting them know about this credit card number issue. (V. DiDiana at 55-56.)

32. No one from National Translink ever discussed the need to truncate with any employee of Bacci. (P. DiDiana Dep. at 19; V. DiDiana Dep. at 53, 63; D. DiDiana Dep. at 10.)

33. The restaurant "[n]ever knew about [the truncation of credit card receipts]" prior to October 2007. (V. DiDiana Dep. at 62; *see also* P. DiDiana Dep. at 19-20.) If Bacci "would have known [lack of truncation] was a problem," it would have gotten different services before finding out about the problem from a patron. (*See id.* at 63-64.)

Case No. 08 CV 2259 3006974 ELS/MAA

34. Immediately after learning about the truncation problem from one of the restaurant's patrons in October 2007, Bacci employees made contact with National Translink in an attempt to get the terminal to function properly. (D. DiDiana Dep. at 11-14.) Bacci was unable to get the machine to truncate. (*Id.* at 14-17.) Starting immediately after the customer noticed the problem, Bacci truncated the customer receipts by manually crossing out the numbers, while the restaurant awaited a new credit card terminal and service. (V. DiDiana Dep. at 59; D. DiDiana Dep. at 19-20.)

                        Respectfully submitted,

                        By: /s/ Molly A. Arranz
                               Attorneys for Defendant
                               BACCI CAFÉ & PIZZERIA ON OGDEN, INC.

Eric L. Samore, ARDC # 6181345
Molly A. Arranz, ARDC # 6281122
SmithAmundsen LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3200

Dated: June 10, 2009