**EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER D. SHURLAND,<br>individually and as the representative of a<br>class of similarly-situated persons,<br><br>                             Plaintiff,<br><br>        v.<br><br>BACCI CAFÉ & PIZZERIA ON ODGEN,<br>INC. and DOES 1 – 10,<br>                          Defendants. | )<br>)<br>)<br>)<br>)<br>)   No. 08 CV 2259<br>)<br>)<br>)   Judge Pallmeyer<br>)<br>)<br>)<br>) |

<u>**NOTICE OF RULE 30(b)(6) DEPOSITION**</u>

TO:   Eric Samore
        Darren Grady
        SmithAmundsen, LLC
        150 N. Michigan Avenue, Suite 3300
        Chicago, IL 60601
        Fax: 312-894-3210

Thomas A. Andreoli
Sonnenschein Nath & Rosenthal LLP
Sears Tower
223 S. Wacker Drive, Suite 7800
Chicago, IL 60606
Fax: 312-876-7934

YOU ARE HEREBY NOTIFIED that the undersigned will take the following deposition before a Notary Public or other authorized officer on the date and at the place and time set forth below:

DEPONENT:     Rule 30(b)(6) deposition of Representative from Bacci Café & Pizza On Ogden, Inc. knowledgeable as to topics addressed in attached Rider A

DATE:           November 11, 2009

TIME:           1:00 p.m.

PLACE:         3701 Algonquin Road, Suite 760
                  Rolling Meadows, IL 60008

PURPOSE:     Rule 30(b)(6) deposition

A REPRESENTATIVE FROM BACCI CAFÉ & PIZZA ON OGDEN, INC. IS HEREBY FURTHER NOTIFIED by this Notice, to be present at the time, date and place stated, the said Deponent for oral examination pursuant to the Federal Rules of Civil Procedure and Local Rules for Northern District of Illinois.

                                   _____
                                   Jonathan E. Irwin
                                   One of Plaintiff's Attorneys

Brian J. Wanca
Jonathan E. Irwin
ANDERSON + WANCA
3701 Algonquin Road, Suite 760
Rolling Meadows, IL 60008
Telephone: 847/368-1500

Phillip A. Bock
BOCK & HATCH, LLC
134 N. LaSalle Street, Suite 1000
Chicago, IL 60602
Telephone: 312/658-5500

## CERTIFICATE OF SERVICE

I, the undersigned, certify that on November 3, 2009 I served a true and correct copy of this Notice on the party listed above, by faxing to the above listed fax number from Rolling Meadows, Illinois at or before 5:00 p.m.

[X]  Under penalties as provided by law pursuant
     to 28 U.S.C. § 1746(2), I certify that the statements
     set forth herein are true and correct.

Brian J. Wanca                          Phillip A. Bock
Jonathan E. Irwin                       BOCK & HATCH, LLC
ANDERSON + WANCA                        134 N. LaSalle St.  Suite 1000
3701 Algonquin Road, Suite 760          Chicago, IL  60602
Rolling Meadows, IL  60008              Telephone:  312/658-5500
Telephone:  847/368-1500

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER D. SHURLAND, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) | |
| Plaintiff, | ) ) ) | No. 08 CV 2259 |
| v. | ) ) | Judge Pallmeyer |
| BACCI CAFÉ & PIZZERIA ON ODGEN, INC. and DOES 1 – 10, Defendants. | ) ) ) ) | |

**RIDER A**

**RULE 30(b)(6) WITNESS DEPOSITION TOPICS**

1.      Person/representative from Bacci Cafe & Pizzeria On Ogden, Inc. knowledgeable to testify as to Bacci Cafe & Pizzeria On Ogden, Inc.'s policy of retention and/or destruction of merchant credit or debit card receipts.

2.      Person/representative from Bacci Cafe & Pizzeria On Ogden, Inc. knowledgeable to testify as to the reason or purpose that Bacci Cafe & Pizzeria On Ogden, Inc. destroys merchant credit card or debit receipts rather than retaining the receipts for a minimum of three years after each transaction has been completed.

3.      Person/representative from Bacci Cafe & Pizzeria On Ogden, Inc. knowledgeable to testify as to the means, methods or devices utilized by Bacci Cafe & Pizzeria On Ogden, Inc. to destroy/dispose of merchant credit or debit card receipts.

4.      Person/representative from Bacci Cafe & Pizzeria On Ogden, Inc. knowledgeable to testify as to the period of time when Bacci Cafe & Pizzeria On Ogden, Inc. first began destroying merchant credit or debit card receipts and whether the practice of destroying/disposing of merchant credit or debit card receipts is still ongoing to the present time.

5      Person/representative from Bacci Cafe & Pizzeria On Ogden, Inc. knowledgeable to testify as to identity of individual from Bacci Cafe & Pizzeria On Ogden, Inc. who implemented policy of destroying/disposing of merchant credit or debit card receipts.

6.      Person/representative from Bacci Cafe & Pizzeria On Ogden, Inc. knowledgeable to testify as to individual(s) who perform the destruction/disposal of merchant credit and debit card receipts.

**EXHIBIT 2**

**Page 1**

```
1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT, CHANCERY DIVISION
2

3

4    CHRISTOPHER D. SHURLAND,        )
     individually and as the         )
5    representative of a class of    )
     similarly-situated persons,     )
6              Plaintiffs,           )
                                     )
7        vs.                        ) No. 08 CH 10786
                                     )
8    BACCI CAFE' & PIZZERIA ON       )
     OGDEN, INC., and DOES 1-10,     )
9                                    )
              Defendants.            )
10

11

12        The Discovery Deposition of VINCENT

13   DIDIANA, called by the Plaintiffs for

14   examination, taken pursuant to notice, taken

15   before MICHELE J. LOSURDO, CSR, a Notary Public

16   within and for the County of DuPage, State of

17   Illinois, and a Certified Shorthand Reporter of

18   said state, taken at 3701 Algonquin Road,

19   Suite 760, Rolling Meadows, Illinois, at the

20   hour of 9:50 a.m., on the 9th of December,

21   A.D., 2008.

22

23

24
```

**Page 2**

APPEARANCES:

ANDERSON + WANCA
BY: MR. GERALD E. NORA
3701 Algonquin Road
Suite 760
Rolling Meadows, Illinois  60008
(847) 368-1500

Appeared on behalf of the Plaintiffs;

SMITHAMUNDSEN
BY: MR. ERIC L. SAMORE
150 North Michigan Avenue
Suite 3300
Chicago, Illinois  60601
(312) 894-3251

Appeared on behalf of the Defendants.

**Page 3**

I N D E X

**THE WITNESS:** VINCENT DIDIANA          PAGE

Examination
by Mr. Nora............................  4

**Page 4**

MR. SAMORE:  Just for the record, I would like to state that just moments ago we were handed the response of National Translink to a subpoena.  The letter is dated August 20, 2008, when Sonnenschein responded to the subpoena.  To the best of my knowledge, this is the first time we received these documents.  We object to their use during this deposition for late disclosure.

Counsel did allow us a few minutes to review them.  It's very difficult to read the handwriting of the merchant processing agreement and it's too late, so we make that objection.  Having said that, we'll continue to make that objection, but I will not instruct the witness not to answer questions regarding that.

MR. NORA:  Do you have any documents from Translink to produce to us?

MR. SAMORE:  We've already produced -- we produced our production response.  You should have our production response.

MR. NORA:  Will you swear in the witness, please?

5

**VINCENT DIDIANA,**

having been first duly sworn, was examined and
testified as follows:

**EXAMINATION**

by Mr. Nora

Q.   Sir, speaking loudly and distinctly to
help me, please state your name.

A.   Vincent Didiana.

Q.   Would you spell your last name?

A.   D-i-d-i-a-n-a.

Q.   Mr. Didiana, have you ever been deposed
before?

A.   No.

Q.   We're here to take the deposition of
you in the case of Christopher Shurland versus
Bacci Cafe` & Pizzeria on Ogden.  If at any
time during this deposition you do not
understand what I am saying, please ask me to
rephrase the question or repeat it.  I can ask
wrong questions every day and you have -- you
could not answer truthfully unless you
understand the question.  You also understand
that you're to answer each question completely,
correct?

6

A.   Yes.

Q.   And if at any time you need to take a
break or want to talk to your attorney, please
advise me and we will comply.

A.   Okay.

Q.   Is that all right with you?

A.   Okay.  All right.

Q.   Sir, during this deposition, I'll be
using some terms and I want to make sure that
I'm using them correctly and we both understand
each other.  You know that we're here about
problems concerning credit card receipts,
correct?

A.   Yes.

Q.   And when I am using the term credit
card, would it be all right with you if we take
that to mean both credit cards and debit cards?

A.   Yes.

Q.   And when I talk about a credit card
number, will you also understand that to be the
customer's account number on the credit card?

A.   Now I know, yes.

Q.   And I don't think it will come up but
if we also use the term primary account number,

7

that would also be the customer account number
too, is that all right with you?

A.   Yeah.

Q.   And please say yes or no because
sometimes we say uh-huh and uhn-uhn but by the
time it gets printed up, the uh-huh becomes
uhn-uhn, okay?  All righty.  We'll see how that
one turns out.

When I talk about the customer receipt,
I'll be talking about the electronic customer
receipts that might be returned after an
electric credit card transaction, do you
understand that?

A.   (Nodding head.)

Q.   And when I talk about a machine, I'll
probably be talking about the credit card
processing machine, do you know what I mean by
that?

A.   Yes.

Q.   Are you -- we'll also be using the term
truncation, do you know what I mean by
truncation?

A.   I just learned it.

Q.   What do you understand truncation to

8

mean?

MR. SAMORE:  You have to answer his
question.

BY THE WITNESS:

A.   Truncation, it's getting me confused.

BY MR. NORA:

Q.   Do you understand that to mean the
restriction of information away from or off of
the customer credit card receipt?

A.   Can you rephrase the question?

Q.   Do you understand that you have any
requirement to truncate information from the
credit card receipt that customers receive in
your store today?

A.   I learned that recently.

Q.   And what did you learn?

MR. SAMORE:  I think the problem may be
with the word truncation.  Why don't you use
a different term like shorten instead of
truncation, shorten?

BY MR. NORA:

Q.   If I use the word truncation, I'm
talking about the requirements that customer
credit card numbers not be shown on their

9

1  receipts, do you understand that?

2  A.  Now that you explained to me, yes.

3  Q.  And it also means that the expiration

4  dates on their credit cards should not be shown

5  on their receipts, do you understand that?

6  A.  Yes, from hearing it now I am.

7  Q.  That's all I am concerned with right

8  now is what you understand those words mean

9  today.  Am I clear so far?

10  A.  Yeah.

11  Q.  Sir, what is your relationship to Bacci

12  Cafe` & Pizzeria on Ogden Avenue?

13  A.  Me and my wife are the owners.

14  Q.  Do you and your wife own 100 percent of

15  the stock in that company?

16  A.  Yes.

17  Q.  And that company, does it own the cafe`

18  and pizzeria restaurant on Ogden Avenue?

19  A.  Yes.

20  Q.  What is the address of that place?

21  A.  6920 West Ogden.

22  Q.  And your wife's name is what, sir?

23  A.  Chiara, C-h-i-a-r-a.

24  Q.  Do you own any other restaurant, sir?

10

1  A.  Yes.

2  Q.  What other restaurants do you own?

3  A.  I own the one in Melrose Park.

4  Q.  What is the address there?

5  A.  2212 West North Avenue.

6  Q.  And what is the company name for that

7  restaurant?

8  A.  Bacci Pizzeria.

9  Q.  Is that the complete corporate name for

10  it or does it have a different corporation?

11  A.  Different corporation.

12  Q.  And do you know the corporate name

13  offhand?

14  A.  What do you mean by the different

15  corporation?

16  Q.  When you file your tax returns, what is

17  the name of the company?

18  A.  Same thing, Bacci Pizzeria of Melrose

19  Park.

20  Q.  And how long have you owned that

21  restaurant, sir?

22  A.  About four years.

23  Q.  And who do you own it with, if anyone?

24  A.  Myself.

11

1  Q.  You're the sole owner?

2  A.  Yes.

3  Q.  Do you have any other restaurants

4  besides the one on Ogden Avenue and the one in

5  Melrose Park?

6  A.  No.

7  Q.  Now, when did you purchase the

8  restaurant you own on Ogden Avenue?

9  A.  Back in 1998, July.

10  Q.  And who did you purchase it from, if

11  you recall?

12  A.  The name was Fiordiorasa.

13  Q.  Is DeRosa the last name?

14  A.  Fiordiorosa, yes.

15  Q.  Is that a first name and a last name

16  you just gave me?

17  A.  Fiordiorasa is the last name.

18  Q.  Do you know how to spell it?

19  A.  F-i-o-r-d-i-o-r-a-s-a.

20  Q.  And what was the name of the restaurant

21  when you purchased it in 1998?

22  A.  It was Paradise Cafe`.

23  Q.  When you began, did you continue

24  operating the restaurant after purchasing it in

12

1  1998?

2  A.  Excuse me?

3  Q.  When you purchased the restaurant in

4  1998, did you take over the operations of the

5  restaurant immediately?

6  A.  Yes.

7  Q.  And were you doing business as Paradise

8  Cafe` when you took it over?

9  A.  No.

10  Q.  Have you been doing business there

11  since 1998 as Bacci Cafe` & Pizzeria?

12  A.  Yes.

13  Q.  In 1998 when you purchased that

14  restaurant, did you own any other restaurants

15  at that time?

16  A.  No.

17  Q.  Is that the first restaurant that you

18  owned and operated?

19  A.  Yes.

20  Q.  Had you been in the restaurant business

21  before 1998 in any capacity?

22  A.  I think it's been a long time.  No,

23  hold on.  Can we take a break?  Can we take a

24  few minutes break, please?

13

1     (Recess taken.)
2     MR. SAMORE:  Why don't you read the
3   last question back.
4     (Record read as requested.)
5     MR. SAMORE:  It's a yes or no answer.
6   BY THE WITNESS:
7     A.   Yes.
8   BY MR. NORA:
9     Q.   How old are you, sir?
10    A.   Forty-nine, just turned 49.
11    Q.   Congratulations.
12    A.   Thank you.
13    Q.   When did you first work in the
14  restaurant business?
15    A.   I started very early age.
16    Q.   Approximately what age, if you can
17  remember?
18    A.   Nineteen, 20.
19    Q.   And have you been working in the
20  restaurant business in one capacity or another
21  since then?
22    A.   Yes.
23    Q.   And has that always been working with
24  other family members who either owned or

14

1   operated those restaurants?
2     A.   Yes.
3     Q.   And how old were you when you first had
4   responsibility for handling money in one of the
5   family restaurants?
6     MR. SAMORE:  I just want to object on
7     the grounds of relevancy.  This has really
8     gone pretty far afield.  You could answer
9     the question.
10  BY THE WITNESS:
11    A.   When I had my own back in 1988.
12  BY MR. NORA:
13    Q.   1988?
14    A.   (Nodding head.)
15    Q.   And what was the name of that
16  restaurant in 1988?
17    A.   '88, the Pepper Page (phonetic).
18    Q.   Where was that located, sir?
19    A.   1747 North 25th Avenue.
20    Q.   In what town?
21    A.   Melrose Park.
22    Q.   Did you accept credit cards in that
23  business?
24    A.   No.  There was no credit card machine

15

1   back then.
2     Q.   When did you start accepting credit
3   cards in any of the businesses that you operate
4   or worked in?
5     A.   Just in the one in 6920 West Ogden.
6     Q.   And when did you start accepting credit
7   cards at that location?
8     A.   I believe 2004.
9     Q.   And was that the first year you,
10  yourself, had handled credit cards in any of
11  the restaurants in which you worked?
12    A.   Yes.
13    Q.   Now, sir, just to clear up what may be
14  confusion in your answer to interrogatories,
15  there is a statement that the restaurant on
16  Ogden Avenue was purchased in April of 2005,
17  did something happen in April of 2005 to change
18  the ownership on that?
19    MR. SAMORE:  No.  The -- that's not
20    what the answer -- are you reading the
21    answer to number 2?  That's not -- you've
22    misread the answer.
23  BY MR. NORA:
24    Q.   You purchased the restaurant at

16

1   6920 Ogden Avenue in 1998; is that correct?
2     A.   Right.
3     Q.   And you obtained a credit card
4   processing machine for that location in 2004;
5   is that correct?
6     A.   Yes.
7     Q.   And that was the first credit card
8   processing machine you had at that location,
9   correct?
10    A.   Yes.
11    MR. SAMORE:  It's 2004 or 2005?
12    THE WITNESS:  2005.
13    MR. SAMORE:  Why don't you show him the
14    interrogatory that you're reading from.
15  BY MR. NORA:
16    Q.   I'm going to ask you to read the answer
17  to question number 2 and the answer to number 2
18  in your answers to interrogatories and then I'm
19  going to ask you a question about them.  Read
20  them to yourself, please.  Let me know when
21  you're done reading it.
22    MR. SAMORE:  I just want to state this
23    so we don't spend a lot of time on this and
24    that is that the credit card machine was

17

1    purchased when the Melrose Park restaurant
2    was purchased in April of 2005 not the
3    Ogden.
4         MR. NORA:  Okay.  Thank you.
5    BY MR. NORA:
6    Q.   Is your wife part owner of the store on
7    Melrose Park?
8    A.   No.
9    Q.   You're the sole owner?
10   A.   (Nodding head.)
11   Q.   And who did you purchase the Melrose
12   Park store from, sir?
13   A.   The gentleman's name is Rick Spillone.
14   Q.   Please spell the last name.
15   A.   S-p-i-l-l-o-n-e.
16   Q.   When you purchased the restaurant from
17   him, what was the name of the restaurant?
18   A.   The Rose.
19   Q.   Do you still have the contracts and
20   closing documents from the sale of that
21   restaurant?
22   A.   I looked for it.  I found part of it.
23   I can't find the rest of the contract.
24   Q.   Did you have an attorney on that

18

1    closing?
2    A.   No.
3    Q.   You handled it yourself?
4    A.   Yes.
5    Q.   Did Mr. Spillone have an attorney on
6    that transaction?
7    A.   No.
8    Q.   Where is Mr. Spillone today, if you
9    know?
10   A.   I have no idea.
11   Q.   What is the last address you knew him
12   to be at?
13   A.   We met at the restaurant there, you
14   know.  I don't know his home address.
15       MR. NORA:  I'll ask you to make those
16   documents available, whatever ones you could
17   find.
18       MR. SAMORE:  Well, the only ones that
19   would be relevant to this case would be the
20   ones pertaining to the credit card machine
21   that was purchased at that time.
22       MR. NORA:  I'm not going to argue
23   relevancy, I just want the documents.
24       MR. SAMORE:  But what I'm saying is I

19

1    don't think you're entitled to them unless
2    we have something pertaining to the credit
3    card machine that was purchased.  A
4    transaction for a different restaurant is
5    not relevant.  We could argue about that
6    later.
7         Just so the record is clear, did
8    you find any contracts pertaining to the
9    purchase of the credit card machine in April
10   of 2005?
11       THE WITNESS:  I don't recall.  I recall
12   that it specified most of the things and on
13   the place itself, whatever was in the place
14   went with the restaurant.
15       MR. SAMORE:  Did you find any
16   documents -- the contract for the purchase
17   of the restaurant that specifically referred
18   to the credit card machine?
19       THE WITNESS:  No, I don't recall.
20       MR. SAMORE:  No bill of sale for the
21   credit card machine, correct?
22       THE WITNESS:  Correct.
23   BY MR. NORA:
24   Q.   Now, since you've been operating two

20

1    restaurants, sir, have you been accepting
2    credit cards in each of those facilities since
3    2004?
4         MR. SAMORE:  Well, he purchased --
5    BY MR. NORA:
6    Q.   Yeah.  Since you've been operating both
7    restaurants, have you been accepting credit
8    cards in each of the locations?
9    A.   Yeah.  Yes.
10   Q.   Now, for the Berwyn location, when did
11   you -- how many credit card processing machines
12   do you have at the Berwyn location?
13   A.   One.
14   Q.   When did you obtain that machine?
15   A.   On the Berwyn location, when did I --
16   I'm sorry, rephrase that question.
17       (Record read as requested.)
18   BY THE WITNESS:
19   A.   When I purchased the restaurant in
20   Melrose Park.
21   BY MR. NORA:
22   Q.   And who did you purchase that machine
23   from, sir?
24   A.   It was already at the restaurant when I

21

1  bought it.
2      Q.   And, again, to the best of your
3  recollection that occurred in?
4      A.   2004 I believe to the best of my
5  recollection.
6      Q.   And who did you obtain that machine
7  from, sir?
8      A.   It was already in the restaurant when I
9  purchased the restaurant, sir.
10     Q.   That's when you purchased the Melrose
11 Park restaurant?
12     A.   Yes.
13     Q.   And you have a second restaurant I
14 believe in Berwyn, Illinois; is that correct?
15     A.   Yes.
16     Q.   Now, I'm asking you about the Berwyn
17 address, sir.  When did you get the credit card
18 processing machine for the Berwyn --
19     A.   When I purchased the one in Melrose
20 Park.
21     Q.   And that was in 2004, correct?
22     A.   Yes.
23     Q.   When you purchased the machine for the
24 Berwyn facility, who did you obtain that

23

1  Translink on that transaction or both?
2      A.   Say that again, please.
3      Q.   How did you -- who dealt with National
4  Translink when you first set up processing on
5  the Berwyn facility?
6      A.   I did.
7      Q.   How did you contact National Translink
8  and set up the service?
9      A.   It was all done by phone.
10     Q.   Do you recall who you spoke with?
11     A.   No, sir.
12     Q.   Do you recall meeting with anyone with
13 National Translink to set up that service?
14     A.   No.
15     Q.   Did you fill out any paperwork for that
16 service?
17     A.   I believe we had to fill out an
18 application.
19     Q.   Would that have been done by your wife,
20 if you recall?
21     A.   The application itself?
22     Q.   Yes.
23     A.   Probably because my wife has better
24 handwriting than I do.

22

1  machine from?
2      A.   That was already in the -- when I
3  bought the restaurant in Melrose Park, there
4  was two machines there so one I took to Berwyn.
5      Q.   And what kind of machine was that, sir?
6      A.   I don't even know the name of it.
7      Q.   Describe it as well as you can, please.
8      A.   Just a little standard operational
9  machine, very simple to operate.
10     Q.   And who installed it in your Berwyn
11 store?
12     A.   We installed it.
13     Q.   When you say we, you and who else?
14     A.   Me.
15     Q.   Had you ever installed such a machine
16 before, sir?
17     A.   No, sir.
18     Q.   Now, what did you do about activating
19 the machine in Berwyn, did you have to obtain a
20 processing company to activate that service?
21     A.   Yes, we did.
22     Q.   And who did you contact?
23     A.   National Translink.
24     Q.   Did you or your wife meet with National

24

1      Q.   And did they give you any written
2  materials or instructions on its use?
3      A.   No.
4      Q.   Did you obtain any materials on rules
5  for using credit cards either with that machine
6  or with the companies?
7      A.   No.
8      Q.   To the best of your recollection, all
9  you had after installing that machine and
10 getting the service was the machine itself; is
11 that correct?
12     A.   Yes.
13     Q.   After setting up the machine in 2004,
14 which credit cards did you process on that
15 machine at the Berwyn facility?
16     A.   I believe it was Visa and MasterCard.
17     Q.   Would you have been able to handle
18 Discover Card there as well?
19     A.   Yes.
20     Q.   In the Berwyn facility, how many tables
21 do you have?
22     A.   Say ten.
23     Q.   Do you have a delivery business from
24 that facility as well?

25

1    A.    Yes.

2    Q.    And do you have take-out from that
3 facility?

     A.    Yes.

5    Q.    How many days a week does that store
6 operate today?

7    A.    Seven days a week.

8    Q.    Has it been seven days a week since you
9 purchased it or since you operated it?

10   A.    Most of the times, yes, of course
11 except the holidays or --

12   Q.    And have you been operating it
13 generally for seven days a week since 2004?

14   A.    Yeah.

15   Q.    Do you generally work in the store
16 seven days a week?

17   A.    Yes.

18   Q.    And how about your wife?

19   A.    No.

20   Q.    Who else -- do you have other family
21 members who are employed in the store?

22   A.    I have a son that works with us.

23   Q.    And his name is?

     A.    Dominic, Domenico.

26

1    Q.    Is he here with you today?

2    A.    No, that's Pasquale.  That's my older
3 son.

4    Q.    Has Domenico been working with you
5 since 2004 in the store?

6    A.    Pretty much, yes.

7    Q.    And Pasquale, what is his relationship
8 with the store past or present?

9    A.    He overlooks operations sometime but
10 he's at a different store.

11   Q.    What store is he at?

12   A.    He's at -- he has one on -- in the
13 city.  It's his own.

14   Q.    He owns his own store?

15   A.    (Nodding head.)

16   Q.    Is my understanding correct that you
17 only have one cash register in the store?

18   A.    Yes.

19   Q.    Is that located by the credit
20 processing machine, credit card processing
21 machine?

22   A.    Close by, very close by.

23   Q.    Now, am I being presumptuous to say
24 usually a family member is in charge of the

27

1 cash register and credit card processing
2 machine?

3    A.    Yes.

4    Q.    Am I correct in saying it's always a
5 family member in charge of those?

6    A.    Yes.

7    Q.    And since 2004, would that be you, your
8 wife or either of your two sons?

9    A.    Yes.

10   Q.    Anyone else?

11   A.    We have another employee.  His name is
12 Oscar.

13   Q.    Is that Oscar Mendoza?

14   A.    Yes.

15   Q.    Does he also have responsibility for
16 the cash register credit card receipts?

17   A.    Yes.

18   Q.    When did you first employ Oscar
19 Mendoza?

20   A.    I don't recall exactly, but it's been a
21 long time.

22   Q.    Has he been there since 2004?

23   A.    Yes.

24   Q.    How many days a week does Oscar Mendoza

28

1 work for you?

2    A.    It varies, three, four days in between
3 school and stuff.

4    Q.    Is he a part-time worker?

5    A.    Yes.

6    Q.    Now, I'm always on the bad end of a
7 credit card receipt transaction.  Can you
8 please tell me what you do when a customer
9 presents a credit card for payment at the cash
10 register?

11   A.    Process?

12   Q.    Yes.  How do you process it?

13   A.    It's a very simple operation.  You give
14 a credit card, you slide it through the
15 machine, it prints it out and then they sign
16 it.

17   Q.    Do you use an imprinter at your place?

18   A.    What do you mean imprinter?

19   Q.    A manual imprinter for some credit
20 cards or is it always electronic?

21   A.    Manual.

22   Q.    You use both manual and credit card --

23         MR. SAMORE:  I think you're getting
24 hung up on semantics.

29

1  BY MR. NORA:
2  Q. Do you know the old-fashioned kind of
3  credit card thing where you use the thumb
4  cruncher?
5  A. Oh, I see what you mean. Not really
6  that one. It's pretty much inside, you know.
7  Q. Have all of your credit card
8  transactions been done electronically through
9  the processing machine?
10  A. Not always.
11  Q. Now, when you just pass that credit
12  card through the machine, what happens?
13  A. You swipe the card and, of course, it
14  gives you a total and it prints out the
15  receipt.
16  Q. And when it prints out the receipt,
17  what do you do with the receipt?
18  A. We let the customer sign it.
19  Q. And when it prints out the receipt, are
20  there two copies of the receipt that are
21  printed out?
22  A. Yes.
23  Q. And the customer signs one of those
 two?

30

1  A. Yes.
2  Q. You keep that copy, correct?
3  A. One is for the customer. One is for
4  us.
5  Q. And the one the customer signs is for
6  you, correct?
7  A. Yes.
8  Q. You keep that one, correct?
9  A. Yes.
10  Q. What do you do with the other one?
11  A. The customer gets it.
12  Q. You give it to the customer?
13  A. Sure.
14  Q. Has that been your procedure since
15  2004?
16  A. Yes.
17  Q. What do you do with the one that you
18  keep, the signed receipt?
19  A. We save them all up and then we keep
20  them for a few months.
21  Q. What do you do with them then?
22  A. Then we dispose of them.
23  Q. Now, I understand National Translink is
24  not handling your credit card processing today;

31

1  is that correct?
2  A. Right.
3  Q. Who handles it for you today?
4  A. The name of the company is First Data.
5  Q. And do you have an agreement with First
6  Data?
7  A. Yes.
8  Q. And under that agreement, are you
9  required to keep your copies of the credit card
10  receipts for any period of time?
11  A. I don't recall. I don't recall because
12  I never actually -- I don't think so.
13  Q. Now, when the credit card is processed
14  through the credit card processing machine,
15  what bank does that information go to?
16  A. From that particular location?
17  Q. From the Berwyn location, yes, sir.
18  A. Probably goes in the company checking
19  account.
20  Q. And where is your company checking
21  account, sir?
22  A. I don't remember the exact name. I
23  can't think of it right now.
24  Q. Mr. Didiana, are you telling me you do

32

1  not recall the name of your checking account
2  bank?
3  A. I'm trying to think. You just want the
4  name of the bank; is that correct?
5  Q. Where does the money go to when you put
6  the credit card?
7  A. It goes to the checking account, but
8  the name of the bank I don't know offhand.
9  Does it say on there?
10  Q. But as far as you know, the bank that
11  acquires the money through the credit card
12  transaction would be the same bank that handles
13  your company checking account?
14  A. Yes.
15  Q. Is there only one company checking
16  account?
17  A. Yes.
18  Q. Who handles disbursements from your
19  company checking account?
20  A. My wife takes care of bills.
21  Q. Would you know the name of an
22  individual who handles your banking matters at
23  your bank?
24  A. At the tip of my head but not right

---

**33**

1 now, no, I can't think of any name.

2 Q. Would your wife be the person most

3 knowledgeable about that account?

4 A. Yes.

5 Q. Now, earlier we discussed how your wife

6 probably filled out the paperwork for getting

7 your contract with National Translink done

8 because she has the best handwriting, would she

9 know the most about how that contract was

10 negotiated and completed?

11 A. Yeah. Like I said, it's pretty simple

12 operation, you know. It's not -- it's a mom

13 and pop operation.

14 MR. SAMORE: Can we take a break for a

15 moment?

16 MR. NORA: Sure.

17 (Recess taken.)

18 BY MR. NORA:

19 Q. Now, we're going to talk about when you

20 learned there was a problem with truncation or

21 the information on the receipts, but before you

22 knew about that problem, did you or your wife

23 handle dealings with Translink or did both of

24 you handle them?

---

**34**

1 A. What do you mean when you say dealing?

2 Q. When you talked to them, corresponded

3 with them, if you had any problems with the

4 machine, who would be the person who would talk

5 to the folks at Translink, who?

6 A. If I was there, I will call or if my

7 son was there, he would call, you know.

8 Q. And how about your wife Chiara?

9 A. If she will be there, probably, yeah.

10 Like I say, she's never --

11 Q. So any family member who was handling

12 the store would have called?

13 A. Whoever was there at the time the

14 problem occurred, right.

15 Q. Now, after you started using that

16 machine at the Berwyn facility, until you

17 learned about the problem on truncation, the

18 credit card receipts showed the customer

19 account numbers; is that correct?

20 MR. SAMORE: Objection, lack of

21 foundation. You could answer the question.

22 BY THE WITNESS:

23 A. There were numbers on there. I don't

24 know what the numbers were, you know.

---

**35**

1 MR. SAMORE: You have to establish

2 whether he reviewed them and I mean you're

3 going way too quickly I think.

4 BY MR. NORA:

5 Q. When you started using the machine at

6 the Berwyn facility up to the time you learned

7 about the problem with truncation, to your

8 knowledge, did anything change about the way

9 the receipts were printed out and the

10 information on those receipts?

11 A. I'm getting a little -- rephrase the

12 question again.

13 Q. When you -- let's talk about the

14 receipts you started giving to the customers

15 when you first started using the machine.

16 A. Okay.

17 Q. Those receipts had some information on

18 them, correct?

19 A. Of course.

20 Q. And some of that information included

21 numbers, correct?

22 A. Of course.

23 Q. Did the information on those receipts

24 change in format or content in any way to your

---

**36**

1 knowledge before you learned there was a

2 truncation problem?

3 A. Not to my knowledge.

4 Q. Now, when you say you first knew of the

5 truncation problem --

6 A. We heard that somebody said something

7 to Oscar, something about these numbers,

8 truncation, what you call it and he brought it

9 to my attention.

10 Q. Let me repeat my question. When did

11 you learn of that problem?

12 A. As far as a date?

13 Q. As nearly as you can tell me.

14 A. From the dates, probably back in

15 October.

16 Q. Would that be 2007?

17 A. Yes.

18 Q. So between April of 2004 when you

19 started using that machine until October of

20 2007, the format on the customer receipts

21 remained unchanged; is that correct?

22 A. To my recollection, yes.

23 Q. And were you using the same credit card

24 processing service for your other store in

---

37

1 Melrose Park during that time?

2    A. Yes.

3    Q. Was the format of the credit card
receipts you were giving in the Melrose Park
5 facility the same as the format in your Berwyn
6 facility, if you know?

7      MR. SAMORE: I object and I instruct
8 the witness not to answer that question
9 because it's totally beyond the scope of the
10 this deposition and the legal issues in this
11 case.

12      MR. NORA: Its relevance is to the
13 witness' knowledge and scope of the
14 knowledge and notice and I'm going to ask
15 you to reconsider and let the witness
16 answer.

17      MR. SAMORE: Would you read the
18 question back?

19    (Record read as requested.)

20      MR. SAMORE: I have the objection.
21 I'll let the witness answer. Want to read
22 the question back to him one more time?

23    (Record read as requested.)

24

38

1 BY THE WITNESS:

2    A. I will have to look it up.

3 BY MR. NORA:

4    Q. Would you be able to look that up?

5    A. Probably.

6    Q. Now, between April of 2004 and October
7 of 2007 when you learned of this problem, how
8 many credit card transactions were you running
9 each week as nearly as you can tell?

10      MR. SAMORE: He doesn't want you to
11 guess or speculate. Give him your best
12 estimate if you can.

13 BY THE WITNESS:

14    A. On a daily?

15 BY MR. NORA:

16    Q. Daily or weekly, what was your credit
17 card volume like?

18    A. I'd say, I don't know, 10, 15 a day.

19    Q. Now, I want to ask you questions about
20 this meeting -- or this thing you learned from
21 Oscar Mendoza. As nearly as you can recall, it
22 was sometime in October of 2007; is that
23 correct?

24    A. Yes.

39

1    Q. And who did Oscar Mendoza first bring
2 this attention to at your store to your
3 knowledge?

4    A. Me.

5    Q. Where were you at this time?

6    A. The restaurant.

7    Q. Was he working at that time?

8    A. Yes.

9    Q. Who else was present when he brought
10 this to your attention?

11    A. Just me.

12    Q. Do you recall what time of day or night
13 it was?

14    A. Evening.

15    Q. And with his schedule, can you recall
16 what day of the week it was? I have to ask you
17 this.

18    A. I know, but -- I know it was in the
19 evening. I want to say maybe Tuesday,
20 Wednesday, something like that.

21    Q. Was it during working hours?

22    A. Yeah.

23    Q. Please tell me as much as you can
24 recall about what he said to you and you said

40

1 to him in this first meeting about the
2 truncation issue.

3    A. He said that one of the customers has
4 brought to his attention there was credit card
5 numbers on the receipt, that they're not
6 supposed to be there.

7    Q. Was the customer still there when he
8 told you this?

9    A. I don't recall.

10    Q. Now, on that night or evening, was he
11 handling the cash register?

12    A. Yes.

13    Q. What were you doing in the restaurant
14 that night?

15    A. Helping out.

16    Q. Helping out?

17    A. Helping out, working.

18    Q. I figured you were working. What were
19 you doing, were you in the kitchen, outside,
20 both places?

21    A. The kitchen.

22    Q. Now, when Oscar Mendoza told you that
23 one of the customers told him that the credit
24 card numbers were not supposed to be on the

41

1  receipt, what did you say to him?

2  A.  I said call Dominic my son and call the

3  credit card company and find out what the

4  situation is.

5  Q.  Did this information surprise you that

6  Oscar Mendoza gave you?

7  A.  Yes.

8  Q.  What was surprising about it?

9  A.  Unusual.  Why would somebody say

10  something that we don't know if it was a

11  problem.

12  Q.  What was it that you did not know

13  before that night?

14  A.  About the numbers that they were

15  mentioned.

16  Q.  Did it surprise you that there were

17  credit card numbers on the receipts?

18  A.  No.

19  Q.  You knew that there were credit card

20  numbers on the receipts, correct?

21  A.  I don't know if it was credit card

22  numbers or what, but it was the normal

23  procedure with the card.

24  Q.  Are you saying at that time you didn't

42

1  know if the credit card number itself was

2  appearing on the receipt?

3  A.  I know there's numbers on there.  They

4  should be the credit card numbers.

5  Q.  So to the best of your knowledge, at

6  that time the credit card numbers were

7  appearing on the receipt?

8  A.  Right.

9  Q.  And you're saying that at that time you

10  believe that was legitimate, correct?

11  A.  Up to then, yes.

12  Q.  So the thing that surprised you is the

13  information that you were not supposed to put

14  the entire credit card number on the receipt,

15  is that your statement?

16  A.  Well, we didn't know this until after

17  we talked to -- we found out about the problem

18  is when we called the credit card company.

19  MR. NORA:  Could you please repeat the

20  last question?

21  (Record read as requested.)

22  BY MR. NORA:

23  Q.  Is that your statement?

24  A.  What do you mean was I surprised?

43

1  Q.  The thing -- the new thing that you

2  learned that night was that the credit card

3  numbers were not supposed to be on the

4  receipt --

5  A.  Yes.

6  Q.  -- completely?

7  Did he say anything to you about the

8  expiration date in that conversation?

9  A.  No.

10  Q.  At that time, did you know if the

11  expiration date was allowed on the receipt?

12  A.  No.

13  Q.  On the receipts that you were handing

14  out up until that time, was the expiration date

15  appearing on the receipt?

16  A.  If they printed out, it should be, but

17  I don't -- I didn't -- I just get the receipt,

18  have them sign and that was it, you know.

19  Q.  Now, you told Oscar to call Dominic and

20  to call the credit card company?

21  A.  For Dominic to call the credit card

22  company.

23  Q.  And where was Dominic that evening when

24  you had this conversation with Oscar?

44

1  A.  Probably his day off.

2  Q.  Do you know if Oscar called Dominic?

3  A.  Sure, he did.

4  Q.  Did he call him right then?

5  A.  They're pretty good friends.

6  Q.  Did he call him then?

7  A.  This would happen at night so probably

8  the next morning he called him.

9  Q.  So you weren't present when he called

10  Dominic?

11  A.  No.

12  Q.  Did you talk to Dominic or Oscar next

13  after this conversation?

14  A.  Dominic.

15  Q.  Your next conversation was with

16  Dominic?

17  A.  Yes.

18  Q.  And when was that?

19  A.  Probably the next day.

20  Q.  Was that in person or on the phone?

21  A.  Person.

22  Q.  Was anyone else present during that

23  conversation?

24  A.  No.

45

1 Q. Where was that conversation?
2 A. At the restaurant.
3 Q. The Berwyn restaurant?
4 A. Yes.
5 Q. And what did Dominic say to you and
6 what did you say to him as nearly as you can
7 recall?
8 A. I asked him if Oscar would have
9 mentioned about the credit card machine and he
10 says yes and he called the Translink company.
11 Q. Dominic told you he had called
12 Translink?
13 A. Yes.
14 Q. Did he tell you anything else?
15 A. No. He said that they told him do some
16 numbers on the -- they walked him through steps
17 that was supposed to cut out the number.
18 Q. What did Dominic say next?
19 A. Well, it didn't work.
20 Q. Did Dominic tell you what he did when
21 it didn't work?
22 A. Yes. All the receipts that he started
23 getting, he was scratching off so they can't be
24 read to the customers or whatever the receipt

46

1 is supposed to go, that they couldn't make out
2 the numbers immediately.
3 Q. So in this conversation, Dominic told
4 you that he had called Translink, they had
5 given him instructions on reprogramming the
6 machine?
7 A. Yes.
8 Q. He followed the instructions?
9 A. Yes.
10 Q. And the instructions failed to correct
11 the problem?
12 A. Right.
13 Q. Dominic further told you he was now
14 scratching out the numbers on the receipt?
15 A. Yes.
16 Q. And was there a problem scratching out
17 the numbers on the receipt?
18 A. No.
19 Q. Did he tell you whether he called
20 Translink back about the failure --
21 A. He called them various times.
22 Q. Let me take it slowly okay because I
23 wasn't there.
24 A. That's all right.

47

1 Q. In this first conversation you had with
2 Dominic, had he talked to Translink once or
3 more than once at that time when you first
4 talked to Dominic?
5 A. Once.
6 Q. Now, did you tell Dominic to do
7 anything after he made this report to you?
8 A. Yes. I told him to call him back and
9 tell them it didn't work.
10 Q. Was this conversation during business
11 at night or during the day?
12 A. During the day.
13 Q. Did he call them back that day?
14 A. Yes.
15 Q. Were you present when he called them
16 back?
17 A. Yes.
18 Q. Did you hear his side of the
19 conversation?
20 A. Not the one that -- the people on the
21 phone. I listened to my son, yeah.
22 Q. You heard your son?
23 A. Yes.
24 Q. And could you tell during the

48

1 conversation what they were discussing?
2 A. Translink was doing the same thing,
3 making him punch in numbers, walking him again
4 through the procedure.
5 Q. Did you watch him punching in the
6 numbers?
7 A. Yes.
8 Q. And after he punched in the numbers,
9 what happened then?
10 A. Same thing, it was still doing what it
11 was doing before.
12 Q. Did he run a test while he was talking
13 to Translink on the phone?
14 A. Yes, they do.
15 Q. How did they run that test?
16 A. I guess through the phone line.
17 Q. And when that second attempt failed,
18 what happened next?
19 A. We tried to tell him -- I don't know if
20 they said they were going to send somebody out
21 or they could get somebody out, but in the
22 meantime we were using the credit card machine
23 but scratching the numbers off.
24 Q. So you continued using the same machine

49

1   but would scratch out the numbers?
2       A.   Right.
3       Q.   Were you scratching out the expiration
    date as well as the customer date at that time?
5       A.   Expiration date and the four digits or
6   five digits, whatever.
7       Q.   Would you leave four digits on the
8   number or would you scratch all of them out, if
9   you remember?
10      A.   That's what I'm saying, whatever was
11  supposed to be scratched off was.
12      Q.   Were you doing any of the receipts that
13  had to be scratched out?
14      A.   If it happened, sure.  If it happened
15  when I did that, yes.
16      Q.   So for awhile you had this problem
17  where you had to scratch it out manually?
18      A.   Yes.
19      Q.   And to the best of your recollection,
20  how many of the numbers did you scratch out or
21  if it's easier, tell me how many numbers you
22  left on the receipt?
23      A.   I think we scratched off from the one
24  side to this side the four or five of them,

50

1   whatever.
2       Q.   You would leave either four or five
3   numbers?
4       A.   Well, I guess you supposed -- the way
5   they saying, you're supposed to scratch off the
6   last -- I don't remember if it was the last
7   four or last five, something like that.
8       Q.   But you recall something about four or
9   five numbers?
10      A.   Yeah.
11      Q.   And you also scratched out the
12  expiration date during this time?
13      A.   Yes.
14      Q.   How did you first learn that the
15  expiration date was supposed to be kept off of
16  the receipt?
17      A.   Now we tried to get Translink, they
18  said that they were going to fix the problem or
19  whatever it was with the credit card machine
20  and that's when we actually learned it.
21      Q.   Would that have been in a conversation
22  with Dominic that your company learned of that
23  on the expiration dates?
24      A.   Say that again.

51

1       Q.   I'll rephrase it.  Was Dominic the
2   first person at your store who learned that the
3   expiration date should also be scratched out?
4       A.   I believe so.
5       Q.   As far as you can recall?
6       A.   Yeah.
7       Q.   Now, on this second day where you
8   watched Dominic doing the testing that was
9   unsuccessful, what was the next thing that you
10  understood was going to be done about this
11  problem?
12      A.   Like I say, we try to -- I don't
13  remember if they say they were going to send
14  somebody out or they're going to correct this
15  problem and we're waiting for them to correct.
16  In the meantime, we're using the machine,
17  scratching the numbers off and within awhile,
18  this is going back and forth, they haven't done
19  anything so we just went to a different credit
20  card company.
21      Q.   How long did that problem persist after
22  you brought it to Translink's attention?
23      A.   I don't exactly recall, but I would say
24  maybe the time there was -- by the time we find

52

1   the company and get the process going, a couple
2   weeks, ten days, I don't know.
3       Q.   Did you ever have a conversation with
4   Translink about this problem?
5       A.   Personally?
6       Q.   Yes.
7       A.   No.
8       Q.   Between April of 2004 when you started
9   using Translink on this machine at Berwyn and
10  the day Oscar Mendoza brought this problem to
11  you, had you brought any other problems with
12  the machine to Translink's attention?
13      A.   Not that I recall.
14      Q.   Did you have any conversations with
15  Translink during the service period with
16  Translink concerning anything on that machine?
17      A.   I don't recall, no.
18      Q.   So to the best of your recollection,
19  you never talked to anyone at Translink about
20  this machine or about the service that they
21  were providing at your store; is that correct?
22      A.   Because we never had no problems or
23  hardly any problems, you know.
24      Q.   So except for this incident, you had no

53

1 problems and you personally had no
2 conversations with Translink?
3    A. Yes.
     Q. Do you know of anyone else at your
5 store either Oscar Mendoza, a member of your
6 family or anyone else having a conversation
7 with Translink about the credit card processing
8 that was being done at the Berwyn store?
9    A. As far as what, you know what I mean?
10   Q. About anything, if you can recall?
11   A. I believe if there was a problem with
12 something, they would have called, but I don't
13 recall any problem.
14   Q. You don't know of any?
15   A. (Shaking head.)
16   Q. When you learned of this problem in
17 October of 2007, did you take any action
18 respecting the receipts that were being given
19 at your Melrose Park store?
20   A. What do you mean?
21   Q. Did you check the receipts that were
22 being given at the Melrose Park store?
23     MR. SAMORE: I'm going to instruct him
    not to answer that question. I don't see

54

1 any relevance.
2     MR. NORA: I'd ask you to reconsider.
3 I like to see if there's some corroboration
4 for the date of the discovery that would be
5 found at the other location.
6     MR. SAMORE: I don't see its relevance.
7 That's just too far afield. I'm going to
8 ask him not to answer that question.
9 BY MR. NORA:
10   Q. You're not going to answer that
11 question, sir?
12   A. No.
13   Q. Do you know, sir, if the Melrose Park
14 facility was using the same format on credit
15 card receipts as the Berwyn store between April
16 2004 and October 2007?
17   A. I would have to look it up.
18   Q. Was Translink being used at the Melrose
19 Park facility at that time?
    A. I don't recall, but I will have to look
21 it up.
22   Q. Is Translink being used there today?
23   A. No.
24   Q. Is First Data being used there today?

55

1   A. Yes.
2   Q. Sir, do you use credit cards?
3   A. Occasionally.
4   Q. And did you notice over the last five
5 or six years that credit card receipts started
6 to change and have Xs where the numbers on the
7 credit card accounts used to be?
8   A. No.
9   Q. You never noticed that?
10   A. I hardly use the credit card.
11   Q. Had you ever seen credit card
12 receipts -- let me start over.
13     Before Oscar Mendoza told you of this
14 problem, had you ever noticed credit card
15 receipts that had Xs where the account numbers
16 used to be?
17   A. No.
18   Q. Had you read anything up to this -- had
19 you learned anything about identity theft
20 before this time?
21   A. No. I've heard of it, but I never
22 learned anything occasionally.
23   Q. Do you belong to any business
24 associations?

56

1   A. No.
2   Q. Receive any business journals or
3 commercial journals?
4   A. We receive a lot of junk mail.
5   Q. Nothing you read?
6   A. No.
7   Q. Have you ever seen any material
8 provided by Visa or MasterCard instructing you
9 on how to handle credit cards?
10   A. No, not to my recollection.
11   Q. Do you have any agreements with Visa
12 and MasterCard?
13   A. The last question?
14   Q. Do you have any agreements or contracts
15 with Visa or MasterCard?
16   A. No, just the credit card company.
17   Q. Do you have any set of instructions on
18 proper usage of your credit processing machine
19 from First Data?
20   A. What do you mean instructions?
21   Q. Have they provided you any written
22 material on their service and the use of that
23 machine?
24   A. I'm sure it comes with directions, you

57

1 know. As I said before, it's a pretty simple
2 operation, put in the phone line and you call
3 it in and they walk you through the process and
4 that should be it.
5    Q. Now, after -- did Translink ever come
6 out to service the machine while they were --
7 after you brought this problem to their
8 attention?
9    A. No.
10    Q. Did anyone with your company contact
11 Translink about this problem other than
12 Dominic?
13    A. Sure.
14    Q. Who was that?
15    A. My son Pasquale.
16    Q. Who?
17    A. Pasquale, P-a-s-q-u-a-l-e.
18    Q. And when did Pasquale contact
19 Translink?
20    A. I know it was after we learned about
21 the problem that was going on.
22    Q. Were you present when he contacted
23 them?
24    A. No.

58

1    Q. Did he tell you anything about his
2 contact with Translink?
3    A. Yeah.
4    Q. How many times, if you recall, did he
5 contact Translink about this problem?
6    A. I'd say a few times.
7    Q. What do you recall Pasquale telling you
8 about his contacts with Translink?
9    A. They weren't being very cooperative.
10 They couldn't take care of the problem. They
11 couldn't send somebody out so it really got
12 aggravating.
13    Q. Other than that second day when you saw
14 Dominic trying his second attempt to punch in
15 numbers, did they ever give you other tests or
16 procedures to follow to reprogram the machine?
17    A. I'm sure they did.
18    Q. Were you present during any of those?
19    A. No.
20    Q. And you replaced them with First Data,
21 is that the name?
22    A. Yes.
23    Q. And would your contracts with First
24 Data show when that service started?

59

1    A. Sure.
2    Q. And between learning of this problem in
3 October or so from Oscar and the start of First
4 Data, you truncated the customer receipts by
5 manually crossing out the numbers, correct?
6    A. Yes.
7    Q. And you had never done that before
8 learning of this problem from Oscar?
9    A. Yes.
10    Q. And you've given me the names of all
11 the people who would have handled --
12    A. Yes.
13    Q. -- customer credit cards during that
14 time?
15    A. Yes.
16    Q. That's the only machine that was used
17 during that time, correct?
18    A. Yes.
19    Q. Tell me, sir, when -- did you ever
20 have -- accept a credit card and later learn
21 the credit card was bad and the money wasn't
22 going to be put into your checking account?
23    A. The machine tells you right there.
24    Q. So if the machine accepted it, it was

60

1 good, correct?
2    A. Yes. They give approval right there on
3 the transaction.
4    Q. Did you accept any credit card numbers
5 over the phone for take-out orders or
6 otherwise?
7    A. I would say occasionally.
8    Q. Was that rare?
9    A. Very rare.
10    Q. Was that only with a known customer?
11    A. Most likely.
12    Q. So for virtually all of the
13 transactions, it was just the simple swipe
14 mechanism, correct?
15    A. Mostly, yes.
16    Q. And all of that work was done through
17 Translink before the Oscar Mendoza report,
18 correct?
19    A. Yes.
20    Q. Let me wrap it up. Have you been using
21 the same bank for your checking account since
22 April 2004 for that store?
23    A. I'm pretty sure, yeah, and I got the
24 name of the -- I remember the name of the bank,

**61**

1  Standard Bank.
2  **Q.**  If you know, is Standard Bank the bank
3  that acquires the funds from the credit card
4  companies and then sends them to your checking
5  account, if you know?
6  **A.**  It's a process, yeah.
7  **Q.**  Now, how many Bacci Pizzerias are there
8  in the city?
9  **A.**  A lot.
10  **Q.**  And are they generally owned by the
11  Didiana family?
12  **A.**  Some of them are.
13  **Q.**  Are most of them?
14  **A.**  Some of them.
15  **Q.**  I'm sorry, would more than half of them
16  be owned by members of the Didiana family?
17  **A.**  It's all individually owned.
18  **Q.**  Would more than half of those
19  individuals be members of the Didiana family?
20  **A.**  Probably.
21  **Q.**  After, and I'm looking for
22  corroboration as to bolster your report --
23  **A.**  I am cooperating.
24  **Q.**  When you learned of this from Oscar

**62**

1  Mendoza, did you bring this new information to
2  any other business associates, companies or
3  acquaintances to alert them to this new
4  information that you found out about?
5  **A.**  I'm pretty sure we talked about it, you
6  know.
7  **Q.**  Who did you talk to about it?
8  **A.**  Family.
9  **Q.**  And did anyone that you speak to say,
10  yes, we knew about that?
11  **A.**  No.
12  **Q.**  Now, I imagine for the most part you
13  have regular contacts with other Bacci Cafe`
14  owners, correct, some you may not talk to as
15  much?
16  **A.**  A lot of them I don't talk to.
17  **Q.**  But up until October of 2007,
18  absolutely no conversations with anyone and you
19  respecting truncation of credit card receipts;
20  is that correct?
21  **A.**  Never knew about it.
22  **Q.**  And you've discussed this truncation
23  problem with Chiara, Dominic, Pasquale and
24  Oscar Mendoza --

**63**

1  **A.**  Of course.
2  **Q.**  -- numerous times since October 2007,
3  correct?
4  **A.**  Yes.
5  **Q.**  Have any of them told you that they
6  knew of the truncation requirements or problems
7  before October 2007?
8  **A.**  No.
9  **Q.**  Has any of them told you that they had
10  a conversation with Translink about any
11  problems on the customer cash receipts -- or
12  customer credit card receipts?
13  **A.**  No.
14  **Q.**  Have you told me everything you can
15  recall about the problems with Translink and
16  the communications between your store and
17  Translink about that problem?
18  **A.**  Are we talking about this problem?
19  **Q.**  About the problem of truncation, yes.
20  **A.**  Say the question.
21  **Q.**  Have you told me everything you recall
22  about dealing with Translink on this problem?
23  **A.**  To the best of my knowledge and if we
24  would have known this was a problem, we would

**64**

1  have got this other company way before.  We
2  wouldn't have waited until -- you know.
3  **Q.**  And the machine that you put into
4  service at the Berwyn store, in your answers to
5  interrogatory you say you did it when that
6  restaurant was purchased, that restaurant was
7  the restaurant in Melrose Park, correct?
8  **A.**  I lost --
9  **Q.**  I just want to get this question -- on
10  answer number 2 which you looked at earlier
11  before, you say the first credit card
12  processing machine was acquired when the
13  restaurant was purchased in April of 2005.
14  Now, here you're talking about the first credit
15  card processing machine you put in Berwyn,
16  correct?  The machine we're talking about here
17  is the machine you put in Berwyn, correct?
18  **A.**  Right.
19  **Q.**  And the restaurant that was purchased
20  in April of 2005 is the Melrose Park
21  restaurant, correct?
22  **A.**  We might be wrong on the year.
23  **Q.**  Okay.  The year to the best of your
24  recollection today was actually 2004, correct?

**65**

1    A.  I'm getting mixed up with the date.

2    MR. SAMORE:  I can't answer for you.

3    THE WITNESS:  When I bought the

4  restaurant in Melrose, that's when I got the

5  machine and I don't remember if it was 2004

6  or 2005, you know what I mean?

7    MR. SAMORE:  You have to answer to the

8  best of your recollection.  If you're not

9  sure of the exact year --

10 BY THE WITNESS:

11   A.  I'm not sure of the exact date.

12 BY MR. NORA:

13   Q.  Whether it was April 2004 or April

14 2005, we're talking about the purchase of the

15 Melrose Park restaurant, correct?

16   A.  Right.

17   Q.  And we're talking about the first

18 credit card machine installed in the Berwyn

19 store, correct?

20   A.  Correct.

21   Q.  And both of those things, the purchase

22 of Melrose Park and the start of the use of the

23 machine in Berwyn were in the same month,

24 correct?

**66**

1    A.  To my best recollection, yeah, give or

2  take a little time or whatever, but yeah.

3    Q.  Certainly the same year, correct?

4    A.  Yes.

5    Q.  So if the store was purchased in 2004,

6  that would have been the year you started using

7  Translink and the machine, correct?

8    A.  Uh-huh.

9    Q.  Yes?

10   A.  Right.

11   Q.  And, of course, the reverse for 2005?

12   A.  Yes.

13   Q.  Okay.  One last question, sir -- I

14 shouldn't say that because it never turns into

15 one last question, but I'll try to be brief.

16 Earlier you approximated doing 10 to 15 credit

17 card transactions a day, correct?

18   A.  Possibly.

19   Q.  Is it also possible that you were doing

20 100 to 200 credit card transactions a week to

21 the best of your recollection?

22   A.  To my best of my recollection, could

23 be.  I don't know.

24   MR. NORA:  That's it.

**67**

1    MR. SAMORE:  Okay.  We'll reserve

2  signature and you're a free man now.  I have

3  no questions.

4    (Witness excused.)

5    FURTHER DEPONENT SAITH NOT

**68**

1  IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
  COUNTY DEPARTMENT, CHANCERY DIVISION

2

3  CHRISTOPHER D. SHURLAND,  )
  individually and as the    )

4  representative of a class of )
  similarly-situated persons,  )

5            )
    Plaintiffs,    )

6            )
  vs.      ) No. 08 CH 10786

7            )
  BACCI CAFE` & PIZZERIA ON  )

8  OGDEN, INC., and DOES 1-10,  )
          )

9      Defendants.    )

10   I, VINCENT DIDIANA, being first duly

11 sworn, on oath say that I am the deponent in

12 the aforesaid deposition taken on December 9,

13 2008; that I have read the foregoing transcript

14 of my deposition, consisting of pages 1 through

15 67 inclusive, and affix my signature to same.

16   _____ as it now appears

17   _____ as it now appears with corrections

18

19

      _____

20         VINCENT DIDIANA

21

22 SUBSCRIBED AND SWORN TO
  before me this _____ day

23 of _____, 2008.

24   _____
    Notary Public